**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROOFERS LOCAL NO. 149 PENSION FUND, on behalf of itself and all others similarly situated, | Case No. |
| Plaintiff, | COMPLAINT -- CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| GSK PLC, EMMA N. WALMSLEY, VICTORIA WHYTE, and IAIN MACKAY, | |
| Defendants. | |

Plaintiff Roofers Local No. 149 Pension Fund ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, inter alia, the investigation of its counsel, which included review and analysis of: (i) regulatory filings made by GSK plc ("GSK" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst and media reports concerning GSK; (iv) legal documents filed in court by GSK; and (v) other public information regarding the Company.

## INTRODUCTION

1.        This securities class action is brought on behalf of all purchasers of the American Depositary Receipts ("ADRs") of GSK between February 5, 2020, and August 14, 2022, inclusive (the "Class Period"). The claims asserted herein are alleged against GSK and certain of the Company's current and former senior executives (collectively, "Defendants"), and arise under

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      GSK is a global pharmaceutical company that develops, manufactures, and markets vaccines and medicines worldwide. Current best-selling GSK products include Trelegy Ellipta, an inhaler used to treat asthma, and Shingrix, a vaccine that protects against shingles. For many years, however, GSK's most lucrative product was a popular treatment for heartburn and acid reflux: Zantac.

3.      Zantac was the brand name for the drug ranitidine, which was developed in 1976 by Glaxo, a predecessor company to GSK. Glaxo began selling Zantac in Europe in 1981 and in the United States in 1983. By 1987, it was the world's best-selling drug. Over the next two decades, Zantac was used by millions of patients and generated billions of dollars for Glaxo and GSK. GSK continued to market Zantac in the U.S. until 2017.

4.      From the time Zantac launched in the U.S., Glaxo and GSK were in possession of an internal Company report which showed that ranitidine could create a highly carcinogenic compound called N-nitrosodimethylamine ("NDMA"). Specifically, in 1982, Glaxo scientist Richard Tanner found that, under testing conditions promulgated by the World Health Organization, ranitidine interacted with nitrites, a common chemical found in many foods, to create 232,000 nanograms of NDMA. The U.S. Food and Drug Administration ("FDA") would later determine that the recommended acceptable intake was 96 nanograms—less than 0.05% of what Dr. Tanner had found.

5.      Glaxo buried Dr. Tanner's resulting report. Its successor company, GSK, kept that report buried. In 2019, independent laboratory Valisure tested Zantac under similar conditions and found NDMA in "every batch of every medication" that it tested. Valisure reported these results

to the FDA and to the public. In September and October 2019, GSK suspended its distribution of Zantac and initiated a voluntary recall. In April 2020, the FDA requested that manufacturers cease selling Zantac and any generic alternatives.

6. Tens of thousands of cancer-stricken patients filed personal injury and product liability lawsuits against GSK in the years that followed. Many of these were unified into a multidistrict litigation proceeding ("Zantac MDL"). In October 2024, GSK reached an agreement with a group of approximately 80,000 plaintiffs, settling 93% of the remaining Zantac litigation.

7. Throughout the Class Period, Defendants represented to investors that GSK removed Zantac from the market "[b]ased on information available at the time and correspondence with regulators." GSK also stated that it was "continuing with investigations into the potential source of NDMA." Defendants also assured investors that "GSK, the FDA, and the EMA [European Medicines Agency] have all independently concluded that there is no evidence of a causal association between ranitidine therapy and the development of cancer in patients," findings that were "consistent with other ranitidine data published prior to 2019." Finally, Defendants claimed that they could not "quantify or reliably estimate the liability."

8. These representations were materially false or misleading. In truth, GSK was fully aware of the source of NDMA and had been for nearly 40 years before withdrawing Zantac from the market. While Defendants asserted that "data published prior to 2019 claims" failed to establish a link between Zantac and cancer, they failed to disclose that GSK possessed unpublished data – the Tanner Report – that did exactly that. Furthermore, the representations about Defendants' ability to "quantify or reliably estimate the liability" deceived investors, who did not know that GSK had for decades concealed an internal study that implicated the Company's liability to Zantac users.

9.      On August 10, 2022, a Deutsche Bank report alerted the market that it seemed "very possible" that GSK and other Zantac distributors "will incur the risk of some degree of shared liability, with the only real questions being what the magnitude of liability may be." Whereas GSK claimed repeatedly to investors that the scientific research did not support a correlation between Zantac and cancer, meaning that the Company did not face significant liability, the Deutsche Bank report forecasted that the total liability could be between $5 billion and $10 billion. As the market absorbed this information, the price of GSK ADRs declined by $4.30 per ADR, or more than 10%.

10.     The price of GSK ADRs declined further on August 15, 2022, when GSK admitted that it could, in fact, provide guidance and that its liability exposure was between $1 billion and $10 billion. The eventual settlement of $2.2 billion fell squarely in that range. These disclosures caused GSK ADRs to decline an additional $1.08 per ADR, or 3%. The eventual settlement of $2.2 billion fell squarely in that range.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because the acts and transactions giving rise to the violations of law complained of herein occurred in part in this District, including the dissemination of false and misleading statements into this District. GSK maintains its United States headquarters in Philadelphia, Pennsylvania, which is situated in this District.

13.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff Roofers Local 149 Pension Fund, as indicated in the certification submitted herewith, purchased GSK ADRs at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

15.     Defendant GSK is a multinational pharmaceutical company headquartered in London. The Company's ADRs, each representing two shares of GSK common stock, trade on the New York Stock Exchange under the ticker symbol "GSK." As of February 23, 2024, over 416 million GSK ADRs were outstanding, owned by hundreds or thousands of investors.

16.     Defendant Emma N. Walmsley ("Walmsley") has served as Chief Executive Officer of GSK since April 2017.

17.     Defendant Victoria Whyte ("Whyte") has served as GSK's Company Secretary since 2011.

18.     Defendant Iain Mackay ("Mackay") served as GSK's Group Chief Financial Officer from January 2019 to April 2023.

19.     Defendants Walmsley, Whyte, and Mackay are sometimes referred to herein as the "Individual Defendants."

20.     The Individual Defendants possessed the power and authority to control the contents of GSK's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of GSK's SEC filings and press releases alleged herein to

be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with GSK, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## BACKGROUND

21.     GSK is the world's tenth largest pharmaceutical company, realizing over $35 billion in revenue each year. Through a series of mergers, GSK came to control Zantac, a medication used to treat acid reflux and heartburn. Before it was pulled off the market, Zantac was prescribed more than 15 million times per year, making it, at one point, the highest selling drug in the world.

22.     NDMA is a known carcinogen. In 1982, GSK's predecessor prepared an internal report that found that Zantac could combine with certain foods to create large quantities of NDMA. The findings of that report were not shared with the FDA or disclosed to investors or consumers. To the contrary, prior to the start of the Class Period, GSK assured investors that Zantac use was not correlated to cancer. For example, an October 2019 article in *Scientific American* quoted GSK as saying that "extensive pharmacovigilance monitoring, regular safety reviews and substantive epidemiological studies have not linked ranitidine to raised cancer risks." In the Fall of 2019, however, an independent testing laboratory identified quantities of NDMA in Zantac and notified the FDA. On November 1, 2019, the FDA published a recommendation advising manufacturers to voluntarily recall Zantac.

6

## DEFENDANT'S MATERIALLY FALSE AND MISLEADING STATEMENTS

23.    The Class Period begins on February 5, 2020, when GSK issued a press release discussing the Company's financial results for the full year and fourth quarter of 2019. In that release, GSK stated that, "[b]ased on the information received to date and correspondence with regulators, the Group made the decision in September 2019 to suspend the release, distribution and supply of all dose forms of *Zantac* to all markets pending the outcome of the ongoing tests and investigations." GSK also claimed that it was "continuing with investigations into the potential source of NDMA." That same day, GSK filed a copy of the press release with the SEC on Form 6-K, signed by Defendant Whyte.

24.    On March 6, 2020, GSK published its annual report for the year ending December 31, 2019. It reiterated that it had withdrawn Zantac from the market as "precautionary action," "[b]ased on information received and correspondence with regulatory authorities." GSK assured investors that it was "continuing to work with" regulators, including the FDA, while those regulatory authorities "reviewed the findings and/or [were] conducting their own tests" regarding NDMA in Zantac. That same day, GSK filed a copy of the annual report with the SEC on Form 20-F, signed by Defendant Mackay. Attached to the Form 20-F were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Walmsley and Mackay.

25.    On April 1, 2020, the FDA requested removal of all ranitidine products from the market. At that time, the FDA advised that "the impurity in some ranitidine products increases over time and when stored at higher than room temperatures and may result in consumer exposure to unacceptable levels of this impurity. . . . These conditions may raise the level of NDMA in the ranitidine product above the acceptable daily intake limit."

26.    On July 29, 2020, GSK issued its financial results for the first half of 2020. In its press release, GSK informed investors that it had received a Civil Investigative Demand from the

U.S. Department of Justice ("DOJ") seeking information regarding Zantac and that the Company was "co-operating with the DOJ to provide this information." GSK also claimed that "[t]he ultimate liability for legal claims may vary from the amounts provided and is dependent upon the outcome of litigation proceedings, investigations and possible settlement negotiations." That same day, GSK filed a copy of the press release with the SEC on Form 6-K, signed by Defendant Whyte.

27.    On September 28, 2020, GSK filed a report reiterating its financial results for the first half of 2020. This report repeated, word-for-word, the statements identified in paragraph 26 above. That same day, GSK filed a copy of the report with the SEC on Form 6-K, signed by Defendant Mackay.

28.    On March 8, 2022, GSK published its annual report for the year ending December 31, 2021. In the annual report, GSK stated that "it is not possible to meaningfully assess whether the outcome [of significant legal proceedings] will result in a probable outflow, or to quantify or reliably estimate the liability, if any, that could result from ultimate resolution of the proceedings." This language was repeated four times in the annual report but was not present in any previous year's report. That same day, GSK filed a copy of the annual report with the SEC on Form 20-F, signed by Defendant Mackay. Attached to the Form 20-F were certifications pursuant to SOX signed by Defendants Walmsley and Mackay.

29.    In a circular issued to shareholders on June 1, 2022, GSK stated that "[b]ased on information available at the time and correspondence with regulators," GSK had decided to withdraw Zantac from the market "pending the outcome of the ongoing tests and investigations." That same day, GSK filed a copy of the circular with the SEC on Form 6-K, signed by Defendant Whyte.

30.     On June 23, 2022, GSK and other defendants in the Zantac MDL moved to exclude certain opinions by plaintiffs' experts. In this public filing, GSK stated that "11 peer-reviewed epidemiology studies" found no "association, much less a causal association, between ranitidine use and any type of cancer." Additionally, GSK claimed that these findings were "consistent with other ranitidine data published prior to 2019, showing that there is no valid association between ranitidine use and the five cancers Plaintiffs allege."

31.     On July 27, 2022, during a conference call with analysts, GSK was asked to comment on the ongoing Zantac litigation, including "generally your stance on the topic and whether or not you could quantify what portion of any liabilities" the Company faced. Defendant Mackay referred the questioner to GSK's 2021 annual report, which contained the statements identified in paragraph 28 above.

32.     The statements set forth above in paragraphs 23-24 and 26-31 were materially false and misleading, and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.

## THE TRUTH EMERGES

33.     On August 10, 2022, Deutsche Bank reported that it was "very possible" that GSK and other Zantac distributors "will incur the risk of some degree of shared liability, with the only real questions being what the magnitude of liability may be." The Deutsche Bank report estimated liability for the group to be between $5 and $10 billion.

34.     As a result of these disclosures, the price of GSK ADRs declined by $4.30 per ADR, or more than 10%, over multiple trading days, from a closing price of $40.03 on August 9, 2022, to a closing price of $35.73 on August 11, 2022.

35.     Analysts shared the market's negative reaction. "GSK's shares have fallen . . . over concerns around litigation which focuses on the potential link between a drug called Zantac and cancer," wrote an analyst for Goodbody. An analyst for Credit Suisse wrote that "[i]nvestor interest has increased sharply in the ongoing Zantac product liability litigation with the first trial expected to start at the end of August 2022." An analyst for J.P. Morgan noted that "GSK is likely to have the clearest evidence linking Zantac use to individual named patients, given GSK sold the product on a prescription basis from 1983."

36.     GSK responded on August 11, 2022, when it released a statement regarding the Zantac MDL. In this press release, GSK asserted that "GSK, the FDA, and the EMA have all independently concluded that there is no evidence of a causal association between ranitidine therapy and the development of cancer in patients." GSK stated that epidemiological studies resulted in the "scientific consensus is that the totality of the reliable evidence does not support that ranitidine increases the risk of any type of cancer." GSK elaborated that "the EMA's comprehensive review of epidemiological and post marketing data concluded there is 'no evidence of a causal association between ranitidine therapy and the development of cancer in patients,'" and that "the FDA reported that its testing did not support that ranitidine is converted to NDMA in a general, healthy population, and after reviewing the epidemiological studies found that '…no consistent signals emerged across studies, and studies with comparison to active controls found no association between ranitidine and overall or specific cancer risk.'" (Ellipsis in original). Furthermore, GSK claimed that "[t]he overwhelming weight of the scientific evidence supports the conclusion that there is no increased cancer risk associated with the use of ranitidine," and that "[s]uggestions to the contrary are therefore inconsistent with the science."

37.    In the same statement, GSK also discussed ongoing product liability litigation concerning Zantac. The Company asserted that "[p]laintiff litigation [is] inconsistent with the scientific consensus," and that "GSK will vigorously defend all claims." GSK filed a copy of the statement with the SEC on Form 6-K on August 12, 2022, signed by Defendant Whyte.

38.    The statements set forth above in paragraphs 36-37 were materially false and misleading, and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.

39.    The following Monday, on August 15, 2022, GSK held a phone call with research analysts to discuss the Zantac litigation. According to notes taken by an analyst for Credit Suisse, GSK was specifically asked if its potential exposure was in the mid-billions of dollars. In response, GSK said analysts had predicted "total exposure low billions to multiple 10s. Think multiple 10s of billions not likely"—an admission that it believed exposure was in the $1 billion to $10 billion range.

40.    As news of what was discussed on the phone call was absorbed by the market, the price of GSK ADRs declined an additional $1.08 per ADR, or 3%, from a closing price of $36.03 on August 12, 2022 to a closing price of $34.95 on August 15, 2022. All told, these disclosures erased nearly $2.3 billion in shareholder value.

## LOSS CAUSATION

41.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

42.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of GSK ADRs and operated as a fraud or deceit on the Class (defined

below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of GSK ADRs declined significantly as the prior artificial inflation came out of the price over time. As a result of their purchases of GSK ADRs during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

43.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of GSK ADRs during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of GSK and their families and affiliates.

44.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of February 23, 2024, over 416 million GSK ADRs were outstanding, owned by hundreds or thousands of investors.

45.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.    Whether Defendants violated the Exchange Act;

b.    Whether Defendants omitted and/or misrepresented material facts;

c.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.    Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

e.    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

f.    Whether Defendants' conduct impacted the price of GSK ADRs;

g.    Whether Defendants' conduct caused the members of the Class to sustain damages; and

h.    The extent of damages sustained by Class members and the appropriate measure of damages.

46.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

47.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

48.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

**<u>INAPPLICABILITY OF STATUTORY SAFE HARBOR</u>**

49.    To the extent that any of the alleged false statements described in this Complaint were forward-looking, GSK's "Safe Harbor" warnings accompanying any purportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

50.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking

statements because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of GSK who knew the statement was false or misleading. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or statements of future economic performance made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

51.     At all relevant times, the market for GSK ADRs was an efficient market for the following reasons, among others:

        a.      GSK ADRs met the requirements for listing, and were listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

        b.      As a regulated issuer, GSK filed periodic public reports with the SEC and the New York Stock Exchange;

        c.      GSK regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

        d.      GSK was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

52.     As a result of the foregoing, the market for GSK ADRs promptly digested current information regarding GSK from all publicly available sources and reflected such information in the price of GSK ADRs. Under these circumstances, all purchasers of GSK ADRs during the Class Period suffered similar injury through their purchases of GSK ADRs at artificially inflated prices and the presumption of reliance applies.

53.     Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves a failure to disclose material adverse information regarding GSK business and operations—information that was required to be disclosed—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Zantac to the overall Company and the impact that its discontinuation could have on the Company's near-term and long-term financial condition, that requirement is satisfied here.

## CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
Against All Defendants**

54.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

55.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase GSK ADRs at artificially inflated prices.

56.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of GSK ADRs in an effort to maintain artificially high market prices for GSK ADRs in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder.

57.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

58.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal GSK's true condition from the investing public and to support the artificially inflated prices of GSK ADRs.

60.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GSK ADRs. Plaintiff and the Class would not have purchased GSK ADRs at the prices they paid, or at all, had they been aware that the market prices for GSK ADRs had been artificially inflated by Defendants' fraudulent course of conduct.

61.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of GSK ADRs during the Class Period.

62.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

63.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of GSK within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about GSK, the Individual Defendants had the power and ability to control the actions of GSK and its employees. By reason of this conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: February 4, 2025

Respectfully submitted,

*s/ Ryan T. Degnan*
Ryan T. Degnan (PA #309305)
**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Naumon A. Amjed (PA #309520)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
rdegnan@ktmc.com
namjed@ktmc.com

*Liaison Counsel for Plaintiff Roofers Local No. 149 Pension Fund*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Hannah Ross
Avi Josefson
Scott R. Foglietta
1251 Avenue of the Americas
New York, NY 10020

Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
scott.foglietta@blbglaw.com

*Counsel for Plaintiff Roofers Local No. 149 Pension Fund*

**ASHERKELLY, PLLC**
Lyndsey K. Bates
25800 Northwestern Highway, Suite 1100
Southfield, MI 48075
Telephone: (248) 746-2710
lbates@asherkelly.com

*Additional Counsel for Plaintiff Roofers Local No. 149 Pension Fund*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

       I, Brian Moore, on behalf of Roofers Local No. 149 Pension Fund ("Local 149"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of Local 149.  I am authorized to sign this certification on its behalf.  I have reviewed the complaint and authorize its filing.

2. Local 149 did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Local 149 is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Local 149's transactions in the GSK plc securities that are the subject of this action are set forth in the chart attached hereto.

5. Local 149 has served as a representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Amgen Inc. Securities Litigation*,
No. 23-cv-2138 (S.D.N.Y.)

6. Local 149 will not accept any payment for serving as a representative party on behalf of the class beyond Local 149's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

       I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.  Executed this 3rd day of February, 2025.

Signed by:

*Brian Moore*

1B3C13C7354C485...

Brian Moore, Chairman
*Roofers Local No. 149 Pension Fund*

**Roofers Local No. 149 Pension Fund**
**Transactions in GSK plc**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 1/22/2021 | 3,788 | 38.3876 |
| Purchase | 1/25/2021 | 13,447 | 38.7697 |
| Purchase | 5/5/2022 | 10 | 44.3770 |
| | | | |
| Sale | 3/16/2021 | (3,423) | 36.3729 |
| Sale | 8/2/2022 | (0.6) | 41.7000 |