# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROOFERS LOCAL NO. 149 PENSION FUND, on behalf of itself and all others similarly situated, | Case No. 2:25-cv-00618-CFK |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **JURY TRIAL DEMANDED** |
| GSK PLC, EMMA N. WALMSLEY, and IAIN MACKAY, | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF ABBREVIATIONS AND DEFINED TERMS ........................................................ iv

I.     INTRODUCTION ...................................................................... 1

II.    JURISDICTION ........................................................................ 8

III.   PARTIES ................................................................................... 9

     A.    Lead Plaintiffs ................................................................. 9

     B.    Defendants .................................................................... 10

IV.   OVERVIEW OF THE FRAUD ........................................... 13

     A.    Background ................................................................... 13

           1.    Before Zantac's Introduction To the Market, GSK Knew from Its Own Studies That Ranitidine Degraded into a Carcinogen ..................... 13

           2.    GSK Manufactured and Sold Zantac from 1982 to 2017, Reaping Tens of Billions of Dollars in Profits, and Transforming GSK into One of the Largest Companies in the World ............................................. 13

     B.    GSK Concealed Zantac's Cancer Risk for Nearly 40 Years ............................... 15

           1.    GSK Has Known Since 1982 That Zantac Forms NDMA ...................... 15

           2.    NDMA Is a Carcinogen ........................................................ 20

           3.    After Being Concealed for 36 Years, Zantac's Degradation into NDMA Was Fortuitously Confirmed by an Independent Laboratory ...................................................................... 25

           4.    When Asked Directly by the FDA and EMA in 2019 Whether It Had Test Results Showing that Zantac Degrades into NDMA, such as the Tanner Study, GSK Falsely Claimed That It Did Not ............................ 26

     C.    Amid Global Recalls, Defendants Falsely Claimed That Determining the "Source of NDMA" in Zantac Required New Investigation ................................ 28

           1.    In Late 2019 and Early 2020, Zantac Is Permanently Recalled in the U.S. and Globally ........................................................... 28

|  |  | 2. | GSK Said It Was Investigating the "Source of NDMA" in Ranitidine Even Though It Had Known Since 1982 That NDMA Formed in Zantac Under Normal Storage and Use .................................................. 30 |

|  | D. | Defendants Falsely Downplayed GSK's Exposure to Zantac Litigation............. 31 |

|  |  | 1. | GSK Is Sued in the U.S. by Tens of Thousands of Cancer Patients........ 31 |

|  |  | 2. | Until March 2021, GSK Says Its Exposures to the Risks of Patient Safety and Product Quality Are "Unchanged" ......................................... 33 |

|  |  | 3. | GSK Made Public Statements in Litigation That Misled Investors.......... 35 |

|  | E. | Defendants Falsified GSK's Financial Statements by Failing to Recognize a Provision or Contingent Liability for Its Zantac Litigation Exposure .............. 36 |

|  |  | 1. | Background on IFRS................................................................................. 37 |

|  |  | 2. | IAS 37 Requirements for Contingent Liabilities ..................................... 38 |

|  |  | 3. | Violating IFRS and IAS 37, GSK Failed to Take Any Accounting Provision for Zantac ................................................................................. 41 |

|  |  | 4. | GSK Also Failed to Disclose a Contingent Liability for Its Zantac Litigation Exposure ................................................................................. 46 |

| V. | THE RELEVANT TRUTH EMERGES ........................................................................... 47 |

| VI. | POST-CLASS PERIOD DEVELOPMENTS ................................................................... 52 |

| VII. | ADDITIONAL ALLEGATIONS OF SCIENTER ........................................................... 55 |

| VIII. | DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 63 |

|  | A. | Materially False and Misleading Statements Concerning GSK's Representation That the "Source of NDMA" in Zantac Was Unknown .............. 64 |

|  | B. | Materially False and Misleading Statements Concerning Risk Management ....................................................................................................................................... 65 |

|  | C. | Materially False and Misleading Public Statements Made by GSK in the MDL Litigation ....................................................................................................... 67 |

|  | D. | Materially False and Misleading Statements Concerning GSK's Accounting for Zantac Litigation Exposure ............................................................................ 72 |

| IX. | LOSS CAUSATION ........................................................................................................ 77 |

| X. | ADDITIONAL ALLEGATIONS OF TIMELINESS ...................................................... 79 |

XI.     CLASS ACTION ALLEGATIONS ........................................................ 81

XII.    THE STATUTORY SAFE HARBOR DOES NOT APPLY ........................... 83

XIII.   A PRESUMPTION OF RELIANCE APPLIES ..................................... 83

XIV.   CLAIMS FOR RELIEF ................................................................. 85

      COUNT I ...................................................................................... 85

         Section 10(b) of the Exchange Act and Rule 10b-5(b) Against All Defendants ........ 85

      COUNT II ..................................................................................... 87

         Section 10(b) of the Exchange Act and Rule 10b-5(a), (c) Against All Defendants ................................................................................. 87

      COUNT III .................................................................................... 89

         Section 20(a) of the Exchange Act Against the Individual Defendants ..................... 89

XV.    PRAYER FOR RELIEF .................................................................. 90

XVI.   JURY TRIAL DEMAND ................................................................. 90

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

| Term/Abbreviation | Definition |
|---|---|
| ADR | American Depositary Receipt |
| Bloomberg Article | Article published by Bloomberg Businessweek on February 15, 2023, titled "Zantac's Maker Kept Quiet About Cancer Risks for 40 Years," which detailed GSK's fraud |
| Class Period | February 5, 2020 through August 12, 2022, inclusive |
| Carcinogenesis | The formation of cancer |
| Company | Defendant GSK |
| GCMS | Gas chromatography mass spectrometry, a methodology used to identify chemical properties |
| CPF | Census Plus Form, documentation to be filled out by plaintiffs and registered claimants in the MDL |
| EMA | European Medicines Agency |
| FDA | United States Food and Drug Administration |
| GSK | Defendant GlaxoSmithKline plc, and its subsidiaries and affiliates. |
| H2RA | Histamine $H_2$-receptor antagonist |
| IAS, or IASB | International Accounting Standards or International Accounting Standards Board |
| ICF | Initial Census Form, documentation to be filled out by plaintiffs and registered claimants in the MDL |
| IFRS | International Financial Reporting Standards |
| Individual Defendants | Defendants Mackay and Walmsley |
| MDL | Multi-district litigation (*In re Zantac (Ranitidine) Products Liability Litigation*, No. 9:20-MD-2924 (S.D. Fla.)) |
| Mackay | Defendant Iain Mackay, GSK's Chief Financial Officer (CFO) from February 2019 until his resignation in April 2023 |
| NDA | New Drug Application |
| NDMA | N-Nitrosodimethylamine |
| OTC | Over the counter |
| PBIT | Profit Before Interest and Taxes |
| PPI | Proton-pump inhibitor |
| Tanner Study | A memo by Dr. Richard Tanner, a GSK scientist, dated April 6, 1982, and titled "*The Determination of N-Nitrosodimethylamine formed by the Reaction of Ranitidine Hydrochloride with Sodium Nitrite*" |
| Ranitidine | The active ingredient in Zantac |

| Valisure | Independent research laboratory that tested Zantac, revealed the presence of NDMA in Zantac in 2019, and submitted its results to the FDA |
| Walmsley | Defendant Emma Walmsley, GSK's Chief Executive Officer (CEO) |
| "¶__" | Paragraphs of this Amended Class Action Complaint for Violations of Federal Securities Laws |

1.      Court-appointed Lead Plaintiffs, Ohio Public Employees Retirement System and Indiana Public Retirement System (collectively, "Lead Plaintiffs" or "Plaintiffs"), bring this action on behalf of themselves and all other persons and entities that purchased or otherwise acquired the American Depositary Receipts ("ADRs") of GlaxoSmithKline plc ("GSK" or the "Company"), from February 5, 2020 through August 12, 2022 inclusive (the "Class Period"), and were damaged thereby (the "Class").

2.      Lead Plaintiffs allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon Lead Counsel's ongoing investigation, which includes reviewing and analyzing, among other things: (1) regulatory filings made by GSK with the United States Securities and Exchange Commission ("SEC"); (2) press releases and presentations issued and disseminated by the Company; (3) analyst, news, and media reports concerning GSK; (4) transcripts of GSK's investor and analyst conference calls; (5) communications with knowledgeable individuals, including former employees of GSK; (6) trading data for GSK securities and related documents; and (7) other publicly available information, including materials publicly filed in various litigation matters.

## I.      **INTRODUCTION**

3.      For nearly forty years, GSK marketed and sold Zantac—a gastrointestinal medication intended to treat heartburn, reflux, and ulcers—to millions of consumers, knowing that Zantac's active ingredient, ranitidine, formed a carcinogenic substance called N-Nitrosodimethylamine ("NDMA"). When the presence of NDMA in Zantac was belatedly revealed by Valisure, an independent research laboratory, Zantac was pulled from the market, and GSK subsequently faced thousands of lawsuits. Defendants, however, misrepresented that the Company was still "investigating" the sources of NDMA, and minimized the risk and exposure

from the influx of litigation in statements to the public and investors. But Defendants' longstanding knowledge exacerbated GSK's liability. When GSK's multi-billion-dollar potential liability exposure was revealed in August 2022, GSK's ADR price collapsed. Lead Plaintiffs and the Class seek to recover those losses.

4.      GSK synthesized Zantac in 1976 and believed the product could be transformational to the Company's growth and profit. Individuals at GSK envisioned the marketing and sales of Zantac as "bigger than all our other products put together," describing that "the sheer size of th[e] opportunity and the potential rewards from it dwarf anything [GSK had] done so far." Upon hitting the market in 1983, Zantac performed as planned, reaping over $1 billion in annual revenue after just five years.

5.      But GSK's hopes for Zantac had a significant problem—Zantac formed NDMA, a known genotoxic carcinogen, under various conditions. Unbeknownst to the FDA and investors, one of the Company's internal scientists, Dr. Richard Tanner, had performed a study in 1982—before the drug was marketed and sold—which found that ranitidine formed NDMA in the human stomach (the "Tanner Study"). GSK was also aware that Zantac formed NDMA in normal transportation and storage conditions. Other studies run by GSK in the following years confirmed the formation of NDMA in Zantac, including in normal transportation and storage conditions. Yet when the FDA expressed concerns and raised questions over this exact issue during the approval process, GSK falsely asserted that this "would not apply to ranitidine," dismissing "the possibility of carcinogenesis."

6.      GSK concealed its knowledge of Zantac's formation of a carcinogen for decades thereafter. In fact, GSK only confidentially disclosed this information to the FDA, EMA, and other regulators after Valisure uncovered the presence of NDMA in Zantac and generic ranitidine in

2019 and confidentially submitted that information to the FDA. Valisure's testing revealed levels of NDMA that were up to *26,000 times* the FDA's daily limit of 96 ng (nanograms). Valisure's reporting ultimately resulted in manufacturers recalling Zantac and generic ranitidine in 2019, and the FDA and other global regulators' permanent removal of the drug from the market in 2020. But GSK engaged in efforts for years thereafter to conceal from investors and the public its knowledge of the Zantac-NDMA connection, including the existence of the Tanner Study and its implications for GSK's liability.

7.    Following inquiries from the FDA and EMA in August and October 2019, GSK at first failed to disclose the Tanner Study and falsely denied its existence. In fact, as was first revealed no earlier than February 2023, GSK only confidentially disclosed the Tanner Study to the FDA and EMA in late 2019, after internal executive deliberations, describing the disclosure as a supplement. Investors remained in the dark. Defendants here, GSK Chief Executive Officer ("CEO") Emma Walmsley and Chief Financial Officer ("CFO") Iain Mackay, continued to conceal that they knew about the Zantac-NDMA connection, including the Tanner Study, even after GSK's high-level deliberations about confidentially providing the Study to the FDA and EMA in late 2019. These late 2019 deliberations informed Walmsley and Mackay's misleading public statements to investors during the Class Period, which began just months later in February 2020. Walmsley and Mackay also misrepresented the impact of that knowledge on GSK's business and the Company's liability to consumers who had taken Zantac for years. Defendants' repeated misstatements and omissions hid the true facts from investors causing the price of GSK ADRs to be artificially inflated during the Class Period. Investors who had purchased ADRs at artificially inflated prices suffered harm when relevant truths were eventually revealed, which caused GSK to lose billions in market capitalization.

8.      As detailed below, Defendants' Class Period statements to investors were materially false and misleading, and omitted key material facts. During the Class Period, GSK, Walmsley, and Mackay falsely stated that GSK was still in the process of investigating the source of NDMA in Zantac and falsely reassured investors that any financial and business risk associated with litigation related to Zantac was minimal. Defendants further assured investors that GSK's exposure to the risks of "patient safety" and "product quality" remained "unchanged." Similarly, in documents filed in litigation brought by consumers with cancer, GSK touted the safety of Zantac, emphasizing that the FDA's approval to market and sell Zantac was the result of "extensive scientific testing," and that the "FDA ha[d] exhaustively and repeatedly reviewed the safety and efficacy of Zantac throughout its lifestyle."

9.      Defendants' misrepresentations concern four subjects. *First*, Defendants repeatedly made misstatements that gave the false impression to investors that GSK was unaware of any carcinogenesis issues with Zantac until the FDA reached out in 2019. For example, in its Form 6-K filed with the SEC on February 5, 2020, GSK represented that its decision to voluntarily recall the drug was "***precautionary***," pending "***ongoing tests and investigations***," and that the Company was "***continuing with investigations into the potential source of NDMA***."[1] But as alleged herein, GSK's recall was not precautionary, and GSK did not need "ongoing tests and investigations" to determine the source of NDMA. GSK already knew the source of NDMA in Zantac—including because GSK's own scientist, Dr. Tanner, had determined the source of NDMA in Zantac in 1982.

10.      ***Second***, in its Annual Reports for 2019 and 2020, filed after the personal injury litigation was pending, Defendants falsely reassured investors that GSK's "***exposure***" to the risks of "***patient safety***" and "***product quality***" remained "***unchanged***" from the prior year. In reality,

---

[1] Unless otherwise noted, all emphasis in quotation is added.

GSK's liability exposure had increased, because GSK's forty-year lie had begun to unravel, and the Company had been forced to turn over the Tanner Study to the personal injury plaintiffs—even while it continued to conceal it from investors. The Annual Report for 2020 further touted GSK's "***ongoing evaluation of products for the presence of nitrosamines***" and purportedly "***strong compliance profile***." Those statements were misleading because they omitted that GSK had found NDMA (a nitrosamine) in Zantac, a fact that was not subject to "ongoing evaluation," and had failed to provide the Tanner Study to regulators (including the FDA and EMA).

11.    ***Third***, throughout the personal injury litigation, GSK represented that the FDA had completed an "exhaustive[] and repeated[]" review of the safety and efficacy of Zantac in approving the drug. However, the FDA had not been able to perform an appropriate review of the drug because GSK had withheld data critical to the FDA approval process—that is, that ranitidine degraded into NDMA. GSK similarly touted the "extensive preclinical (animal) and clinical (human) testing" which "revealed no heightened risk of carcinogenicity" and led to the FDA's decision to approve ranitidine for prescription use in 1983. But without the Tanner Study, the FDA could not have made an informed decision about the approval of Zantac for marketing and sales. This study, performed before the FDA's approval in 1983, clearly indicated that Zantac degraded into NDMA, which is a known carcinogen. In fact, in defending those personal injury cases GSK falsely argued that GCMS testing—similar to the methodologies used by Dr. Tanner in 1982—showing NDMA in Zantac were "***recent revelations***." GSK, with Defendants Walmsley and Mackay overseeing GSK's defense of the litigation and GSK's disclosures regarding it, made a series of misrepresentations throughout the course of the personal injury litigation, which misdescribed the safety of the drug and misled investors.

12.    ***Finally***, GSK made false statements concerning the need to quantify the range of its liability related to Zantac in its financial statements. Defendants needed to recognize such financial liability, known as a "provision" under the accounting rules, for the personal injury litigation. Specifically, Defendant Mackay, who possessed an extensive accounting background, knew that a multi-billion-dollar exposure was likely and hardly remote. But GSK chose to recognize ***zero*** provision, despite its awareness of (1) significant non-public evidence, including the Tanner Study, which gave rise to a strong "failure to warn" claim (among other claims) with significant jury appeal, and (2) the nature and number of claims against GSK and the settlement value of those claims. In reality, Defendants admitted that they actually estimated GSK's liability in the mid-single-digit billions immediately after the Class Period. Based on the purportedly favorable developments occurring during the Class Period cited by Defendant Mackay as the basis for GSK's liability estimate, Defendants either did or should (and could) have estimated that amount or greater liability for inclusion in GSK's accounting statements throughout the Class Period, but failed to disclose any such internal estimate until August 2022.

13.    GSK's internal estimates for its Zantac liability were into the billions, and had the Company booked the accounting provision reflecting even a portion of that estimate during the Class Period, it would have materially reduced GSK's profitability at a time when GSK was underperforming versus peers in key financial metrics. By declining to book such a provision, on the other hand, Walmsley and Mackay were able to significantly boost their cash bonuses—which were directly tied to the Company's reported profits (in 2019-2021) and profit growth (in 2022). Ultimately, despite developments in GSK's favor that were uncertain at the time of GSK's financial statements during the Class Period, GSK would pay over $2 billion to resolve just some

of its Zantac liability. Had that amount—or even a fraction of it—been properly recognized during the Class Period, the Individual Defendants' cash bonuses would have been slashed.

14.    Defendants' misstatements and omissions persisted throughout the Class Period, causing GSK ADRs to trade at inflated prices and/or maintaining artificial inflation in the price of GSK ADRs. The relevant truth was revealed to investors through corrective information reaching the market in August 2022. For example, on August 10, 2022, analysts revealed that GSK's estimated Zantac litigation exposure could be "in the $5-10 billion" range." On August 11, 2022, analysts revealed that GSK would bear a significant portion of the liability related to the Zantac litigation—specifically, around 80%. This was a drastic departure from GSK's prior representations that its risk exposure related to product safety was "unchanged" from before Zantac was removed from the market, as well as from Defendants' decisions to take no liability provision. Investors were shocked to learn the extensive liability GSK would face as a result of the Zantac litigation. As CFO, Defendant Mackay effectively confirmed these exposures during an August 16, 2022 analyst call with Credit Suisse, which stood in sharp contrast to Defendants' disclosures and financial statements during the Class Period representing that GSK's exposure was improbable, impossible to estimate, or remote. Indeed, investors bore the brunt of this bad news: these disclosures caused GSK's ADRs to decline by 17%.

15.    Investors and the public only began to learn of the Tanner Study and GSK's longstanding knowledge of it after the February 15, 2023 publication of a Bloomberg Businessweek article entitled "*Zantac Cancer Risk Data Was Kept Quiet by Manufacturer Glaxo for 40 Years*" (the "Bloomberg Article"). That article, which was based on "hundreds of documents, thousands of pages, many of which have never been made public," including many court filings "still under seal," revealed that GSK executives had been aware that Zantac degraded

into NDMA, and had concealed this fact from investors, consumers, and the FDA for several decades.

## II.    <u>JURISDICTION</u>

16.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c), because the acts and transactions giving rise to the violations complained of herein occurred in part in this District, including the dissemination of false and misleading statements into this District. GSK maintains its United States headquarters in Philadelphia, Pennsylvania, in this District.

19.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of national securities exchanges.

20.    Defendants purposefully availed themselves of the privileges of doing business in the United States by selling billions of dollars of Zantac in the United States—sales which gave rise to consumer litigation that is central to this Action. Defendants further availed themselves of the privileges of doing business in the United States by depositing GSK's ordinary shares with a U.S.-based depositary bank, issuing GSK's sponsored, "Level II" American Depositary Shares ("ADS") and ADRs (backed by the ADS), listing GSK's ADRs on the New York Stock Exchange ("NYSE") under the ticker "GSK," registering them with the U.S. Securities and Exchange

Commission ("SEC") on Form F-6, and maintaining the registration and listing of those ADRs. For example, on July 19, 2019, GSK filed with the SEC, and Walmsley and Mackay signed, a Post-Effective Amendment No. 1 to Form F-6 Registration Statement under the Securities Act of 1933 for Depositary Shares Evidenced by American Depositary Receipts. During the Class Period, GSK had more than 425 million ADRs outstanding, representing approximately 20% of its ordinary shares outstanding and market capitalization. Each GSK ADS represents two ordinary shares.

21.     Pursuant to the registration of its ADRs with the SEC, during the Class Period, GSK made periodic annual and current event filings on Forms 20-F and 6-K with the SEC, some of which were signed by Defendants Walmsley and Mackay.

22.     Defendants repeatedly and at least recklessly directed false and misleading statements to the United States, including false and misleading statements in documents filed with the SEC that were drafted, reviewed, approved, and/or signed by Defendants.

23.     In addition, Defendant Walmsley traveled to New York in January 2022 to speak to analysts and investors at the Goldman Sachs 14th Annual Healthcare CEOs Unscripted Conference and 40th Annual JP Morgan Healthcare Conference.

24.     GSK consented to personal jurisdiction in the United States pursuant to GSK's Second Amended and Restated Deposit Agreement, filed with the SEC as an exhibit to GSK's Registration Statement on Form F-6 dated July 19, 2019.

III.    **PARTIES**

A.    **Lead Plaintiffs**

25.     Lead Plaintiff Ohio Public Employees Retirement System ("Ohio") is a public pension fund organized for the benefit of public employees throughout the state of Ohio who are not covered by another state or local retirement system. As set forth in the certification filed with

this Complaint, Ohio purchased GSK ADRs during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements alleged herein.

26.     Lead Plaintiff Indiana Public Retirement System ("Indiana") (together with Ohio, "Lead Plaintiffs") is a public pension fund organized for the benefit of public employees throughout the state of Indiana who are not covered by another state or local retirement system. As set forth in the certification filed with this Complaint, Lead Plaintiff Indiana purchased GSK ADRs during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements alleged herein.

**B.     Defendants**

27.     Defendant GSK is a multinational pharmaceutical and biotechnology company organized under English law and headquartered in London, United Kingdom.

28.     GSK and its predecessors invented ranitidine and marketed it under the trademark name Zantac from 1983 to 2017. Glaxo Inc., a North Carolina corporation and wholly owned subsidiary of Glaxo plc, filed the Zantac NDA in 1982. Glaxo plc merged with Burroughs Wellcome & Co. in 1995 to create Glaxo Wellcome plc. Glaxo Wellcome plc merged with SmithKline Beecham P.L.C. in 2000 to form GlaxoSmithKline plc. In May 2022, GlaxoSmithKline plc was renamed GSK plc. Today, GSK's U.S. operations are conducted through GlaxoSmithKline LLC, a Delaware limited liability company with its principal place of business located in Philadelphia, Pennsylvania, and a successor to Glaxo Inc. GSK and several of its non-judgment-proof subsidiaries (including GlaxoSmithKline LLC and other subsidiaries that are consolidated for purposes of its financial statements) are liable in tort for the historical Zantac sales. Thus, for simplicity, when discussing historical Zantac sales, unless the name of a predecessor or subsidiary entity has particular relevance, these entities are referred to as "GSK."

29.     Defendant Emma Walmsley has been GSK's CEO and a Director of the Company since April 2017. As CEO, Walmsley is responsible for the Company's important strategic decisions and for the accuracy of its financial statements and other communications with investors. During the Class Period, Walmsley reviewed and approved the Company's public statements to investors, including its filings with the SEC, several of which she signed personally. Walmsley's direct reports included Defendant Mackay, GSK's Chief Scientific Officer (Hal Barron until August 1, 2022, then Tony Wood), and GSK's General Counsel.

30.     Prior to becoming CEO, Walmsley was an executive in GSK's Consumer Healthcare Division—the division responsible for over-the-counter products, such as OTC Zantac. Walmsley joined GSK in May 2010 as President of Consumer Healthcare Europe; in 2011, she was promoted to global head of Consumer Healthcare; and in March 2015, she became CEO of Consumer Healthcare. During Walmsley's tenure, GSK has been a defendant in significant product liability litigation.

31.     Defendant Iain Mackay was GSK's CFO and a Director of the Company from February 2019 until his resignation was announced in September 2022, effective April 2023. As CFO, Mackay shared responsibility with Walmsley for the Company's important strategic decisions and for the accuracy of its financial statements and other communications with investors. Mackay reviewed and approved the Company's public statements directed to investors, including its filings with the SEC, some of which he signed personally. Mackay was also the GSK executive responsible for overseeing the Zantac personal injury litigation and related regulatory investigations. Mackay regularly reported to Walmsley and GSK's Board of Directors regarding the status of the Zantac litigation.

32.     Prior to joining GSK, Mackay was a long-time financial and accounting executive. Defendant Mackay received a master's degree in accounting and finance from the University of Aberdeen and started his career as an auditor at KPMG and then PwC. He then served as a financial and accounting executive at SLB, a multinational oilfield services company; as Controller, Audit Leader, and CFO at General Electric Capital from 1996 to 2004; and then as EVP & CFO Americas at HSBC from August 2007 to August 2009, CFO of the Asia Pacific Region at HSBC from September 2009 to November 2010, and Group Finance Director at HSBC from December 2010 to April 2019. Based on this experience, Mackay was familiar with the International Financial Reporting Standards ("IFRS"), including International Accounting Standard ("IAS") 137. Defendants Walmsley and Mackay may be referred to collectively as the "Individual Defendants."

33.     Defendants Walmsley and Mackay also signed Sarbanes Oxley Act of 2022 ("SOX") Certifications, which were attached as exhibits to the Forms 20-F filed by GSK during the Class Period, confirming that they reviewed each of the annual reports. Defendants Walmsley and Mackay certified that:

> [] Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report; []

> Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report[.]

IV.    **OVERVIEW OF THE FRAUD**

A.    **Background**

1.    **Before Zantac's Introduction To the Market, GSK Knew from Its Own Studies That Ranitidine Degraded into a Carcinogen**

34.    Before Zantac's initial FDA approval and first public sales in 1983, GSK knew that Zantac's active ingredient, ranitidine, would form NDMA, a nitrosamine and genotoxic carcinogen. GSK also knew that this degradation would accelerate in the presence of heat, water, and/or additional nitrites—the first two of which are found under normal transportation and storage conditions, and all three of which are found in the human digestive system. Dr. Richard Tanner, a GSK scientist, confirmed and documented Zantac's degradation into NDMA in the April 6, 1982 Tanner Study. By 1984, GSK scientists had conducted additional testing and determined that ranitidine rapidly degrades in the mere presence of moisture and heat—even without added nitrites (as in the Tanner Study). Thus, Zantac degraded into NDMA in the body (stomach) and in transit, in storage, on store shelves, or in patients' homes. GSK knew this but hid the truth from regulators and the public for four decades—during which time GSK reaped tens of billions of dollars in profits, which it used to build itself into the multinational giant it is today.

2.    **GSK Manufactured and Sold Zantac from 1982 to 2017, Reaping Tens of Billions of Dollars in Profits, and Transforming GSK into One of the Largest Companies in the World**

35.    Glaxo Laboratories Ltd. discovered and synthesized ranitidine in 1976, patented it in 1978, and gained FDA approval for its New Drug Application ("NDA") in 1983. Prescription Zantac was sold in 150 mg and 300 mg tablets, with other dosages, including for over-the-counter (OTC) formulations and dosages, later approved. Ranitidine is a histamine $H_2$-receptor antagonist ("H2RA"), meaning that it blocks the production of stomach acid. It is used to treat and maintain

healing of duodenal and gastric ulcers, gastroesophageal reflux disease, and erosive esophagitis. Other H2RAs include cimetidine (brand name Tagamet) and famotidine (brand name Pepcid).

36.    GSK was motivated to conceal Zantac's cancer risk by the enormous economic potential of the drug. In the words of David Wright, GSK's Zantac Product Manager, in a June 17, 1983, internal speech:

> [T]he sheer size of this opportunity and the potential rewards from it dwarf anything we've done so far. It's not just that Zantac is bigger than all our other products put together...it's bigger than the whole company. You've all heard the numbers. My mind finds it difficult to absorb all those zeroes...especially when I'm salivating so hard. (LAUGHTER)

37.    From 1983 to 2017, GSK earned more than $30 billion in aggregate Zantac revenue. That revenue increased from 1983 to 1994; modestly declined from 1995 to 1997 (the year the U.S. patent expired); and then declined more steadily following the entry of generic competition. GSK's annual revenue from Zantac crossed the $1 billion threshold by 1988, peaked around $4 billion in 1994, and was $336 million (£168 million) in 2007 (the last year that GSK reported annual Zantac revenue as a line item). During its period of patent exclusivity, Zantac consistently accounted for approximately 40% of GSK's revenue and approximately 50% of its profits.

38.    Over the years, GSK submitted additional NDAs to the FDA for Zantac—never once disclosing the Tanner Study or the degradation of Zantac into NDMA. For example, in 1995, the FDA approved an over-the-counter (OTC), 75 mg version of Zantac; and in 1998, the FDA approved another OTC, 75 mg version of Zantac, with faster absorption.

39.    GSK sold OTC Zantac from 1995 to 1998 through a joint venture with Warner-Lambert (which was later acquired by Pfizer in 2000). After the end of that joint venture, Warner-Lambert obtained the right to market OTC Zantac in the United States and Canada, while GSK retained the right to market OTC Zantac in the rest of the world. In 2006, Pfizer sold its rights to OTC Zantac to Johnson & Johnson, which immediately divested those rights to Boehringer

Ingelheim Pharmaceuticals. Boehringer then sold its rights to Sanofi in 2017. Until 2017, GSK continued to manufacture OTC Zantac and received a royalty from the sales by Pfizer and Boehringer. At all times, GSK remained the NDA holder and retained the right to market prescription Zantac worldwide.

40.     Fueled by Zantac's success, GSK was one of the largest companies in the world by 2019, with global businesses units spanning pharmaceuticals (including respiratory and HIV drugs), vaccines, and consumer healthcare. Yet, leading up to the Class Period, GSK faced several considerable challenges. GSK's total shareholder return had significantly underperformed its peers for years. GSK's research and development spending was also in decline.

### B.    GSK Concealed Zantac's Cancer Risk for Nearly 40 Years

#### 1.    GSK Has Known Since 1982 That Zantac Forms NDMA

41.     Ranitidine is an unstable molecule possessing a nitroso group and a dimethylamino group. Those two groups are building blocks for the creation of NDMA. Ranitidine is capable of forming NDMA through a chemical reaction called nitrosation, in which a nitroso group is added to another molecule. The nitrosation of a secondary amine forms N-nitrosamine, and specifically the nitrosation of demthylamine forms NDMA.



42.     The formation of NDMA from Zantac can occur both exogenously, *i.e.*, while Zantac is on the shelf or in the package, and endogenously, *i.e.*, after the Zantac is ingested into the human digestive system. Exogenously, the source of nitrosation can be the nitroso group on the ranitidine molecule itself. Endogenously, there are several additional sources of nitrosation,

including nitrites (compounds containing one nitrogen and two oxygen) consumed as food, and nitrates (compounds containing one nitrogen and three oxygen) consumed as food and reduced to nitrites by bacteria present in the gut. Both exogenously and endogenously, nitrosation can be accelerated by heat and moisture.

43.    Prior to Zantac's FDA approval, the FDA and GSK both anticipated that Zantac might degrade into NDMA by nitrosation; the FDA insisted that GSK test for nitrosation; GSK tested and found that Zantac did degrade into NDMA; and GSK covered up its testing and lied to the FDA.

44.    For example, GSK's notes of a May 2, 1980 meeting between GSK scientists and executives and FDA staff reveal that "FDA voiced their concern about the nitrosation potential of ranitidine." After that meeting, the FDA insisted upon receiving GSK's data, including "the exact details and conditions under which the experiments were carried out."

45.    Following that meeting, GSK conducted at least two experiments that confirmed the FDA's concern about the nitrosation potential of ranitidine. The first experiment, conducted in 1981, is documented in an internal memo from GSK scientist, Dr. L.E. Martin, dated February 19, 1982, and titled "*Formation of N-Nitrosodimethylamine from Ranitidine*." That "study was undertaken on the formation of N-nitrosodimethylamine [NDMA] under the WHO (NAP)"—*i.e.*, the World Health Organization's Nitrosation Assay Procedure (NAP) test. After combining 10 mmol (millimoles) of ranitidine (31.5mg) and 40 mmol of sodium nitrite in a medium of 10 ml (milliliters) of acetic acid with pH 3, Dr. Martin yielded 144 µgs (144,000 ngs) of NDMA. In other words, "about 2% of the ranitidine present was converted" to NDMA.

46.    GSK replicated those results in a second experiment—the Tanner Study—which is formally titled "*The Determination of N-Nitrosodimethylamine formed by the Reaction of*

*Ranitidine Hydrochloride with Sodium Nitrite.*" The Tanner Study found that "molecules with tertiary amines"—like ranitidine—can "react with nitrite under certain conditions to yield N-nitrosodimethylamine (NDMA)." "[T]herefore experiments were carried out to determine whether NDMA could be formed from the drug in the presence of nitrite." Dr. Tanner found even more NDMA than Dr. Martin. After conducting a WHO NAP test similar to Dr. Martin's—10 mmol of ranitidine and 40 mmol of sodium nitrite in a medium of 10ml 6% acetic acid—Dr. Tanner yielded 232 μgs (*232,000 ngs*) of NDMA, a yield of 3.1%. The FDA's established acceptable daily intake limit is just *96 ngs* of NDMA.

47.    Dr. Tanner also conducted another test with less ranitidine (1 mmol) and less sodium nitrite (0.3 mmol), which he stated were based on simulated gastric conditions, but did not report the actual results of that test. Without providing any numbers, Dr. Tanner characterized the results as a "low intensity signal." GSK destroyed any record of the actual results.

48.    On May 13, 1982, GSK presented to the FDA's Scientific Advisory Panel regarding ranitidine's "mutagenicity" and "nitrosation." Despite the contrary results of the Martin and Tanner Studies, which GSK did not disclose, GSK's representative falsely dismissed the "the possibility of carcinogenesis" and falsely asserted that the "mechanism" "nitrosat[ing] to this N-nitroso derivative… *would not apply* to ranitidine."

49.    The Tanner Study and the study by Dr. Martin were not the only analyses undertaken at GSK relating to the Zantac-NDMA connection. In 1984, GSK prepared a report titled, "*Preliminary Results of an Investigation into the Thermal Degradation of Ranitidine Hydrochloride.*" The report detailed that ranitidine would rapidly degrade in the presence of moisture and heat, and that "[a]dditional, as yet unidentified, breakdown products are also

17

produced within the liquid mass formed as a result." The authors also noted that the increased temperature and moisture caused "considerable darkening."

50.     GSK was also aware of perennial discoloration issues with Zantac, which confirmed the instability and degradation of the product. Zantac was originally colored white, which resulted in a significant number of tablets turning yellow or brown. GSK changed the color of Zantac pills to cover up this discoloration. In 1989, GSK submitted an NDA supplement to "change the color of Zantac 150 mg tablets from white to peach and to provide for an alternative coating process." In 1990, the FDA responded to GSK with a deficiency letter due to "inadequate data on the stability of the 5-sided tablets with the color changes." In GSK's NDA supplement and in GSK's response to the deficiency letter, GSK again failed to disclose NDMA formation to the FDA, and the shape and color change was approved on January 4, 1991.

51.     In 1994, while GSK was developing OTC Zantac, the Company originally planned to color the 25 mg tablets yellow and the 75 mg tablets white. GSK again observed "significant discoloration," which GSK identified as a "stability issue." The degradation occurred in both the double foil and HDPE (high-density polyethylene) packaging. As a result, GSK decided to change the color of the 75 mg tablets to yellow (the same as the 25 mg tablets). The discoloration problem was escalated, and the color changed was approved by the Ranitidine OTC IPT (Integrated Product Team), which included several GSK (and Warner-Lambert) executives. The GSK executives with knowledge of the discoloration and who approved the color change include Dr. James Palmer, Glaxo's Senior Vice President, Medical Operations and Chief Medical Officer (later Glaxo Wellcome's Senior Vice President and Director, Group Medical and Regulatory Operations and GSK's Senior Vice President of New Product Development), Dr. Phil Gould, Glaxo's Head of New Product Development (later GSK's Vice President and Head of Biology), Dr. Mark Sirgo,

Glaxo's Vice President, Clinical Development (later GSK's Vice President of New Product Marketing), Dr. Paul Rubin, Glaxo's (and later Glaxo Wellcome's) Vice President, Worldwide Clinical Pharmacology and Early Clinical Development, and Dr. Rav Kumar, a Glaxo (and later a Glaxo Wellcome and GSK) Vice President with several portfolios including R&D.

52.    The issue arose again in 1996 when GSK was developing "Zantac AQ Bulk Packs," which a GSK manager wanted to color white. An internal GSK memo reminded that manager that white tablets had "failed" stability studies "due to discoloration" and that prescription Zantac was sold with "peach coloured coating" to "mask the yellow-brown discoloration." While GSK was aware that Apotex, a generic manufacturer, was proposing a white-colored generic ranitidine tablet, GSK believed that Apotex used a "heavier" "solvent coat" and that a risk of continued discoloration would remain.

53.    GSK never disclosed to regulators, patients, or investors that Zantac was colored peach (prescription Zantac) and yellow (OTC Zantac) for the deceptive purpose of masking a known discoloration problem caused by degradation.

54.    Additionally, Former Employee ("FE") 1, who worked as an Investigator in Chemical Development at GSK's facilities in Pennsylvania from November 2014 until October 2020, provided details about GSK's awareness of NDMA in Zantac. FE 1 worked on a team of process chemists tasked with conducting research into and forming control strategies for impurities in GSK drugs. FE 1's group was familiar with the scientific issues around the question of how certain medicines could form harmful compounds.

55.    FE 1, who began working at GSK in 2014, indicated that by at least approximately 2018 GSK knew that NDMA was forming in Zantac. FE 1 recalled that the timing of his group's

engagement on NDMA and Zantac coincided with similar issues with nitrosamines forming in Valsartan and other sartan drugs (used to treat hypertension), which was in 2018.

56.    Specifically, FE 1 knew that GSK was aware of the formation of NDMA in Zantac because his team of process chemists was asked to consider possible reasons why nitrosamines were formed in Zantac. FE 1 and his team were involved in one or two "brainstorming" sessions in 2018 or 2019 to help determine why nitrosamines or NDMA were forming in Zantac.

57.    FE 1's group was called in to consult because his group possessed the skill set needed to understand how such substances formed in existing medicines. FE 1 indicated that this group regularly participated in these types of brainstorming sessions.

58.    GSK's concern with nitrosamine formation in Zantac "escalated pretty quickly" and a GSK group that conducted analysis and risk mitigation began overseeing the investigation following FE 1's group having conducted the brainstorming sessions. FE 1 said in typical investigations of that nature, someone high up within GSK would have been notified fairly quickly.

59.    Despite the FDA's request for the "exact details and conditions" of GSK's experiments to test for NDMA, GSK did not disclose the Tanner Study, or any other information GSK had concerning the Zantac-NDMA connections, to the FDA (or any other regulator worldwide) until December of 2019 and instead falsely represented to the agency that the nitrosating mechanism "would not apply."[2]

### 2.    NDMA Is a Carcinogen

60.    NDMA is a genotoxic carcinogen—as many scientific, government authorities and researchers have recognized.

_____

[2] The Tanner Study first became public, at the earliest, on December 30, 2022, when it was unsealed alongside 50,000 pages of other exhibits to the *Daubert* motions in the MDL litigation (described below). The first publication to mention the Tanner Study was the Bloomberg Article published on February 15, 2023 (also described below).

61.     The Food and Drug Administration (FDA) recognized NDMA as a probable human carcinogen by 1978. Historically, the FDA has demanded removal of numerous products that can degrade into NDMA. For example, in 1978, the FDA recalled the drug methapyrilene because it oxidized and formed NDMA. Like ranitidine, methapyrilene forms NDMA when exposed to nitrites. Similarly, in 1980, the FDA compelled brewers to ensure no more than trace levels of nitrosamine existed in barley malt and malt beverages, after the United States Brewers Association informed the FDA that German researchers had discovered that such products contained unacceptable levels of nitrosamines. In July 2018, the FDA recalled certain batches of valsartan tablets, a drug primarily used to treat high blood pressure and heart failure, because it contained NDMA. Separately, the FDA also issued an August 30, 2018 statement indicating that "NDMA" is "of special concern to global regulators because, unlike most impurities in drugs, [it has] the potential to cause harm at very low levels." In a November 13, 2019 press release, the FDA wrote that "NDMA has been found to increase the occurrence of cancer in animal studies."

62.     Since 1978, the International Agency for Research on Cancer (IARC) has designated NDMA as "Group 2A," or "probably carcinogenic." This designation is below Group 1 (carcinogenic), but above Group 2B (possibly carcinogenic), Group 3 (not classifiable), and Group 4 (probably not carcinogenic). The IARC designated NDMA as Group 2A based on controlled experimentation in animals.

63.     Since 1987, the Environmental Protection Agency (EPA) has designated NDMA as a "Group B2," probable carcinogen. In its "Hazard Summary," the EPA warned that "[a]nimal studies have suggested that chronic ingestion and inhalation of N-nitrosodimethylamine may cause an increase in liver tumors and other types of tumors."

64.    Since 2002, the World Health Organization has stated that NDMA is a genotoxic carcinogen, and exposure should be reduced to the extent possible. In 2002, the World Health Organization issued a chemical assessment document for NDMA, stating that: "Based upon laboratory studies in which tumours have been induced in all species examined at relatively low doses, NDMA is ***clearly carcinogenic***. There is overwhelming evidence that NDMA is mutagenic and clastogenic. … Qualitatively, the metabolism of NDMA appears to be similar in humans and animals; as a result, it is ***considered highly likely that NDMA is carcinogenic to humans, potentially at relatively low levels of exposure***."

65.    Since 2016, the U.S. Department of Health and Human Services (HHS) has also designated NDMA as "reasonably anticipated to be a human carcinogen."[3] Additionally, the HHS's Agency for Toxic Substances and Disease Registry created a toxicological profile for NDMA to address the associations between NDMA exposure and a number of cancer types, including gastric, liver, bladder, and prostate cancers, as well as leukemia and multiple myeloma. This profile cited an array of studies to support this conclusion.

66.    By July 2018, following the recall of valsartan for NDMA contamination, the FDA established a 96 ng daily acceptable intake limit for NDMA. The FDA established that daily limit pursuant to the method described by the FDA in March 2018 for "DNA Reactive (Mutagenic)" carcinogens. The limit is based on the median toxic dose ($TD_{50}$) observed in controlled studies in rats, extrapolated linearly based on the weight difference between a rat and a 50-kg human. In other words, because a human weighs about 200 times more than a rat, it is assumed to be

---

[3] To support this designation, the National Toxicology Program of the HHS cites a 1998 study by Dr. De Stefani, referenced in SectionIV.B.2 below, which determined that NDMA was "statistically significantly associated with gastric cancer."

"acceptable" for a human to be exposed to 200 times more NDMA than the dose known to cause 50% of the rats exposed to it to develop cancerous tumors.

67.     Since 2018, the European Medicines Agency (EMA) has also designated NDMA as a probable human carcinogen. The EMA created a guidance resource to marketing authorization holders (i.e., drug manufacturers), to avoid the presence of nitrosamine impurities in their products.

68.     In addition to these findings from public health agencies and organizations, several independent scientists have also conducted human epidemiological studies over the last forty years which provide direct support for the assertion that NDMA and/or ranitidine consumption is associated with cancer:

    (a)    Dr. Alvaro Luis Ronco conducted a case-control study of all incidents of bladder cancer in the time period between 1996-2004 in individuals in Montevideo, Uruguay, through which he found that individuals consuming NDMA were **2.14 times more likely** to develop bladder cancer than individuals who did not consume NDMA.

    (b)    Dr. E De Stefani conducted a hospital-based case-control study, published in 1996, which found there was a **3.14 times greater** chance of developing lung cancer in individuals who had a high category of NDMA intake.

    (c)    Dr. Yun Zhu published a case-control study in 2013, which determined that NDMA intake was found to be associated with a **1.42 times increased risk** of colorectal cancer, and more specifically, colorectal cancer risk increased with the consumption of NDMA-containing meats.

    (d)    Dr. Mira Hidajat, beginning in 1967 and following up with participants in 2015, found that individuals exposed to NDMA were **5.36 times more likely** to experience prostate cancer mortality and **1.72 times more likely** to experience stomach cancer mortality.

    (e)    Dr. Jiali Zheng conducted a large case-control study in 2019 which found that individuals consuming foods creating NDMA were **1.93 times more likely** to develop pancreatic cancer compared to the control group.

    (f)    In a study published in 2021, Dr. Lior Z. Braunstein conducted a cross-sectional analysis of 89 oncology patients reporting use of ranitidine or an active comparator (i.e., a proton-pump inhibitor [PPI] or other H2 blocker). The study concluded that ranitidine was associated with increased odds of thyroid, bladder, prostate, and breast cancer.

(g)    In a 2022 study, Dr. Chun-Hsiang Wang found that individuals taking ranitidine showed a "significantly higher prevalence" of many cancers when compared to individuals who had not taken ranitidine, and specifically, renal cancer (*1.33 times more likely*), liver cancer (*1.22 times more likely*), gastric cancer (*1.26 times more likely*), pancreatic cancer (*1.35 times more likely*), and lung cancer (*1.17 times more likely*).

69.    Before and during the Class Period, it was well established that "probable" and even "possible" IARC carcinogens could give rise to multi-billion-dollar tort liabilities. For example, other probable carcinogens designated as Group 2A by the IARC include glyphosate and talc. In 2020, Bayer and Monsanto agreed to pay an over $10 billion settlement to cancer patients exposed to glyphosate, a weed killer branded Roundup; between 2016 to present, Johnson & Johnson ("J&J") paid billions of dollars to settle claims related to talc. Similar to Zantac, plaintiffs alleged that J&J knew of the carcinogenic risks of talc, due to the presence of asbestos, since the 1950s but concealed that knowledge from consumers. The list of "possible" carcinogens (Group 2B) prepared by the IARC includes pioglitazone (brand name Actos), a diabetes medication. In April 2015, Takeda Pharmaceutical Company paid $2.4 billion to settle consumer claims alleging that Actos caused bladder cancer. These prior matters involving possible carcinogens provided GSK with knowledge that a loss related to Zantac was both probable and estimable under IFRS. GSK's potential exposure also incorporated the fact that there is documentary evidence that the Company knew about the formation of NDMA in Zantac since 1982, which it concealed at all times but which Walmsley and Mackay were acutely aware of before the start of the Class Period. The particular circumstances of GSK's potential liability are informed by both the specific facts related to its knowledge, which remained out of the public view, and other litigation matters involving similar claims.

24

### 3. After Being Concealed for 36 Years, Zantac's Degradation into NDMA Was Fortuitously Confirmed by an Independent Laboratory

70. By 2019, GSK had deceived investors, patients, the FDA, and regulators worldwide about Zantac's degradation into NDMA for 36 years. These regulators rely primarily on drug sponsors, like GSK, to ensure drug safety by conducting appropriate testing and by disclosing adverse data. As GSK knew, it is rare for regulators or independent laboratories to replicate drug safety testing—which is difficult, expensive, and thankless work. Formation of NDMA in Zantac came to the attention of regulators only through the unexpected efforts of Valisure.

71. In early 2019, Valisure used methods similar to that used by GSK in 1981 and 1982 to test for NDMA (but never disclosed).[4] The then-FDA-standard method was Gas Chromatography Mass Spectrometry ("GCMS"), which involved heating samples to 130 degrees Celsius for 15 minutes, and then spinning them in a centrifuge to separate the constituent molecules by molecular weight. Using GCMS, Valisure found that the OTC 150 mg version of Zantac contained 2,511,469 ng of NDMA. That was **_26,000 times_** the FDA's daily limit, 96 ng. (The "mint" flavored version of Zantac contained even more NDMA.)

72. Even though GCMS was the test endorsed by the FDA's then-guidance, Valisure anticipated the potential objection that the heat from GCMS may have contributed to NDMA formation. Therefore, Valisure also ran a second test, using a modified GCMS that heated the samples only to human body temperature, 37 degrees Celsius, in simulated gastric conditions. Using this modified GCMS, Valisure still found troubling results, detecting 23,600 ng of NDMA after mixing Zantac with 25 mmol sodium nitrite, and 304,500 ng of NDMA after mixing Zantac

---

[4] Starting on July 16, 2018, several drug manufacturers recalled valsartan, a generic drug used to treat high blood pressure and heart failure, due to the presence of NDMA. Unlike with Zantac, where NDMA is formed by the degradation of the ranitidine itself, with valsartan, the NDMA was contamination introduced by the use of particular manufacturing process. In January 2019, the FDA released guidance that established GCMS testing protocols.

with 50 mmol sodium nitrite. These values were still *245 times* and *3,171 times* the FDA's daily limit, respectively.

73.    In June 2019, Valisure confidentially submitted the results of these tests to the FDA. The FDA, in turn, confidentially submitted the results to the European Medicines Agency (EMA). Valisure's notification to the EMA and FDA set off a chain of events that eventually led to Zantac being pulled from the market and tens of thousands of lawsuits by patients who had taken Zantac.

> **4.    When Asked Directly by the FDA and EMA in 2019 Whether It Had Test Results Showing that Zantac Degrades into NDMA, such as the Tanner Study, GSK Falsely Claimed That It Did Not**

74.    In July 2019, GSK received an inquiry from the EMA, asking for information about NDMA in Zantac. GSK did not inform the FDA of the EMA's inquiry or the Zantac-NDMA issue until the FDA reached out separately.

75.    By correspondence dated August 6, 2019, the FDA informed GSK about Valisure's results—which, it said, used "FDA's nitrosamine test methods"—and asked GSK the following four questions regarding Zantac and NDMA:

> Recently a private analytical pharmacy and advanced laboratory notified the FDA that Zantac (ranitidine) produces a very high quantity (thousands of times higher than the FDA limits) of a probable human carcinogen N-nitrosodimethylamine (NDMA) in a single tablet of 150 mg of Zantac, when analyzed using FDA's nitrosamine test methods. The same private laboratory also found that Zantac forms high quantity of NDMA in simulated human body gastric conditions. The preliminary reports seem to indicate that in certain conditions (e.g., high temperatures and presence of nitrites) ranitidine hydrochloride (API) and ranitidine tablets degrade to form high quantities of NDMA….

> 1.   Are you aware of the above information?

> *2. Is there any potential for NDMA to be present in the Zantac tablets* or ranitidine hydrochloride API? Provide a detailed explanation for your response. Include in your explanation quality information for API, excipients, manufacturing process, etc.

> *3. Have you tested Zantac tablets or ranitidine hydrochloride for the presence of NDMA? If you have, what were the levels of NDMA found?*

4. ***Have you tested Zantac tablets in simulated human body conditions (including gastric conditions)? If you have, have you detected NDMA? If you did, what were the levels observed?***

76.     The investing public did not know about these EMA and FDA inquiries during the Class Period. The full text quoted above first became public as a result of Valisure's amended *qui tam* complaint, filed in May 2024.

77.     The Tanner Study was responsive to the FDA's second, third, and fourth questions. Yet, on September 6, 2019, without disclosing the Tanner Study, GSK confidentially misinformed the FDA that "***[t]here was no analysis for NDMA***" because "***NDMA would not have been predicted*** to form given the structures of the observed nitrosation products." GSK's response was false and misleading because, in 1981 and 1982, not only had GSK predicted that NDMA would form, but further, GSK had tested and confirmed that Zantac did degrade into NDMA.

78.     On September 23, 2019, the EMA asked GSK to "submit all relevant data on the carcinogenic potential of ranitidine use," including "in-vitro incubations with ranitidine and its metabolites … where generation of NDMA and/or dimethylamine has been investigated (e.g. in simulated gastric conditions or hepatocytes)."

79.     The Tanner Study was also responsive to the EMA's request. Yet, on October 23, 2019, without disclosing the Tanner Study, GSK confidentially told the EMA that "***the generation of NDMA from ranitidine has not been investigated by GSK … in simulated gastric conditions***." GSK's response was false and misleading because, in 1981 and 1982, not only had GSK investigated the generation of NDMA from ranitidine in simulated gastric conditions, but further, GSK had confirmed that Zantac degrades into NDMA under those conditions.

80.     Internally, GSK's false responses to the FDA and EMA were escalated to the highest levels of GSK. According to the Bloomberg Article, a "senior GSK executive" emailed

"colleagues" in November 2019 about the Tanner Study, writing: "***All, we have an urgent need to identify if the following study report was submitted in the European Union and United States***." According to the Bloomberg Article, "***the answer was no***."

81.     Following the internal discussions at the highest levels of GSK, GSK determined it must provide that information to the FDA and EMA. GSK first confidentially provided the Tanner Study to the EMA on December 6, 2019 and to the FDA on December 11, 2019—more than 37 years too late. Investors remained in the dark.

**C.     Amid Global Recalls, Defendants Falsely Claimed That Determining the "Source of NDMA" in Zantac Required New Investigation**

**1.     In Late 2019 and Early 2020, Zantac Is Permanently Recalled in the U.S. and Globally**

82.     On September 9, 2019, Valisure submitted a citizen petition to the FDA pursuant to 21 C.F.R. § 10.30, detailing Valisure's findings that ranitidine tablets did, in fact, contain NDMA, and requesting that it be removed from the market. Valisure reached this conclusion by testing ranitidine using GCMS testing, as per FDA protocol.

83.     Shortly after receiving Valisure's petition, the FDA warned the public of the cancer risks posed by the presence of NDMA in Zantac and generic ranitidine.

84.     On October 2, 2019, the FDA ordered manufacturers of Zantac and generic ranitidine to test their products using liquid chromatography with high resolution mass spectrometer ("LC-HRMS"). The FDA also conducted its own LC-HRMS testing, including under simulated gastric conditions. The FDA's results showed that "NDMA was present ***in all samples tested***," and in several cases, NDMA was present in excess of the FDA's daily limit of 96 ng. Of particular concern, the FDA concluded that NDMA levels continued to increase over time while Zantac was in the packaging. For its part, GSK never publicly disclosed the results of its testing of Zantac using the LC-HRMS testing methods.

28

85.    In response to the FDA's warning, by October 2019, every manufacturer of Zantac and generic ranitidine, including GSK, initiated a recall. Sandoz, a generic manufacturer, did so on September 24; followed by other generic and "store brand" manufacturers, Apotex Corp., Walgreens, Walmart, and Rite Aid, on September 26; CVS, another store brand, on September 28; Sanofi, the incumbent seller of OTC Zantac in the United States, on October 18; and more generic manufacturers, Perrigo, Novitium, and Lannett, on October 28. GSK recalled Zantac from all markets on October 8, 2019.

86.    Similar recalls of Zantac and ranitidine followed in substantially all major markets worldwide, including the European Union (EMA), United Kingdom (MHRA), Australia, Canada, and Hong Kong. In September 2020, the EMA recommended suspension of all products across the European Union containing ranitidine. The EMA cited, among other things, "the presence of low levels of an impurity called [NDMA]," "a probable human carcinogen." Zantac and ranitidine were also banned in additional countries, including Egypt, Ethiopia, Namibia, and Russia.

87.    On April 1, 2020, the FDA granted Valisure's citizen petition, in part, and ordered the immediate withdrawal from the market of all drugs containing ranitidine sold in the United States, releasing the following announcement:

> The U.S. Food and Drug Administration today announced it is requesting manufacturers withdraw all prescription and over-the-counter (OTC) ranitidine drugs from the market immediately. … The agency has determined that the impurity in some ranitidine products increases over time and when stored at higher than room temperatures and may result in consumer exposure to unacceptable levels of this impurity. As a result of this immediate market withdrawal request, ranitidine products will not be available for new or existing prescriptions or OTC use in the U.S.
>
> …
>
> NDMA is a probable human carcinogen (a substance that could cause cancer).
>
> …

New FDA testing and evaluation prompted by information from third-party laboratories confirmed that NDMA levels increase in ranitidine even under normal storage conditions, and NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during distribution and handling by consumers. The testing also showed that the older a ranitidine product is, or the longer the length of time since it was manufactured, the greater the level of NDMA. These conditions may raise the level of NDMA in the ranitidine product above the acceptable daily intake limit.

88.    Since October 2019, neither Zantac nor generic ranitidine has *ever* returned to the market in the United States or in *any* other jurisdiction worldwide in which it was recalled or banned. Since then, *not one* public health agency or government regulator has determined that Zantac or ranitidine is safe to use or eligible to be returned to the market. Sanofi, the current United States trademark holder for OTC Zantac, abandoned in 2020 its efforts to return ranitidine to the market. Instead, Sanofi today markets famotidine (generic Pepcid) as "Zantac 360."

> **2.    GSK Said It Was Investigating the "Source of NDMA" in Ranitidine Even Though It Had Known Since 1982 That NDMA Formed in Zantac Under Normal Storage and Use**

89.    In announcing its Zantac recall on October 8, 2019, a GSK spokesperson told the media that it was "continuing with investigations into the potential source of the NDMA." GSK repeated that claim in a press release at the start of the Class Period on February 5, 2020 and in its 2019 Annual Report on March 4, 2020, both of which were filed with the SEC, stating that GSK was still, months later, "***continuing with investigations into the potential source of NDMA***."

90.    GSK's statements about the "source of NDMA" were important to investors in assessing the scope of GSK's liability to cancer-stricken patients. For example, if the source of NDMA was contamination (as in the recent case of valsartan), then GSK's liability would likely be limited. The contamination might only have been introduced at a certain manufacturing facility and/or during a certain period of time. Injured plaintiffs would face significant, if not insurmountable, difficulty in proving that the Zantac pills that they took were affected by a

contamination of limited scope. If, on the other hand, the source of NDMA was ranitidine itself (which it was), then every single Zantac patient for nearly four decades was exposed to a dangerous genotoxic carcinogen. Critically, if plaintiffs were able to prove that GSK knew before Zantac's approval that the drug degraded into NDMA, the Company's behavior would be subjected to a much greater level of scrutiny, and much greater potential liability. Specifically, GSK could be exposed to punitive damages based on the perception and conclusion that its concealment of these facts was highly cynical and willful. This could potentially increase GSK's exposure by many multiples, as it had in prior pharmaceutical-related personal injury cases, for example, against Takeda and Eli Lily, for claims related to the drug Actos, and against Merck, for claims related to Vioxx, where millions of dollars in punitive damages were awarded to plaintiffs.

91.     In reality, as discussed above, GSK knew prior to February 5, 2020 (and, in fact, since 1982) that the "source of NDMA" was degradation, not contamination.

**D.     Defendants Falsely Downplayed GSK's Exposure to Zantac Litigation**

**1.     GSK Is Sued in the U.S. by Tens of Thousands of Cancer Patients**

92.     Starting in September 2019, tens of thousands of personal injury plaintiffs—patients who had taken Zantac and later been diagnosed with certain cancers (or their heirs, if the patient was deceased)—sued GSK and other ranitidine manufacturers.

93.     Cases were filed in state and federal courts across the United States. GSK generally attempted to remove the cases to federal court but was unable to do so (or attempted to do so, only to have the cases remanded to state court) in cases where a defendant was sued in its home state. Ultimately, GSK was unable to remove to federal court the filed claims of nearly 72,000 personal injury plaintiffs in Delaware state court, plus about 3,000 in California state court and about 1,000 in Illinois state court.

94.     Starting on November 4, 2019, the cases filed in or successfully removed to federal court (a minority of the overall personal injury litigation) were consolidated for pre-trial purposes in a multi-district litigation proceeding ("MDL") in the United States District Court of the Southern District of Florida, *In re Zantac Products Liability Litigation*, No. 20-MD-2924. The MDL consisted of a few thousand plaintiffs who had filed complaints, plus a greater number who "registered" unfiled claims on the MDL Census Registry. While the data on the MDL Census Registry was confidential and not publicly available, it was available to the parties in the MDL, including GSK. According to GSK's public disclosures on the aggregate number of claims, approximately 32,970 unfiled claims on the MDL Census Registry could be "mapped to" GSK.

95.     Pursuant to various orders of the MDL court (including Pretrial Orders Nos. 15, 27, 58, 72, 74, and 79), plaintiffs in filed cases were required to fill out an "Initial Census Form" (ICF), as well as a "Census Plus Form" (CPF) if they alleged personal injury or a claim for medical monitoring. Claimants in unfiled cases were encouraged to register their claims by filling out those forms too. In exchange for registering, unfiled claimants benefited from tolling of the statute of limitations and cost-sharing in obtaining medical records. Plaintiffs in filed cases and clients who retained any attorney who applied for appointment to the Plaintiffs' Steering Committee were required to submit ICFs by April 30, 2020. Plaintiffs in filed cases were required to submit CPFs by July 21, 2020. GSK received a substantial amount of ICF and CPF data on or about those dates, both from plaintiffs required to submit and from additional claimants who chose to register claims.

96.     The ICFs and CPFs provided GSK with important data useful for estimating the scope of its liability and facilitating settlement discussions. These forms called for details, including: whether the plaintiff used Zantac produced from GSK, or otherwise leading to liability for GSK; how long and how frequently they took Zantac; details about their cancer diagnosis; and

what evidence they had in support of these facts. This data allowed GSK to determine whether plaintiffs or claimants purchased Zantac from GSK and to assess the strength and settlement value of their claims. As noted above, the data in the MDL Census Registry was available for GSK to view and to download in aggregated reports but was not made public.

97.    GSK produced the Tanner Study to personal injury plaintiffs in the MDL prior to February 22, 2021. Despite this production, GSK continued its efforts to keep the Study hidden from public investors, designating it as "Confidential" under the Protective Order in the MDL and insisting that any mention of it be redacted from court filings. The Tanner Study was unsealed on December 30, 2022, along with 50,000 pages of other exhibits, but was not mentioned in public reports until the Bloomberg Article published on February 15, 2023.

98.    Fact discovery was completed in the MDL on January 24, 2022 and expert discovery on May 31, 2022. *Daubert* motions were filed on June 13, 2022, opposed on August 1, 2022, and fully briefed as of August 22, 2022. These motions focused, in particular, on plaintiffs' experts' testimony and contentions concerning the causal linkage between ranitidine and cancer.

99.    Before the MDL *Daubert* motions were argued (which occurred on September 21 and 22, 2022 and October 7, 2022), thousands of unfiled claimants exited the MDL Census Registry and filed cases in state court. Approximately 72,000 claims (mostly in multi-plaintiff complaints) were filed against GSK in Delaware state court in August and September 2022.

**2.    Until March 2021, GSK Says Its Exposures to the Risks of Patient Safety and Product Quality Are "Unchanged"**

100.    Despite being sued by tens of thousands of personal injury plaintiffs, and despite being aware of non-public evidence that GSK knew since 1982 that Zantac forms NDMA, GSK's Annual Reports for 2019 and 2020 (filed March 6, 2020 and March 12, 2021, respectively) reassured investors that its risk exposures regarding "patient safety" and "product quality"

remained "***unchanged***." The latter report specifically cited GSK's "***ongoing evaluation of products for the presence of nitrosamines***," meaning the Company was purportedly still investigating the source of NDMA in Zantac, as a reason why its exposure to these risks remained unchanged. This risk management assessment was the same as the risk management assessment set forth in GSK's Annual Report for 2018, which was filed on March 15, 2019—that is, prior to the filing of the numerous personal injury lawsuits.

101.    In reality, prior to filing its 2019 Annual Report on March 6, 2020, Defendants knew that GSK faced much greater liability than the public recognized. That liability was exacerbated by the fact that Defendants also knew it would be revealed (confidentially and subject to court orders) to the plaintiffs in litigation that GSK had concealed studies from the public for decades that Zantac formed NDMA. Those studies, and GSK's historical failure to turn them over to regulators and the public, reflected an effort to conceal adverse facts and a willful, wanton disregard for the safety of patients. Those studies also demonstrate the falsity of GSK's suggestion that NDMA in Zantac could have derived from isolated contamination, which would have resulted in far lower levels of liability. Devastating GSK's defenses, plaintiffs and their lawyers would learn in discovery of the nearly 40-year window of time where GSK allowed Zantac to be sold to consumers while keeping its internal knowledge secret. The Company's knowledge of the NDMA-Zantac connection, and concealment of that knowledge would be used to paint GSK as cynical and dishonest to the juries in those cases, resulting in increased risk for punitive damages.

102.    Defendants' ongoing efforts to conceal the facts from the public is consistent with GSK's cynical approach to disclosure even after Zantac sales were suspended in 2019. GSK executives, including Walmsley and Mackay, had to address the release of the Tanner Study and similar documents to regulators by the end of 2019, as discussed above. Even then, Defendants'

failures of transparency were confirmed by GSK's designation of the Tanner Study as "Confidential" under the Protective Order in the MDL, requiring references to the study to be maintained under seal. The Tanner Study was first publicly reported on in the Bloomberg Article on February 15, 2023.

### 3. GSK Made Public Statements in Litigation That Misled Investors

103.    In memoranda of law filed in the MDL, GSK repeatedly and misleadingly cited the FDA approval of Zantac in 1983 (and thereafter) as evidence of Zantac's safety. For example, GSK stated that the FDA's initial approval of Zantac in 1983 was "***[b]ased on extensive scientific testing***" and that the "***FDA has exhaustively and repeatedly reviewed the safety and efficacy of Zantac throughout its lifecycle***." Those statements were false and misleading because, as GSK knew, for each and every FDA approval (including in 1983, 1995, and 1998), GSK had withheld the Tanner Study from the FDA.

104.    GSK also argued that GCMS testing showing NDMA in Zantac were "***recent revelations***" and denied that GSK "***knew (or should have known) that ranitidine was dangerous from the day it was placed on the market in 1983***." Such statements were false and misleading because GSK actually used GCMS in 1981 and 1982 to test Zantac for NDMA—and found it at dangerous levels.

105.    GSK also argued that plaintiffs failed to allege GSK's pre-approval knowledge that Zantac degrades into NDMA despite defendants' production of "***millions of pages of discovery***." Such statements were false and misleading because those "millions of pages of discovery"—as GSK knew, but investors did not—included the Tanner Study, which demonstrated GSK's pre-approval knowledge that Zantac degrades into NDMA.

### E. Defendants Falsified GSK's Financial Statements by Failing to Recognize a Provision or Contingent Liability for Its Zantac Litigation Exposure

106.    Defendants compounded their misstatements—that the "source of NDMA" in Zantac was unknown, that GSK's risk exposure remained "unchanged" despite tens of thousands of personal injury claims being filed, that the FDA approval supported Zantac's safety, and that plaintiffs were unable to allege GSK's knowledge that Zantac forms NDMA—by quantifying GSK's financial exposure to the Zantac litigation as nil. Although the relevant accounting standards required GSK to establish a provision (commonly referred to as a reserve under U.S. accounting rules) for its estimated exposure, or in the alternative, to disclose a range of exposures as a contingent liability, GSK did neither. That accounting treatment conveyed the false and misleading impressions that the prospect of GSK having to pay to resolve these claims by settlement or judgment was no more than "remote" or else impossible to estimate. In reality, GSK was able to quantify that it had a probable multi-billion-dollar liability that could be estimated with reasonable assumptions. This is apparent from Defendants' own admissions in August 2022, when Defendant Mackay told analysts that GSK's internal liability estimate was in the mid-single-digit billions. Moreover, under IFRS, the accrual of a provision reduces profit in the period the provision is recorded. Thus, Defendants were motivated to avoid, delay, and reduce the record of that provision, as the Company's profitability would have been adversely affected, as would Defendant Walmsley's and Mackay's incentive compensation, which was materially based on GSK's reported profits.

36

### 1.    Background on IFRS

107.    As a UK listed company, GSK was required to prepare its financial statements in accordance with IFRS as issued by the International Accounting Standards Board ("IASB").[5] GSK's Annual Reports for 2019, 2020, and 2021—dated March 4, 2020, March 9, 2021, and March 4, 2022, respectively, and filed with the SEC on Form 20-F on March 6, 2020, March 12, 2021, and March 8, 2022, respectively—stated that GSK's financial statements were prepared in accordance with IFRS as issued by the IASB.

108.    Financial statements (including footnote disclosures) are a central feature of financial reporting. One of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. The Conceptual Framework underlying IFRS states "[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders and other creditors in making decisions about providing resources to the entity." (IASB Conceptual Framework ("IASB CF") OB2.)

109.    The IASB Conceptual Framework also states that investors, lenders, and other creditors are interested to know and understand, among other things, "how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources," while examples of these responsibilities include "protecting the entity's resources from unfavourable effects of economic factors such as price and technological changes and ensuring that the entity complies with applicable laws, regulations and contractual provisions." (IASB CF OB 4; footnote omitted.) Therefore, a reporting entity has a duty to present information

---

[5] As a result of Brexit, starting in fiscal year 2021, changes to IFRS were not effective in the UK until adopted by the UK Endorsement Board (UKEB), but as relevant here, there was no change in the accounting rules applicable to GSK.

in its general purpose financial reports that reflects its actual financial position, which is information about the entity's economic resources and the claims against the reporting entity. (IASB CF OB 12.)

110.    Further, the IASB Conceptual Framework states that the two fundamental qualitative characteristics that make accounting information useful for decision-making are relevance and faithful representation. (IASB CF QC 4 & 5.) To be a faithful representation, information must be complete, neutral, and free from error. (IASB CF QC 12.) "Complete" means providing "all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations." (IASB CF QC 13.) "Neutral" means "without bias in the selection or presentation of financial information . . . not slanted, weighted, emphasized, de-emphasized or otherwise manipulated to increase the probability that financial information will be received favourably or unfavourably by users." (IASB CF QC 14.) "Free from error" means "there are no errors or omissions in the description of the phenomenon, and the process used to produce the reported information has been selected and applied with no errors in the process." (IASB CF QC 15.) "Free from error" would also mean the material conformity with the relevant accounting standards promulgated by IFRS, including International Accounting Standard ("IAS") 37.

### 2.    IAS 37 Requirements for Contingent Liabilities

111.    IAS 37 addresses accounting for "contingent liabilities," which can require either the recognition of a provision or else the disclosure of a contingent liability. IAS 37 requires the recognition of a "provision"—that is, a "liability of uncertain timing or amount"—if (1) a present obligation exists as a result of a past event, (2) an outflow of resources is "probable" and (3) a "reliable estimate" can be made (which it usually can be). IAS 37 ¶14. IAS 37 requires the disclosure of a contingent liability if a present obligation exists as a result of a past event and an

outflow of resources is probable but not subject to reliable estimate (which is "extremely rare"). IAS 37 ¶¶25-26. IAS 37 also requires the disclosure of a contingent liability—even if it is not probable and no reliable estimate can be made—if a "possible" present obligation exists and the probability is not "remote." IAS 37 ¶¶23, 27.

112.    A present obligation can be either "legal or constructive." IAS 37 ¶14. It can arise from a "lawsuit" where liability is "disputed." IAS 37 ¶16. "It is not necessary … to know the identity of the party to whom the obligation is owed." IAS 37 ¶20. A present obligation exists if "taking account of all available evidence, it is more likely than not that a present obligation exists at the end of the reporting period." IAS 37 ¶15.

113.    "Where there are a number of similar obligations … the probability that an outflow will be required in settlement is determined by considering the class of obligations as a whole. Although the likelihood of outflow for any one item may be small, it may well be probable that some outflow of resources will be needed to settle the class of obligations as a whole. If that is the case, a provision is recognized." IAS 37 ¶24.

114.    An outflow of resources is "probable" if it is "more likely than not to occur, i.e., the probability that the event will occur is greater than the probability that it will not." IAS 37 ¶23.

115.    "The amount recognised as a provision shall be the best estimate of the expenditure required to settle the present obligation at the end of the reporting period." IAS 37 ¶36. "The best estimate of the expenditure required to settle the present obligation is the amount that an entity would rationally pay to settle the obligation at the end of the reporting period or to transfer it to a third party at that time." IAS 37 ¶37.

116.    A reliable estimate can be made, even if the liability amount is "uncertain," so long as there is a "range of possible outcomes." "The use of estimates is an essential part of the

preparation of financial statements and does not undermine their reliability. This is especially true in the case of provisions, which by their nature are more uncertain than most other items in the statement of financial position. Except in extremely rare cases, an entity will be able to determine a range of possible outcomes and can therefore make an estimate of the obligation that is sufficiently reliable to use in recognising a provision." IAS 37 ¶25. In such extremely rare cases, a contingent liability must be disclosed. *Id.*

117.    For a provision, the company must disclose "(a) the carrying amount at the beginning and end of the period; (b) additional provisions made in the period, including increases to existing provisions; (c) amounts used (i.e., incurred and charged against the provision) during the period; (d) unused amounts reversed during the period; and (e) the increase during the period in the discounted amount arising from the passage of time and the effect of any change in the discount rate." IAS 37 ¶84.

118.    Under IAS, the accrual of a provision results in a corresponding reduction to income in the period of the accrual. IAS 37 ¶10.

119.    For a contingent liability, the company must disclose "a brief description of the nature of the contingent liability," including "an estimate of its financial effect" and "an indication of the uncertainties relating to the amount or timing of any outflow." IAS 37 ¶86.

120.    "In extremely rare cases," if the disclosure of a provision or contingent liability "can be expected to prejudice seriously the position of the entity in a dispute," the company "need not disclose the information, but shall disclose the general nature of the dispute, together with the fact that, and reason why, the information has not been disclosed." IAS 37 ¶92. GSK did not invoke this provision and made no such disclosure related to Zantac liabilities, which further evidence Defendants' failure to comply with IFRS.

### 3. Violating IFRS and IAS 37, GSK Failed to Take Any Accounting Provision for Zantac

121.    In GSK's Annual Reports for each of 2019, 2020, and 2021, Defendants stated that:

*A provision is made where an outflow of resources is considered probable and a reliable estimate can be made of the likely outcome of the dispute* ….

…
*We provide for the outcome of … legal … disputes when an outflow of resources is considered probable and a reliable estimate of the outflow may be made.* At 31 December [2019, 2020, or 2021, respectively], *other than for those disputes where provision has been made, it was not possible to make a reliable estimate of the potential outflow of funds that might be required to settle disputes where the possibility of there being an outflow was more than remote.*

122.    In each of GSK's press releases announcing quarterly results for 4Q 2019 through 2Q 2022, Defendants' similarly stated that: "*This Results Announcement has been prepared applying consistent accounting policies to those applied by the Group in*" its most recent Annual Report (sometimes with limited exceptions, none relevant here); and "*Provision is made for the outcome of legal … disputes where it is both probable that the Group will suffer an outflow of funds and it is possible to make a reliable estimate of that outflow*."

123.    Yet, contrary to these statements made annually and quarterly in violation of IFRS and IAS 37, GSK recognized zero provision for the Zantac litigation during the entire Class Period (in GSK's Annual Reports for 2019 through 2021 and press releases announcing quarterly results for 4Q 2019 through 2Q 2022). GSK did not disclose a provision for the Zantac litigation until after the Class Period.

124.    GSK first disclosed a provision of £45 ($55) million "primarily reflecting increased legal fees in relation to Zantac," which had "now been classified as a Significant Legal matter," when it announced its 3Q 2022 results (on November 2, 2022). GSK then disclosed a provision of £218 million as of December 31, 2022 in its Annual Report for 2022 (filed March 10, 2023). GSK next disclosed a provision of £267 million as of December 31, 2023 in its Annual Report for 2023

(filed March 5, 2024). GSK then took a £1.8 billion charge in 2024 to fund the expected £1.9 billion cost (£700 million already paid in 2024, and £1.2 billion expected to be paid in 2025) of the settlement announced October 2024. In other words, after depletion for defense costs, at most about £100 million of the provision established in 2023 and 2024 remained available at the time of the October 2024 settlement—meaning that the post-Class Period provision covered only 5% of the cost.

| Year or Quarter | Provision for Zantac litigation[6] |
|---|---|
| Year-end 2019 (6-K filed February 5, 2020 and 20-F filed March 6, 2020) | *Zero* |
| 1Q 2020 (6-K filed April 29, 2020) | *Zero* |
| 2Q 2020 (6-K filed July 29, 2020) | *Zero* |
| 3Q 2020 (6-K filed October 28, 2020) | *Zero* |
| Year-end 2020 (6-K filed February 3, 2021 and 20-F filed March 12, 2021) | *Zero* |
| 1Q 2021 (6-K filed April 28, 2021) | *Zero* |
| 2Q 2021 (6-K filed July 28, 2021) | *Zero* |
| 3Q 2021 (6-K filed October 27, 2021) | *Zero* |
| Year-end 2021 (6-K filed February 9, 2022 and 20-F filed March 8, 2022) | *Zero* |
| 1Q 2022 (6-K filed April 27, 2022) | *Zero* |
| 2Q 2022 (6-K filed July 27, 2022) | *Zero* |
| **Post Class Period:** | |
| 3Q 2022 (6-K filed November 2, 2022) | £45 ($55) million "primarily reflecting increased legal fees in relation to Zantac" |
| Year-end 2022 (20-F filed March 10, 2023) | £218 ($269) million provision |
| Year-end 2023 (20-F filed March 5, 2024) | £267 ($332) million provision |
| Year-end 2024 (20-F filed March 3, 2025) | £1.9 billion ($2.413 billion) charge (£700 million ($894.6 million) paid in 2024; £1.2 billion ($1.53 million) expected to be paid in 2025) |

---

[6] British pounds to US dollars exchange rates in this Complaint are reflective of applicable exchange rates for the respective year.

125.    In each of its financial statements during the Class Period, GSK reported (1) a "charge" for "significant legal matters" that "included the settlement of existing matters as well as provisions for ongoing litigation"; (2) "[s]ignificant legal cash payments"; and (3) "provisions at the year-end … related to legal and other disputes." None of these provisions was for the Zantac litigation, which GSK did not classify as a "Significant Legal matter" until 3Q 2022, after the Class Period.

| Annual or Quarterly Report | "Charge" for "significant legal matters" | "Significant legal cash payments" | Ending provision for "legal and other disputes" |
|---|---|---|---|
| Full-year 2018 | £33 ($44) million | £39 ($52) million | £219 ($292) million |
| Full-year 2019 | £251 ($320) million | £294 ($375) million | £198 ($253) million |
| 1Q 2020 | £5 ($6.4) million | £5 ($6.4) million | £0.3 ($0.4) billion |
| 2Q 2020 | £1 ($1.3) million | £1 ($1.3) million | £0.3 ($0.4) billion |
| 3Q 2020 | Zero | £1 ($1.3) million | £0.3 ($0.4) billion |
| Full-year 2020 | £7 ($9) million | £9 ($11) million | £320 ($411) million |
| 1Q 2021 | -£1 ($1.4) million (credit) | £1 ($1.4) million | £0.3 ($0.4) billion |
| 2Q 2021 | -£11 ($15.1) million (credit) | £1 ($1.4) million | £0.2 ($0.3) billion |
| 3Q 2021 | -£11 ($15.1) million (credit) | £4 ($5.5) million | £0.2 ($0.3) billion |
| Full-year 2021 | £26 ($35) million | £5 ($7) million | £196 ($269) million |
| 1Q 2022 | Not disclosed | Not disclosed | £0.2 ($0.24) billion |
| 2Q 2022 | Not disclosed | Not disclosed | £0.2 ($0.24) billion |

126.    At the times of each Annual Report and press release announcing quarterly results filed during the Class Period (GSK's Annual Reports for 2019 through 2021 and press releases announcing quarterly results for 4Q 2019 through 2Q 2022), it was more likely than not that GSK had a present legal obligation to pay a material amount (more than $1 billion) to resolve the tens of thousands of Zantac personal injury claims against it, considered as a whole. The Zantac cases arose from past events: GSK's decades-long conduct in selling a drug that it knew formed NDMA,

a genotoxic carcinogen. It would have been rational for GSK to pay billions of dollars to settle the cases—as in fact it did, even after and despite obtaining a favorable *Daubert* ruling from the MDL court resulting in the dismissal of all cases in the MDL (which result was uncertain and far from guaranteed during the Class Period). It was possible for GSK to make a reliable estimate of its Zantac liability.

127.    At the times of each Annual Report and press release announcing quarterly results filed during the Class Period (GSK's Annual Reports for 2019 through 2021 and press releases announcing quarterly results for 4Q 2019 through 2Q 2022), Defendants were aware of significant non-public evidence—including the Tanner Study—giving rise to a strong "failure to warn" claim with significant jury appeal. The non-public evidence available to Defendants was entirely contrary to GSK's public statements (*supra* Sections IV.C and IV.D) that the source of NDMA in Zantac required investigation and that GSK did not know and could not have known that Zantac formed NDMA. Defendants concealed this evidence from investors by insisting that it be designated as "Confidential" under the MDL Protective Order—even though it was decades old; and related to a product that GSK was no longer selling, had no plans to sell, and had not sold for years.

128.    At the times of each Annual Report and press release announcing quarterly results filed during the Class Period (GSK's Annual Reports for 2019 through 2021 and press releases announcing quarterly results for 4Q 2019 through 2Q 2022), Defendants also possessed significant non-public information about the number and nature of claims against GSK and about the settlement value of those claims (including from GSK's own extensive experience with products liability litigation, including litigation relating to Paxil, Advair, and Avandia).

129.    At the times of GSK's Annual Reports for 2020 and 2021 and press releases announcing quarterly results for 2Q 2020 through 2Q 2022, GSK had also received a wealth of additional non-public data in connection with the MDL Census Registry. GSK received a substantial initial production of ICF data on or about April 30, 2020 and a substantial initial production of CPF data on or about July 21, 2020. The MDL Census Registry data covered both filed and registered but unfiled claims and enabled GSK to estimate the number, strength and value of the claims with a high degree of reliability.

130.    Although Defendants had the ability to estimate or actually quantified the estimated liability, they chose not to disclose any such estimate until August 2022—after analysts and experts had made public less favorable estimates. Specifically, as discussed below (Section V), analysts estimated GSK's liability in mid-August 2022. On August 16, Defendant Mackay confirmed that the analysts were directionally correct—telling Credit Suisse that: "GSK views the size of the total potential settlement for all parties, assuming ranitidine cased cancer, would be in the mid $ billions range" (i.e., near the middle of the range between $1 billion and $10 billion). Mackay was asked to clarify what he meant by "mid billions" and he responded that (according to Credit Suisse's notes): "Think multiple 10s of billions not likely." Mackay discussed the status of the litigation, including the information from the MDL Census Registry (which was not public), and then stated: "When we take those factors, average settlements in these cases, we get to numbers at lower level than those in some research in the last few weeks. $45bn is the high end of the range. In GSK's view, this is 'not on the cards.'"

131.    In delivering GSK's "mid $ billions" estimate, Mackay did not say when that estimate had been formed. He did not, for example, say that the estimate had been formed between March 4, 2022 (the date of GSK's Annual Report for 2021) and August 16, 2022—or, for that

matter, after the dates of GSK's other financial statements during the Class Period. Nor did Mackay identify any new development before which it would not have been possible to estimate GSK's liability—which, per IAS 37, would be "extremely rare." To the contrary, Mackay referred to facts (including data from the MDL Census Registry and GSK's precedent settlements of other product liability matters) that were available earlier. Moreover, as of August 2022, GSK had not settled any Zantac cases; it did not do so until June 2023. GSK would have had access to all the bases for the estimate identified by Mackay—such as the number of plaintiffs and the "average settlements" in "analogue" cases—throughout the Class Period.

132.    No new factual development between the end of the Class Period and year-end 2022, when GSK established a (still inadequate) provision of £218 million, justifies GSK's failure to take a provision earlier. Of the 72,000 plaintiffs who filed claims against GSK in Delaware in August and September 2022, at least 79% of them had previously registered unfiled claims on the MDL Claims Registry and provided GSK with detailed information about their claim. Moreover, on December 6, 2022, the MDL court entered a *Daubert* order that resulted in the dismissal of all the claims pending in the MDL. Prior to the MDL *Daubert* order, a reasonable estimate of GSK's liability would have been even higher than after the MDL *Daubert* order.

### 4.    GSK Also Failed to Disclose a Contingent Liability for Its Zantac Litigation Exposure

133.    In the alternative, in GSK's Annual Reports and press releases announcing quarterly results filed throughout the Class Period, Defendants should have disclosed a multi-billion-dollar contingent liability for the Zantac litigation. Even if Defendants believed that liability was not probable and/or impossible to reliably estimate (which they did not), IAS 37 still required them to disclose a contingent liability so long as it was not "remote." Further, Defendants were required to include "a brief description of the nature of the contingent liability," including

"an estimate of its financial effect" and "an indication of the uncertainties relating to the amount or timing of any outflow." IAS 37 ¶86. The omission of the discussion required by IAS 37 made Defendants' financial statements materially misleading.

134.    GSK disclosed only the contingent liabilities depicted below, as of year-end, in its financial statements for 2019, 2020, and 2021. GSK did not state that any of these contingent liabilities were for the Zantac litigation. Nor do these amounts correspond to any plausible estimate of GSK's Zantac litigation exposure.

| Annual or Quarterly Report | Guarantees | Other contingent liabilities | Total contingent liabilities |
|---|---|---|---|
| Full year 2018 | £33 ($44) million | £60 ($80) million | £93 ($124) million |
| Full year 2019 | £32 ($41) million | £65 ($83) million | £97 ($124) million |
| Full year 2020 | £34 ($43) million | £104 ($133) million | £138 ($177) million |
| Full year 2021 | £12 ($16.5) million | £114 ($157) million | £126 ($173) million |

## V.    THE RELEVANT TRUTH EMERGES

135.    Defendants misled investors by (1) misleadingly stating that GSK was investigating the source of NDMA in Zantac; (2) falsely stating that GSK's exposure to the risks of patient safety and product quality remained unchanged; (3) misleadingly touting the scientific data provided to the FDA in connection with Zantac's approval and the purported lack of evidence of GSK's knowledge in the voluminous discovery produced in the MDL; and (4) failing to report a provision or contingent liability related to GSK's exposure in Zantac lawsuits. As a result, GSK downplayed the scope of its liability and misled the market about the Company's potential exposure. Investors began to learn the relevant truth when (1) damning evidence, which was confidentially filed under seal in the MDL litigation, began to leak out in August 2022, and (2) securities analysts studying the Zantac litigation undertook efforts to analyze the true scope of GSK's liability based on voluminous and complex materials not readily available or digestible to ordinary investors. When

its ADR price fell, GSK ultimately admitted that its liability was probable and subject to reasonable estimation. Evidence of Defendants' scienter came out subsequently in February 2023 and thereafter, as set forth below in Section VII.

136.    On August 1, 2022, the MDL lead plaintiffs filed their oppositions to Defendants' *Daubert* and summary judgment motions. Attached to those oppositions were more than 7,000 pages of evidentiary exhibits, including the Tanner Study. While those filings were made under seal, under the terms of the Protective Order, they were permitted to be shared with tens of thousands of people (including the parties, their counsel, experts, and support staff), any of whom could have traded on the information themselves or tipped third parties who could have traded, which caused the information revealed in the MDL filings to begin to be incorporated into GSK's ADR price.

137.    As these *Daubert* motions were filed and being briefed, securities analysts and the media began to focus on the severity and magnitude of GSK's potential liability, which Defendants had downplayed and publicly indicated was effectively nonexistent. Following those filings, the focus on and news about the evidence against GSK (and the other defendants) attracted the focus of analysts who published market-moving revelations concerning the true scope of GSK's liability risks from the Zantac litigation.

138.    On August 10, 2022 by 11:01 a.m. eastern time, Deutsche Bank published an analysis of the Zantac litigation. Deutsche Bank's lead analyst, Emmanuel Papadakis, held a PhD in Gene/Genetic Therapy, a BSc in Biochemistry, and a CFA certification, and had been a pharmaceutical equity analyst for 14 years. Papadakis was assisted by four research associates. The report states that Deutsche Bank had been "holding our pen on this topic pending a detailed review of the subject." In discussing the key perspectives on the litigation, Deutsche Bank stated

that with "the levels of NDMA and extent of any corporate misdem[eanor]/lack of due care, the reality is the FDA requested the product withdrawn and there is a broad acceptance of NDMA's link with carcinogenicity per se," while noting that the cases involve allegations of "lack of full record disclosure/email deletion, etc., which typically makes jury-based tort cases challenging [for the defendants]." These considerations furthered Deutsche Bank's conclusion that "it seems very possible parties (GSK/Haleon, PFE, BI, SAN) will incur the risk of some degree of shared liability with the only real questions being what the magnitude of the liability may be." The report concluded that it is "*very possible* we may see a liability of *some $bn magnitude* incurred" and estimated the exposure "in the *$5-10bn*" range.

139.    As a result of this disclosure, the price of GSK ADRs declined by about $1.73 per share, or 4.3%, from a closing price of $40.03 on August 9, 2022 to a closing price of $38.30 on August 10, 2022.

140.    On August 11, 2022, Credit Suisse published two analyst reports (one for GSK, one for Sanofi) addressing the Zantac litigation. The reports were authored by Credit Suisse's European Pharma Team, which included analyst Matthew Weston, PhD, who had 22 years of experience as a pharmaceutical research analyst, including 14 as a Managing Director at Credit Suisse. The reports noted that "Investor interest has increased sharply in the ongoing Zantac product liability litigation," and that GSK, Sanofi, and Pfizer's market capitalization were down $12 billion, $18 billion, and $8 billion, respectively—an aggregate amount of $38 billion—month to date. Credit Suisse also provided in its analysis that: "If liabilities were split by cumulative sales over time, this would imply *80% for GSK as brand originator* and 20% for the combined OTC manufacturers." Credit Suisse's analysis that GSK was responsible for 80% of sales could not be calculated directly from any of GSK's or the other defendants' public disclosures. Rather, it was

cited to "Credit Suisse estimates." Credit Suisse's estimate suggested GSK would be responsible for a larger share of the Zantac liability than already reflected in the recent price declines. GSK's $12 billion market capitalization decline was only 31% of the aggregate market capitalization decline of GSK, Sanofi, and Pfizer—not 80%.

141.    As a result of these disclosures, the price of GSK's ADRs declined by $2.57 per share, or nearly 6.7%, from a closing price of $38.30 on August 10, 2022, to a closing price of $35.73 on August 11, 2022.

142.    On Monday, August 15, 2022, Credit Suisse hosted a call with a litigation expert, who explained that a Zantac liability of $10 billion was "feasible."

143.    As a result of this disclosure, the price of GSK's ADRs traded materially lower than their $36.03 August 12, 2022 closing price from the open of trading on August 15, 2022 and ultimately declined by $1.08 per ADR, or nearly 3%, to close at of $34.95 on August 15, 2022.

144.    Defendant Mackay, GSK's CFO, responded to the above disclosures on August 16, 2022, by disputing the magnitude of the analysts' estimates—asserting that GSK estimated Zantac liability in the "mid $ billions," lower than the ranges quoted by some analysts—but effectively confirming that GSK's potential liability was both very significant, probable and subject to reliable estimate. These statements were disclosed in an analyst report published by Credit Suisse which stated that it was a report on a call their analysts had with Defendant Mackay. Defendants did not issue a statement or other disclosure correcting, clarifying or contesting the statements attributed to Mackay in the Credit Suisse report.

145.    In the aggregate, GSK's ADR price declined by $7.22 per share (or about 17%), from a closing price of $42.17 on July 29, 2022, to a closing price of $34.95 on August 15, 2022.

146.    The leakage of information between August 1 and 15, 2022 is supported by, among other circumstances, the sustained declines in the stock prices of GSK, its MDL co-defendants (Sanofi and Pfizer), and Haleon (which, GSK had stated, could be liable to indemnify GSK). Beyond the analyst reports discussed above, which repeatedly noted the new focus on the potential Zantac liabilities beginning on August 1, 2002, no other published negative information about these four companies explains their synchronized declines during these two weeks.



147.    Many analysts and GSK itself have attributed the above declines in GSK's stock price to the Zantac litigation. For example, on August 10, 2022, Guggenheim published an analyst report stating that Sanofi and GSK shares traded down, -8.2% and -5.5%, respectively, "which appears to be due largely to investor uncertainty around ongoing litigation involving Zantac (ranitidine)." On August 11, 2022, JP Morgan published an analyst report which affirmatively stated that the day before, "Haleon shares fell -8%" due to "market sentiment around potential

Zantac liabilities." Additionally, at the CitiBioPharma Conference on September 7, 2022, Citigroup's analyst recognized that with respect to nitrosamines, companies like GSK were "struggling and their share price has been sorely impacted by the feared liability risk." Likewise, on GSK's third quarter 2022 earnings call on November 2, 2022, Defendant Mackay recognized "the impact [Zantac] has had on the stock price over the recent months."

148.    Also supportive of leakage, the "short interest" in GSK spiked from a *10-year low* of 0.01% of its free float on July 15 to a *10-year high* of 1.66% of its free float on September 14.

## VI.    **POST-CLASS PERIOD DEVELOPMENTS**

149.    On November 2, 2022, GSK belatedly classified the Zantac litigation as a "Significant Legal matter" and took a "charge of £45 million … primarily reflecting provision for increased legal fees in relation to Zantac."

150.    On December 6, 2022, the MDL court granted defendants' *Daubert* motion to exclude plaintiffs' general causation experts and granted defendants' summary judgment motion on the ground that plaintiffs were unable to prove liability without such testimony. Following that ruling, the MDL court unsealed nearly all of the briefs and exhibits filed in connection with the *Daubert* and summary judgment rulings, more than 50,000 pages in all. Those unsealed papers were filed on the MDL docket, which contained more than 6,000 entries at that time, starting on December 30, 2022. The MDL court's *Daubert* ruling is pending on appeal before the Eleventh Circuit, while state court litigation has progressed to partial settlement as set forth below.

151.    On February 15, 2023, the Bloomberg Article was published. The article confirmed GSK executives were aware of GSK's long-concealed findings that Zantac formed NDMA, and namely, "that Glaxo didn't share a critical study," i.e., the Tanner Study, "backed flawed research designed to minimize concerns and chose not to routinely transport and store the medication in ways that could have eased the problem." The article details that the Tanner Study was undertaken

in response to information GSK received from a rival pharmaceutical company, indicating the formation of NDMA in ranitidine. GSK then set out to confirm those findings, directing Tanner to investigate them. The Tanner Study confirmed those conclusions that ranitidine forms high levels of NDMA, far exceeding safe limits.

152.    The Bloomberg Article details internal concerns at GSK from the early 1980s focused on the instability of Zantac, noting it was "sensitive to heat and humidity, and when exposed to too much of either could degrade. This is what the FDA would later focus on: that in certain conditions, not necessarily extreme ones, sometimes normal room temperature, ranitidine starts to fall apart. That creates conditions for NDMA to form in the drug itself." These issues and internal GSK concerns were not disclosed to investors. Critically, the Bloomberg Article was based on documents that are "still under seal" and cited a November 2019 email from a "senior GSK executive," who wrote: "All, we have an urgent need to identify if the following study report [the Tanner Study] was submitted in the European Union and United States." Beyond that quote, the November 2019 email has yet to be made public.

153.    State courts in Delaware, California, and Illinois declined to follow the MDL *Daubert* ruling and have denied Defendants' motions to exclude plaintiffs' general causation experts in the cases pending in those courts, thus clearing the way for the state-court cases to proceed to trial. For example, on March 23, 2023, the first California state court "*Sargon*" ruling was in plaintiffs' favor. Similarly, the Delaware *Daubert* ruling on June 3, 2024, denied the motion to exclude Plaintiffs' general causation experts.

154.    In 2023 and 2024, GSK settled several individual bellwether cases in California and Illinois for undisclosed amounts. Between June and September 2024, GSK reached four confidential settlements in product liability cases filed in Illinois state court.

155.    In March 2024, Valisure's *qui tam* action against GSK was unsealed. In May 2024, Valisure—represented by new counsel, with access to the discovery from the personal injury cases—filed an amended complaint that publicly revealed for the first time (*see supra* ¶¶75-76) the full text of the inquiry that GSK received from the FDA in August 2019. This added new context to the email between GSK executives quoted in the Bloomberg Article, explaining why those executives had an "urgent need" to focus on the Tanner Study. In May 2025, GSK paid $67.5 million to resolve the Valisure *qui tam* case.

156.    On June 10, 2024, GSK filed an application for interlocutory review of the Delaware *Daubert* ruling by the Delaware Supreme Court. In that filing, GSK revealed that 79% of the Delaware state court plaintiffs had previously registered claims on the MDL Census Registry. Previously, GSK's Delaware *Daubert* brief (dated November 15, 2023) said that "tens of thousands" of Delaware plaintiffs had previously registered claims on the MDL Census Registry. This confirmed that the cases filed against GSK in Delaware state court after the Class Period were filed by claimants known to GSK during the Class Period.

157.    On October 9, 2024, GSK announced a $2.2 billion settlement with clients of several law firms that, according to GSK, represent 93% of the personal injury plaintiffs. As discussed above, because the Company had failed to establish an adequate provision for its Zantac liability, GSK took a £1.8 billion charge to income in 2024 to cover substantially all the cost of that settlement.

158.    GSK continues to face additional Zantac liability, including to the MDL appellants and the state court plaintiffs not covered by the settlement.

## VII.   ADDITIONAL ALLEGATIONS OF SCIENTER

159.   Numerous facts including those detailed above, considered collectively, demonstrate that Defendants knew or recklessly disregarded that their statements (*see* Section VIII) were materially false or misleading.

160.   *First*, Defendants Walmsley and Mackay knew, by no later than December 2019, about the Tanner Study and the fact that GSK withheld it from the FDA, EMA, and other regulators worldwide for decades. The Tanner Study and GSK's concealment of it from the FDA, EMA, and other regulators worldwide directly contradict Defendants' statements that the "source of NDMA" in Zantac required further investigation; that GSK's exposure to the risks of patient safety and product quality remained "unchanged" in 2019 and 2020 (after litigation commenced); and that the FDA had approved Zantac based on "extensive" scientific evidence; as well as Defendants' failure to take a provision or disclose a contingent liability for Zantac litigation exposure.

161.   The extraordinary sequence of events from August to December 2019 confirms that the Tanner Study was a focus at the highest levels of GSK in the months immediately prior to the Class Period. In August 2019, the FDA specifically asked whether NDMA could be present in Zantac and whether GSK had tested for NDMA, including in simulated gastric conditions. In September 2019, GSK falsely represented to the FDA that it had conducted such testing, even though the Tanner Study was directly responsive to the FDA's questions. Later in September 2019, the EMA specifically asked GSK for all data on the carcinogenic potential of Zantac, including any in-vitro studies in simulated gastric conditions. In October 2019, GSK falsely denied to the EMA that the Company had investigated NDMA generation in simulated gastric conditions, even though the Tanner Study was directly responsive to the EMA's inquiry. Then, in November 2019, a "senior GSK executive" sent an internal email to "colleagues" about an "urgent need" to determine whether the Tanner Study had ever been shared with the FDA or EMA. And in

December 2019, GSK finally turned over the Tanner Study to the EMA and FDA—37 years after GSK's initial new drug application in 1982.

162.    The group of senior GSK executives aware by December 2019 of the Tanner Study and of GSK's concealment of it from regulators included GSK's senior-most executives. Defendants Walmsley, Mackay, and GSK's General Counsel and Chief Scientific Officer, who reported directly to Walmsley, were all directly involved in the events around the suspension and recall of Zantac, as well as managing the eventual litigation response. Walmsley chaired GSK's Corporate Executive Team, which made the decision to recall and stop selling Zantac. Mackay was also a member of GSK's Corporate Executive Team and was responsible for managing the Zantac litigation risks. The scienter of each of these management-level executives, including the General Counsel and Chief Scientific Officer, is imputable to GSK.

163.    ***Second***, Defendants Walmsley and Mackay oversaw GSK's defense of the Zantac litigation and GSK's disclosures regarding it, including GSK's failure to establish an accounting provision or contingent liability for Zantac in its financial statements. On GSK's third quarter 2022 earnings call, held on November 2, 2022, Walmsley stated that Mackay, together with GSK's General Counsel, was "***on point*** for the Zantac world" "both from a governance and a disclosure point of view." Consistent with his on-point role, Mackay spoke to analysts on August 16, 2022, providing GSK's liability estimate and discussing the matter in detail, including GSK's analysis of data from the MDL Census Registry.

164.    Walmsley and Mackay spoke publicly about the Zantac litigation, revealing their close involvement. For example, Walmsley addressed the litigation in detail at the Bank of America Merrill Lynch Global Healthcare Conference on September 16, 2022, and Mackay on GSK's third quarter 2022 earnings call on November 2, 2022. Mackay was interviewed by analysts

at Credit Suisse on August 16, 2022, and provided detailed comments and GSK's internal estimate of a multi-billion-dollar exposure to the Zantac claims. Given their roles overseeing GSK's litigation defense, Walmsley and Mackay were aware of the Tanner Study and possessed information relevant to GSK's probable exposure (including the MDL Census Survey).

165.    GSK represented in its Annual Reports before, during, and after the Class Period that its General Counsel and Global Head of Litigation "routinely brief" its CEO and CFO (during the Class Period, Defendants Walmsley and Mackay) on "significant litigation pending against the Group" and that those briefings "detail the status of significant litigation … and review matters such as the number of claims notified to us, information on potential claims not yet notified, assessment of the validity of claims, progress made in settling claims, recent settlement levels and potential reimbursement by insurers."

166.    ***Third***, Defendants' decisions to take zero provision and not to disclose any contingent liability for the Zantac litigation at year-end 2019, 2020, and 2021 were egregious. Defendants knew that a multi-billion-dollar exposure was likely and hardly remote. Defendants were also aware of non-public evidence indicating that the claims against GSK were particularly strong, including the 1982 Tanner Study confirming Zantac's formation of NDMA and the fact that the Tanner Study was concealed from regulators, doctors, and patients for four decades. Defendants were also aware of non-public information relevant to estimating GSK's liability, including the terms of GSK's precedent mass tort settlements and data from the MDL Census Survey.

167.    During the Class Period, if Defendants had followed the process required by IFRS and IAS 37 (as they represented they did), they either did or at minimum should have determined that GSK's Zantac litigation exposure was at least in the billions of dollars. GSK was required to

record such a provision or disclose such a contingent liability. It did neither, in violation of IFRS and IAS 37. Defendant Mackay informally disclosed GSK's estimate in August 2022 only after investment bank analysts had estimated a higher range for GSK's liability and GSK's market capitalization had plummeted by billions of dollars. GSK also gave pretextual reasons for establishing a (still-inadequate) provision at year-end 2022, citing the "increase in cases" that year. Yet, as GSK more recently revealed, 79% of those "new" cases were filed by plaintiffs who had previously registered claims in the MDL and just moved their claims from the MDL to state courts.

168.    Defendants first classified the Zantac litigation as a "Significant Legal matter" in its disclosure in the third quarter of 2022 on November 2, 2022, after the Class Period. Deloitte's audit report for 2022 noted GSK's new classification of the Zantac litigation as a significant legal matter during 2022 and identified GSK's application of IAS 37 to the Zantac litigation as a "critical audit matter." Deloitte's audit reports for 2023 and 2024 again identified GSK's application of IAS 37 to the Zantac litigation as a "critical audit matter." There is no indication that Deloitte's audits for 2019, 2020, and 2021 devoted substantial attention to the Zantac litigation, which follows from and is consistent with GSK management's failure to classify the Zantac litigation as a "Significant Legal matter" during those years. By failing to identify the Zantac litigation as a "Significant Legal matter" Defendants were able to avoid any material review or consideration of these matters by Deloitte, and thus escaped any scrutiny by GSK's purportedly independent auditor. In addition, GSK's quarterly reports filed on Form 6-K were unaudited.

169.    **Fourth**, the misstatements regarding the "source of NDMA," GSK's risk exposure, and GSK's financial statements were included in GSK's Annual Reports filed with the SEC on Form 20-F. Walmsley and Mackay were required to certify the accuracy of those 20-Fs pursuant

to Sections 302 and 906 of the Sarbanes Oxley Act of 2002 ("SOX"). Walmsley and Mackay signed SOX Certifications for GSK's Forms 20-F for 2019, 2020, and 2021.

170.    Walmsley's and Mackay's SOX Certifications state that (1) they "are responsible for establishing and maintaining disclosure controls and procedures [] and internal control over financial reporting" for GSK, (2) they "designed" and "evaluated" GSK's disclosure controls, and (3) they "designed with such internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

171.    Defendants further represented in each SOX Certification that they disclosed to GSK's auditors and the audit committee of GSK's board of directors: (1) "All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information" and (2) "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."

172.    The Defendants who signed the SOX Certifications also confirmed that they reviewed the report to which the Certification was attached and that:

> [] Based on my knowledge, this [] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> [] Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

173.    If Defendants reviewed and evaluated the financial statements as represented in each of the SOX Certifications, such review would further confirm that they would have been

alerted to GSK's failure to establish an accounting provision or contingent liability for Zantac. Defendants, therefore, either knew of the material misstatements and omissions contained in GSK's financial statements or failed to perform the required reviews and falsely represented that they had. In either scenario, Defendants' knowing or reckless SOX Certifications further support an inference of their scienter.

174.    **Fifth,** Zantac was the single most important product in GSK's history, and it continued to remain an important current product during Walmsley's tenure as head of the Consumer Healthcare division and as CEO. GSK had sold Zantac to millions of patients over four decades. After those sales to millions of patients and multiple transactions involving GSK's property rights with other OTC and generic companies, Zantac was rapidly recalled and then pulled from the market. These events were significant and required the attention of both Walmsley and Mackay. Information that Zantac formed NDMA, a genotoxic carcinogen, was extremely important—not only to GSK's balance sheet, but also to its regulatory obligations and reputation. Such information (and the fact that it had been concealed from regulators for decades) would have been, and was, rapidly escalated to GSK's senior executives. In the words of one GSK senior executive in the email reported in the Bloomberg Article, it was an "urgent" matter.

175.    **Sixth**, Defendants Walmsley and Mackay had personal financial motives to obtain incentive compensation inflated by GSK's failure to take a provision of its Zantac litigation exposure in 2019 to 2021 and by GSK's inadequate Zantac litigation provision in 2022. Since the accrual of a provision is a charge against (and reduction to) profit, if GSK had taken a provision that was even a fraction of the £1.9 billion partial settlement announced in October 2024 at any time during the Class Period, Walmsley and Mackay would have been deprived of millions of dollars of cash bonuses. Specifically, Walmsley and Mackay would have been deprived of at least

***£1.921 million*** for 2019, ***£2.028 million*** for 2020, ***£2.068 million*** for 2021, and ***£1.718 million*** for 2022.[7] Walmsley and Mackay's desire to receive this compensation provided a powerful motive to conceal the truth about Zantac.

176.     For 2019, Walmsley and Mackay earned fixed pay (inclusive of base salary, benefits, and pension) of £1.532 million and £1.135 million, respectively. Walmsley and Mackay were also eligible for target cash bonuses of 100% of their base salaries and maximum bonuses of 200% of their base salaries. 70% of their potential cash bonuses for 2019 were tied to GSK's adjusted Group PBIT in 2019.[8] If GSK's 2019 adjusted PBIT was less than the minimum threshold of £7.6304 billion, then the PBIT portion of Walmsley and Mackay's 2019 cash bonuses would have been erased entirely. GSK reported adjusted Group PBIT of £8.177 billion for 2019, which resulted in Walmsley and Mackay receiving ***£1.088 million*** and ***£833,000***, respectively. If GSK's adjusted Group PBIT had been even £546.6 million less (or ***just 28%*** of the eventual October 2024 partial Zantac settlement), it would have fallen below the minimum threshold and Walmsley and Mackay would have been deprived of those amounts entirely.

177.     For 2020, Walmsley and Mackay earned fixed pay (inclusive of base salary, benefits, and pension) of £1.585 million and £1.2 million respectively. Walmsley and Mackay were also eligible for target cash bonuses of 100% of their base salaries and maximum bonuses of 200% of their base salaries. 70% of their potential cash bonuses for 2020 were tied to GSK's adjusted Group PBIT in 2020. If GSK's 2020 adjusted Group PBIT was less than the minimum threshold of £8.212 billion, then the PBIT portion of Walmsley and Mackay's 2020 cash bonuses

---

[7] At then-prevailing exchange rates, these amounts were equivalent to approximately $2.45 million, $2.6 million, $2.84 million, and $2.12 million, respectively.

[8] For executive compensation purposes, GSK's adjusted Group PBIT was "calculated applying GSK budget exchange rates and not actual exchange rates," and therefore differs from the adjusted Group PBIT reported in GSK's financial statements.

would have been erased entirely. GSK reported adjusted Group PBIT of £8.271 billion for 2020, which resulted in Walmsley and Mackay receiving ***£1.175 million*** and ***£853,825*** respectively. If GSK's adjusted Group PBIT had been even £59 million less (or ***just 3%*** of the eventual October 2024 partial Zantac settlement), it would have fallen below the minimum threshold and Walmsley and Mackay would have been deprived of those amounts entirely.

178.    For 2021, Walmsley and Mackay earned fixed pay (inclusive of base salary, benefits, and pension) of £1.602 million and £1.309 million, respectively. Walmsley and Mackay were also eligible for target cash bonuses of 100% of their base salaries and maximum bonuses of 200% of their base salaries. 70% of their potential cash bonuses for 2021 were tied to GSK's adjusted Group PBIT in 2021. If GSK's 2021 adjusted Group PBIT was less than the minimum threshold of £7.841 billion, then the PBIT portion of Walmsley and Mackay's 2021 cash bonuses would have been erased entirely. GSK reported adjusted Group PBIT of £8.562 billion for 2021, which resulted in Walmsley and Mackay receiving ***£1.198 million*** and ***£870,901*** respectively. If GSK's adjusted Group PBIT had been even £308 million less (or ***just 16%*** of the eventual October 2024 partial Zantac settlement), it would have fallen below the minimum threshold and Walmsley and Mackay would have been deprived of those amounts entirely.

179.    For 2022, Walmsley and Mackay earned fixed pay (inclusive of base salary, benefits, and pension) of £1.644 million and £1.389 million, respectively. Walmsley and Mackay were also eligible for target cash bonuses of 100% of their base salaries and maximum bonuses of 300% of their base salaries. 30% of their potential cash bonuses for 2022 were tied to GSK's adjusted operating profit growth in 2022. If GSK's adjusted operating profit growth in 2022 was 12.8%, Walmsley and Mackay would receive their target bonuses in that category (equivalent to 30% of their base salaries). GSK reported adjusted operating profit growth, for compensation

purposes of 16.8% in 2022,[9] which exceeded the target growth rate by 4%. As a result, Walmsley and Mackay obtained bonuses representing 79% of their base salary tied to adjusted operating profit growth—*£995,285* for Walmsley, and *£723,114* for Mackay. GSK reported adjusted operating profit of £8.151 billion in 2022, after establishing a provision of £218 million for the Zantac litigation as of year-end 2022. If that provision had been just £305 million more (*i.e.*, £523 million, or *just 27%* of the eventual October 2024 partial Zantac settlement), GSK's adjusted operating profit growth would have fallen below the 12.8% target and Walmsley and Mackay would have been deprived of those amounts entirely.

## VIII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

180.    Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions, including those concerning: (1) GSK's investigation into the source of NDMA in Zantac; (2) GSK's exposure to the risks of patient safety and product quality; (3) the scientific data provided to the FDA in connection with Zantac's approval and the discovery produced in the MDL; and (4) the amount of GSK's probable Zantac litigation exposure.

181.    The alleged materially false and misleading statements are set forth below in their original context, with the specific language or passages that Plaintiffs' alleged to be false or misleading identified by *emphasis*.

---

[9] For financial statement purposes, GSK reported adjusted operating profit growth for 2022 of 26% (based on "AER" or actual exchange rates) and 14% (based on "CER" or constant exchange rates). 16.8% appears to reflect the CER growth rate, plus 2.8% added back in purportedly to exclude an effect of the COVID-19 pandemic. Elsewhere in the Annual Report, GSK claimed adjusted operating profit growth of "+17% excl COVID."

A.    **Materially False and Misleading Statements Concerning GSK's Representation That the "Source of NDMA" in Zantac Was Unknown**

182.    Throughout the Class Period, Defendants made misstatements that were misleading in light of GSK's undisclosed knowledge that Zantac (ranitidine) degrades into NDMA. On the first day of the Class Period, in GSK's press release announcing full year and fourth quarter 2019 results, filed with the SEC on Form 6-K on February 5, 2020, GSK shared that it was "contacted by several regulatory authorities regarding the detection of NDMA in Zantac products," and made the decision "to suspend the release, distribution and supply of all dose forms of Zantac to all markets *pending the outcome of the ongoing tests and investigations*." GSK also stated: "*[A]s a precautionary action*, in early October 2019, the Group made the decision to initiate a voluntary recall (at the pharmacy/retail level) of all Zantac products globally. *The Group is continuing with investigations into the potential source of NDMA*." This filing was reviewed and approved by Defendant Walmsley, who was quoted at length in the press release, and by Defendant Mackay, who was "on point" for the Zantac litigation.

183.    Similarly, in its Annual Reports for 2019, 2020, and 2021 filed with the SEC on Form 20-F (on March 6, 2020, March 12, 2021, March 8, 2022, respectively), GSK stated that it was "contacted by several regulatory authorities regarding the detection of NDMA in Zantac products," and made the decision "to suspend the release, distribution and supply of all dose forms of Zantac to all markets *pending the outcome of the ongoing tests and investigations*." In its Annual Report for 2019, GSK also stated that "*as a precautionary action*, the Group made the decision in early October 2019 to initiate a voluntary pharmacy/retail level recall of all Zantac products globally. Ranitidine is subject to regulatory scrutiny and *the Group is continuing with investigations into the potential source of NDMA*." This filing was reviewed, approved, and signed by Walmsley and Mackay.

64

184.    The statements set forth in ¶¶182-183 were materially false and omitted material facts necessary to render such statements not misleading. Contrary to Defendants' statements that GSK "*is continuing with investigations into the potential source of NDMA*," GSK had already identified the source of NDMA in Zantac. As detailed above, at the time of these statements, Defendants already knew, including from the Tanner Study decades before and from the more recent analysis described by FE 1, that Zantac forms NDMA. To the extent there was any continuing investigation, it was materially misleading to highlight such investigation without disclosing GSK's prior findings, including from the Tanner Study and the analysis described by FE 1. The source of NDMA in Zantac was highly material to GSK's product liability litigation exposure, as Defendants knew. Because the source of NDMA in Zantac was inherent degradation of Zantac's active ingredient, every Zantac patient for decades had likely been exposed to NDMA.

## B.    Materially False and Misleading Statements Concerning Risk Management

185.    Defendants falsely represented GSK's exposure to risk with respect to patient safety and product quality. For example, in GSK's 2019 Form 20-F, filed with the SEC on March 6, 2020, GSK reassured investors that its "exposure" to the "Risk[s]" of both "Patient safety" and "Product quality" remained "*unchanged*" from the prior year. This filing was reviewed, approved, and signed by Walmsley and Mackay.

186.    The statements set forth in ¶185 were materially false and omitted material facts necessary to render such statements not misleading. Contrary to Defendants' statements that GSK's exposure to the risks of patient safety and product quality were "*unchanged*," GSK's exposure had increased dramatically. As detailed above, during 2019, GSK's decades long deception had effectively been uncovered by Valisure's petition to the FDA specifying the formation of NDMA in ranitidine; GSK had misrepresented to the FDA and EMA about the existence of the Tanner Study; and GSK had been sued by a large and increasing number of

personal injury plaintiffs, who had particularly strong claims as a result of GSK's longstanding but concealed knowledge of the NDMA-Zantac connection. By disclosing the existence of the personal injury litigation, while reassuring investors that GSK's risk exposure regarding patient safety and product quality remained "*unchanged*," GSK falsely reassured investors its risk exposure in that litigation was immaterial.

187.    The next year, GSK again maintained that its risk was unchanged. GSK's Annual Report for 2020, filed with the SEC on Form 20-F on March 12, 2021 ("2020 Form 20-F"), stated again that GSK's "exposure" to the "Risk[s]" of "Patient safety" and "Product quality" remained "*unchanged*." With respect to product quality risk, the 2020 Form 20-F further stated: "The macro risk *remains the same* despite … *the ongoing evaluation of products for the presence of nitrosamines*"; and that "GSK's exposure *remains unchanged with quality oversight processes in place to monitor and maintain a strong compliance profile* throughout the pandemic. Governance and control strategies have been developed and deployed for the timely completion of our *nitrosamine assessments*." This filing was reviewed, approved, and signed by Walmsley and Mackay.

188.    The statements set forth in ¶187 were materially false and omitted material facts necessary to render such statements not misleading, as set forth above in ¶186, above. In addition, contrary to Defendants' statements that GSK's exposure to the risks of patient safety and product quality were "*unchanged*," GSK's exposure had again increased dramatically. As detailed above, during 2020, GSK had been forced to confidentially produce the Tanner Study to the personal injury plaintiffs; and received a substantial amount of detailed ICF and CPF data from the MDL Census Registry, for both filed and registered claims, which confirmed that the personal injury claims had substantial settlement value.

189.    Further, contrary to Defendants' statement that GSK's "***evaluation of products for the presence of nitrosamines***" was "***ongoing***," GSK already knew that NDMA (a nitrosamine) was present in Zantac, including from the Tanner Study and the analysis described by FE 1, among other data and studies. To the extent there was any ongoing evaluation of the presence of nitrosamines, it was materially misleading to highlight such evaluation without disclosing GSK's prior discoveries of the presence of nitrosamines (and specifically NDMA) in Zantac, including the Tanner Study and the analysis described by FE 1.

190.    In addition, contrary to Defendants' statement that GSK maintains a "***strong compliance profile***" relative to nitrosamines, GSK had provided an incorrect response to the FDA and EMA's inquiries regarding the presence of NDMA (a nitrosamine) in Zantac in September and October 2019, which it was forced to retract in December 2019, and which had been followed by the FDA's decision in April 2020 to recall Zantac. Indeed, the Tanner Study that GSK first produced to the FDA and EMA in December 2019 had been withheld from the FDA and regulators worldwide for nearly four decades. It was misleading to tout GSK's "strong compliance profile" in the context of nitrosamines while omitting this material compliance failure regarding NDMA.

### C.    Materially False and Misleading Public Statements Made by GSK in the MDL Litigation

191.    Throughout the MDL, GSK made false and misleading public statements in litigation filings about the FDA's review and approval of the safety of Zantac, omitting that GSK had withheld the Tanner Study from the FDA, and about whether the discovery record supported GSK's prior knowledge that Zantac forms NDMA. These filings were the ultimate responsibility of, and were reviewed and approved on behalf of GSK directly by, Defendant Mackay and GSK's General Counsel, who were "on point" for the Zantac litigation.

192.    For example, on August 24, 2020, GSK filed a motion to dismiss certain claims in the MDL on the ground that they were preempted by federal law. That motion stated:

Zantac (ranitidine) is a medication that, for nearly four decades, had been approved by the Food and Drug Administration ("FDA") and widely used in prescription and over-the-counter ("OTC") form to treat stomach ulcers, gastroesophageal reflux disease, heartburn, indigestion, and other conditions of the stomach and esophagus. **FDA has exhaustively and repeatedly reviewed the safety and efficacy of Zantac throughout its lifecycle**, and closely regulates the Branded Defendants' involvement in the product.

That motion further stated:

**Based on extensive scientific testing**, FDA first approved ranitidine hydrochloride (the active ingredient in Zantac) for prescription use in 1983. …

**FDA has reviewed the safety and efficacy of ranitidine many times, approving additional indications for the medication over the years, and also approving different dosages and formulations**. In 1995, FDA approved Zantac for OTC sale at a dosage of 75 mg after review of an NDA that detailed, among other things, extensive clinical investigations by experts qualified in the field demonstrating the medication was safe and effective for treatment of heartburn and indigestion. In 1998, FDA- approved Zantac OTC 75 mg in effervescent tablets, also through an NDA. And in 2004, FDA approved through an NDA OTC Zantac in an increased dosage of 150 mg.

193.    The statements set forth in ¶¶191-192 were materially false and omitted material facts necessary to render such statements not misleading. Contrary to Defendants' statements that the "***FDA has exhaustively and repeatedly reviewed the safety … of Zantac throughout its lifecycle***," that FDA approved Zantac "***[b]ased on extensive scientific testing***," that "***FDA has reviewed the safety … of ranitidine many times***," GSK had withheld the Tanner Study from the FDA—not only during the FDA's initial approval, but also for nearly four decades, including during two subsequent NDAs by GSK for OTC Zantac. The Tanner Study was directly relevant to the FDA's safety review, should have been disclosed to the FDA even in the absence of a specific request, and was responsive to the FDA's specific request for GSK's scientific testing data regarding the nitrosation of Zantac. It was materially misleading for GSK to tout the FDA's safety

review of Zantac, while omitting that GSK had directly undermined that safety review by withholding a critical adverse study.

194.    Further, on March 24, 2021, GSK again filed a motion to dismiss certain claims in the MDL on the ground that they were preempted by federal law. That motion stated:

> Zantac (ranitidine) is a medication that, for nearly four decades, has been approved by the Food and Drug Administration ("FDA") and widely used in prescription and OTC form to treat stomach ulcers, gastroesophageal reflux disease, and other conditions of the stomach and esophagus. *FDA has exhaustively and repeatedly reviewed the safety and efficacy of Zantac throughout its lifecycle*, and closely regulates the Branded Defendants' sale of the product.

195.    The statement set forth in ¶194 was materially false and omitted material facts necessary to render such statements not misleading. Contrary to Defendant's statements that the "*FDA has exhaustively and repeatedly reviewed the safety … of Zantac throughout its lifecycle*," as discussed in ¶193, GSK had withheld the Tanner Study from the FDA throughout Zantac's entirely lifecycle, directly undermining the FDA's review of Zantac's safety.

196.    On June 23, 2022, GSK filed a *Daubert* motion in the MDL to exclude the plaintiffs' general causation experts. That motion stated:

> *In 1983*, *based on* extensive preclinical (animal) and clinical (human) testing, including *testing that revealed no heightened risk of carcinogenicity*, FDA approved ranitidine for prescription use in the treatment of ulcers. FDA later approved additional indications, including the treatment of other conditions of the stomach and esophagus.
>
> Zantac was on the market for more than 35 years. *Over that time, FDA determined on multiple occasions that Zantac was a safe and effective treatment* that offered relief for millions of patients with heartburn, stomach ulcers, gastroesophageal reflux disease ("GERD"), erosive esophagitis, and hypersecretory conditions such as Zollinger-Ellison syndrome, and various other conditions. In 1995, after more than a decade of safe and effective prescription use, FDA authorized over-the-counter ("OTC") use for Zantac 75 mg up to twice daily. In 2004, FDA approved Zantac 150 mg up to twice daily for OTC use. *Over the course of Zantac's 35 years on the market, no regulatory agency or scientific body ever concluded that Zantac was a risk factor for or the cause of any cancer*.

197.    The statement set forth in ¶196 was materially false and omitted material facts necessary to render such statements not misleading. Contrary to Defendant's statements that GSK's pre-approval testing "*revealed no heightened risk of carcinogenicity*" (*i.e.*, ability to cause cancer) GSK's testing had revealed that Zantac formed NDMA, a genotoxic carcinogen. Even if certain animal or human testing showed no heightened risk of carcinogenicity, it was misleading to tout such testing without also disclosing that Zantac degraded into a carcinogen.

198.    Further, contrary to Defendant's statements that "*Over that time, FDA determined on multiple occasions that Zantac was a safe and effective treatment*" and that "*Over the course of Zantac's 35 years on the market, no regulatory agency or scientific body ever concluded that Zantac was a risk factor for or the cause of any cancer*," as discussed in ¶193, GSK had withheld the Tanner Study from the FDA throughout Zantac's entirely lifecycle, directly undermining the FDA and other regulators' review of Zantac's safety.

199.    On March 24, 2021, GSK filed a motion to dismiss the MDL Plaintiffs' Amended Master Personal Injury Complaint ("AMPIC"). That motion stated:

> Numerous counts fail because Plaintiffs do not plausibly allege that, prior to September 2019, any Defendant knew or should have known that ranitidine could degrade to form NDMA over time or due to exposure to heat or humidity, or that any Defendant stored or transported the product outside of the labeled conditions.

200.    That motion further stated:

> According to the AMPIC, in September 2019, 43 years after that discovery [of ranitidine], testing of certain Defendants' products revealed the presence of an allegedly carcinogenic chemical called NDMA. *Based on those "recent revelations," … Plaintiffs claim that … Defendants … somehow knew (or should have known) that ranitidine was dangerous from the day it was placed on the market in 1983*.

201.    That motion continued:

> Plaintiffs assert four different claims grounded in their theory that ranitidine "internally degrades to form NDMA," and that those NDMA levels "increase over time and under normal storage conditions, but more so with respect to heat or

humidity." In the relevant counts, Plaintiffs claim that Manufacturer Defendants either failed to provide expiration dates that properly accounted for degradation, or that Manufacturer Defendants failed to utilize container designs that would minimize degradation to form NDMA. None of those claims meets federal pleading standards. Although ***Plaintiffs have obtained millions of pages of discovery from various Defendants to date***, Plaintiffs' allegations with respect to degradation are "mere conclusory statements" or facts that "do not permit th[is] [C]ourt to infer more than the mere possibility of misconduct."

…

Whatever the specific standard, Plaintiffs fail to plausibly allege notice because ***they allege virtually nothing that could put Defendants on notice of potential degradation of ranitidine***. … ***Plaintiffs have not plausibly alleged that Defendants knew about the alleged risk of degradation to form NDMA due to time, heat, or humidity***. Only one allegation of the thousands in the AMPIC purports to demonstrate knowledge about degradation that predates this lawsuit. Specifically, Plaintiffs allege that "[e]arly studies, including one conducted by GSK in the early 1980s, demonstrated that nitrosamines were formed when ranitidine was exposed to heat." Plaintiffs' vague reference to "early studies," which is not clarified in the AMPIC, does not satisfy Rule 8; rather, it is just the sort of conclusory allegation not entitled to a presumption of truth.

Nor is Plaintiffs' passing reference to an unidentified GSK study sufficient. That unsupported allegation, albeit nominally factual, does not plausibly suggest a known risk of degradation because the study allegedly demonstrated the formation of nitrosamines generally, not NDMA specifically.

202.    The statements set forth in ¶¶199-201 were materially false and omitted material facts necessary to render such statements not misleading. Contrary to Defendant's statement that Valisure's GCMS testing results were "***recent revelations***," GSK had conducted substantially similar GCMS testing by 1982 and knew that Zantac formed NDMA. It was materially misleading to characterize Valisure's discovery of NDMA in Zantac using GCMS as "recent revelations," while omitting that GSK had also discovered NDMA in Zantac using GCMS in 1982. GSK emphasized the recency of Valisure's findings specifically to argue that they did not put GSK on notice under a "knew or should have known" standard, when GSK not only should have known— it did know, and it knew before Zantac was placed on the market.

203.    Further, Defendants' statement that plaintiffs had failed to allege GSK's knowledge that Zantac degrades into NDMA despite having "***obtained millions of pages of discovery from various Defendants to date***" was further misleading because those millions of pages of document discovery included the Tanner Study, which had already been produced, and which supported Zantac's formation of NDMA. Indeed, the bates-stamped Tanner Study was cited in the MDL Plaintiffs' Consolidated Amended Consumer Economic Loss Class Action Complaint, which was filed one month before GSK's motion. Because GSK designated the Tanner Study as "Confidential" under the MDL Protective Order, and because GSK insisted that the MDL Plaintiffs redact reference to it in the Consolidated Amended Consumer Economic Loss Class Action Complaint, it was unavailable to investors. It was materially misleading for GSK to assert that "millions of pages of discovery" supported its position that it had no knowledge that Zantac degrades into NDMA, without disclosing, and while actively concealing, the Tanner Study. A reasonable investor would have understood the reference to "millions of pages of discovery" as making an assertion of the content of that discovery, not just the sufficiency of a pleading. GSK's assertion about the contents of "millions of pages of discovery" was important to assessing GSK's litigation exposure.

### D.    Materially False and Misleading Statements Concerning GSK's Accounting for Zantac Litigation Exposure

204.    In GSK's Annual Reports for 2019, 2020, and 2021, which were filed with the SEC on Form 20-F (on March 6, 2020, March 12, 2021, and March 8, 2022), and in GSK's press releases announcing quarterly results for 4Q 2019 through 2Q 2022, which were filed with the SEC on Form 6-K (on February 5, 2020, April 29, 2020, July 29, 2020, October 28, 2020, February 3, 2021, April 28, 2021, July 28, 2021, October 27, 2021, February 9, 2022, April 27, 2022, and July 27, 2022), Defendants misrepresented that: (1) GSK complied with IFRS and IAS 37;

(2) GSK had made an accounting provision for all existing legal obligations that were probable and could be reliably estimated, including legal disputes; and (3) the risk of an outflow for disputes without a provision was not "more than remote."

205.    Defendants Walmsley and Mackay signed the Forms 20-F and the SOX certifications therein and reviewed and approved the press releases announcing quarterly results that were filed on Forms 6-K. As GSK's CFO, Mackay was responsible for preparing GSK's financial statements and was admittedly "on point" overseeing GSK's defense in the Zantac litigation. Walmsley, who received regular updates from Mackay on the Zantac litigation, also reviewed and approved GSK's financial statements, including the provisions and contingent liabilities or lack thereof. Walmsley was quoted in each press release announcing quarterly results. Further, GSK's press releases announcing quarterly results for 2Q 2020, 2Q 2021, and 2Q 2022 contained a statement that GSK's Board of Directors (which included Walmsley and Mackay, who were identified by name) approved the report and that "to the best of their knowledge the unaudited condensed financial information has been prepared in accordance with" IFRS.

206.    GSK's Annual Reports for 2019, 2020, and 2021 each stated: "***The Group consolidated financial statements have been prepared in accordance with international accounting standards in conformity with … the International Financial Reporting Standards (IFRS)***."

207.    GSK's Annual Reports for 2019, 2020, and 2021 each further stated:

> ***In accordance with the requirements of IAS 37, 'Provisions, contingent liabilities and contingent assets', we provide for anticipated settlement costs where an outflow of resources is considered probable and a reliable estimate may be made of the likely outcome of the dispute and legal and other expenses arising from claims against the Group***.

208.    GSK's Annual Reports for 2019, 2020, and 2021 each further stated:

***Provision has been made for legal and other disputes***, indemnified disposal liabilities, employee related liabilities and the costs of the restructuring programme ***to the extent that at the balance sheet date a legal or constructive obligation existed and could be reliably estimated***.

209.    GSK's Annual Reports for 2019, 2020, and 2021 each further stated:

***A provision is made where an outflow of resources is considered probable and a reliable estimate can be made of the likely outcome of the dispute ….***

…

***We provide for the outcome of … legal … disputes when an outflow of resources is considered probable and a reliable estimate of the outflow may be made.*** At 31 December [2019, 2020, or 2021, respectively], ***other than for those disputes where provision has been made, it was not possible to make a reliable estimate of the potential outflow of funds that might be required to settle disputes where the possibility of there being an outflow was more than remote***.

210.    GSK's Annual Reports for 2019, 2020, and 2021 each further stated, as a purported "Risk Factor," as one of GSK's "Principal risks and uncertainties," that:

Similarly, our global business exposes us to litigation and government investigations, ***including but not limited to product liability litigation***, patent and antitrust litigation and sales and marketing litigation. Litigation and government investigations, including related ***provisions we may make for unfavourable outcomes and increases in related costs*** such as insurance premiums, could materially and adversely affect our financial results.

211.    GSK's press releases announcing quarterly results for 4Q 2019 through 2Q 2022, each stated that: "***This Results Announcement has been prepared applying consistent accounting policies to those applied by the Group in***" its most recent Annual Report (sometimes with limited exceptions, none relevant here); and "***Provision is made for the outcome of legal … disputes where it is both probable that the Group will suffer an outflow of funds and it is possible to make a reliable estimate of that outflow***."

212.    The statements set forth in ¶¶206-211 were materially false and omitted material facts necessary to render such statements not misleading. Contrary to Defendants' representations that GSK's financial statements in its Annual Reports for 2019, 2020, and 2021 were "***prepared***

*in accordance with*" and "*in conformity with*" IFRS and IAS 37 and that its press releases announcing quarterly results were "*prepared applying consistent accounting policies*" to those stated in the latest Annual Report, GSK violated IFRS and IAS 37 by taking zero provision for the Zantac litigation during the Class Period, even though a material financial outflow was probable and subject to reliable estimate. In the alternative, in those same filings, GSK violated IFRS and IAS 37 by failing to disclose a contingent liability for the Zantac litigation, even though the probability of a material financial outflow was more than remote.

213.    Defendants bypassed GSK's stated accounting methodology, which was to make a provision for the Zantac litigation based on the "*anticipated settlement costs*." Defendant Mackay told Credit Suisse on August 16, 2002 that the "potential settlement" was in the "mid $ billions range" (*i.e.*, in the middle of the range between $1 billion and $10 billion). Based on the factors cited by Mackay to Credit Suisse as supporting that settlement value, GSK's anticipated settlement costs would have been the same or greater during the Class Period. For example:

- Mackay cited Joseph Bayer's voluntary dismissal of GSK, without prejudice, on the eve of trial, in Illinois state court. Mr. Bayer's counsel informed GSK of the voluntary dismissal only on August 15, 2022. Mackay cited the Bayer dismissal as a positive development because "plaintiff concluded that they preferred not to try the case." Prior to that purportedly favorable development, GSK's anticipated settlement costs would have been greater.

- Mackay cited the strength of GSK's position on the MDL general causation *Daubert* motion. GSK had just received Plaintiffs' *Daubert* brief on the first of that month and had filed its own *Daubert* brief just two months earlier. Prior to that purportedly favorable development, GSK's anticipated settlement costs would have been greater.

- Mackay cited the MDL plaintiffs' concession that they could not prove general causation for 5 of the 10 cancers previously identified. The expert report making that concession was served on January 23, 2022. Prior to that purportedly favorable development, GSK's anticipated settlement costs would have been greater.

- Mackay cited "11 publications" that purportedly "show there is no significant evidence of causality." 10 of those 11 articles were published in 2021; the other in 2020. Prior to those supposedly favorable publications, GSK's anticipated settlement costs would have been greater.

- Mackay cited the dismissal of the "innovator liability" claim against GSK in the MDL. That order was entered on June 30, 2021. Prior to that favorable order, GSK's anticipated settlement costs would have been greater.

214.    At no point during the Class Period could Defendants have reasonably anticipated settling the Zantac litigation for nothing.

215.    Further, the lack of a provision for GSK's Zantac litigation exposure flowed through to several items on GSK's income statement and balance sheet. Among other items, GSK understated its expenses and liabilities and overstated its profit and net assets during the Class Period. For example, GSK's (1) reported profit before taxation for 2019, 2020, and 2021 of £6.221 billion, £6.968 billion, and £5.442 billion, respectively; (2) reported adjusted Group PBIT for 2019, 2020, and 2021 of £8.177 billion, £8.271 billion, and £8.562 billion, respectively (as discussed *supra* ¶¶176-178); and (3) its reported adjusted operating profit growth for 2022 were overstated, which, not coincidentally, inflated Defendants Walmsley and Mackay's incentive compensation by millions of pounds.

216.    The representations that GSK's financial statements for 2019, 2020, and 2021 and for 4Q 2019 through 2Q 2022 complied with IFRS and IAS 37 were both objectively and subjectively false. As alleged *supra* ¶¶130, 144, Defendants' subjective belief as to GSK's Zantac litigation exposure was in the mid-single-digit billions as stated by Defendant Mackay on August 16, 2022—and should have been higher earlier in the Class Period. The objective evidence, discussed in part by the bank analysts, supported an anticipated settlement at even higher level, into the double-digit billions. At no time during the Class Period was it objectively true, nor did Defendants ever subjectively believe, that the Zantac litigation could be settled for nothing.

217.    Even assuming that Defendants believed that that an outflow of funds for the Zantac litigation was remote, improbable, and/or impossible to estimate (which they did not), that would not fairly align with the information in GSK's possession and omitted material facts regarding the

basis (or lack of basis) for GSK's lack of provision and failure to disclose a contingent liability.

Those omitted facts include that:

(a)     GSK confirmed that Zantac forms NDMA, including by 1982 in the Tanner Study, prior to the first FDA approval and the first sale, and in the additional testing described by FE 1;

(b)     GSK had never disclosed the Tanner Study to the FDA or EMA prior to December 2019, and only after mispresenting to the FDA and EMA about the existence of the Tanner Study in September and October 2019;

(c)     GSK knew that every Zantac pill that GSK ever sold had the propensity to form NDMA and cause cancer in the person ingesting it, as opposed to being limited to some discrete, subset of pills contaminated by particular circumstances;

(d)     GSK had disclosed the Tanner Study to the personal injury plaintiffs, who therefore would be able to prove that GSK knew the risk of which GSK failed to warn;

(e)     GSK had access to non-public data from the MDL Census Registry that confirmed that many plaintiffs and registered claimants could prove that they purchased Zantac from GSK, consumed Zantac regularly over an extended period of time, were diagnosed with cancer, and did not suffer from significant risk factors providing a compelling alternative explanation for their cancer diagnosis;

(f)     GSK had access to non-public data indicating that tens of thousands of claimants on the MDL Census Registry, with claims "mapped" to GSK, had not elected a federal forum and thus would not be bound by any of the MDL Court's rulings and could sue GSK in state court; and

(g)     GSK had internally estimated its Zantac liability in the mid-single-digit billions, as Mackay admitted on August 16, 2022.

## IX.    <u>LOSS CAUSATION</u>

218.    During the Class Period, as detailed in this complaint, Defendants engaged in a fraudulent scheme and made materially false and misleading statements, including statements regarding the source of NDMA in Zantac, exposure to the risks of patient safety and product quality, the scientific data provided to the FDA in connection with Zantac's approval, and the amount of GSK's probable Zantac litigation exposure. These statements created or maintained

artificial inflation in the price of GSK ADRs and operated as a fraud or deceit on the Class. Later, when facts and risks concealed by Defendants' alleged misrepresentations and omissions materialized and/or were disclosed to the market, in August 2022, the price of GSK ADRs declined precipitously, as set forth above in ¶¶135-148.

219.    The disclosures that corrected the market price of GSK ADRs and reduced the artificial inflation caused by Defendants' materially false and misleading statements and omissions are summarized in the chart below, which identifies each corrective disclosure event, the price declines in GSK ADRs resulting from the event as compared to the prior day's close, and the percentage decline:

| Date | Event | Price Decline | % Decline |
|------|-------|---------------|-----------|
| August 10, 2022 | *See* ¶¶ 138-139 | $1.73 | 4.3% |
| August 11, 2022 | *See* ¶¶ 140-141 | $2.57 | 6.7% |
| August 15, 2022 | *See* ¶¶ 142-143 | $1.08 | 3% |
|  |  |  |  |
| *August 1-15, 2022* | *See ¶¶ 135-137, 145-148* | *$7.22* | *17%* |

220.    As a result of their purchase or acquisition of GSK ADRs during the Class Period and Defendants' material misstatements, Plaintiffs and other members of the Class (defined below) suffered economic loss, i.e., damages, under the federal securities laws. Defendants' materially false and misleading statements caused GSK ADRs to trade at artificially inflated levels throughout the Class Period.

221.    By concealing from investors the adverse facts alleged herein, Defendants presented a misleading picture of GSK's business and prospects. As true facts about the Company were revealed to the market, the price of GSK ADRs fell significantly. These declines removed the artificial inflation from the price of GSK ADRs, causing real economic loss to investors who purchased GSK ADRs during the Class Period.

222.    The declines in the price of GSK ADRs after the corrective disclosures came to light were a direct result of the relevant truth concealed by Defendants' fraudulent misrepresentations and omissions being revealed to investors and the market. The timing and magnitude of the price declines in GSK ADRs negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

223.    The economic loss, i.e., damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of GSK ADRs and the subsequent significant decline in the value of GSK ADRs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## X.    ADDITIONAL ALLEGATIONS OF TIMELINESS

224.    Lead Plaintiffs did not discover, and a reasonably diligent plaintiff would not have discovered, the facts constituting the violations of the federal securities laws alleged herein, including scienter, before February 4, 2023, at the earliest. The critical facts that were unavailable to Lead Plaintiffs and other reasonably diligent plaintiffs before that date include those identified above in ¶¶151-157 and below in ¶¶225-227.

225.    As set forth above (*see, e.g.*, ¶¶15, 152) the Bloomberg Article was based on "hundreds of documents, thousands of pages, ***many of which have never been made public***," including many court filings "***still under seal***" that were reviewed by Bloomberg Businessweek. For example, the article quoted the following from an internal GSK email that was not previously (and still is not) publicly available:

> "***All, we have an urgent need to identify if the following study report was submitted in the European Union and United States,***" *a senior GSK executive wrote colleagues that November [2019].* She was talking about the Tanner Study, and ***the answer was no***, it hadn't been submitted as part of any new drug

application. GSK then, finally, handed over the report, which had been tucked away since 1982.

226.    On May 20, 2024, Valisure publicly filed the complaint in its False Claims Act *qui tam* action against GSK. The entire *qui tam* action had been under seal from September 13, 2019, when it was filed, until March 13, 2024, after the United States declined to intervene. Valisure's May 2024 complaint revealed, for the first time, that the FDA had made the following notification to GSK and asked GSK the following questions on August 6, 2019:

> Recently a private analytical pharmacy and advanced laboratory notified the FDA that Zantac (ranitidine) produces a very high quantity (thousands of times higher than the FDA limits) of a probable human carcinogen N-nitrosodimethylamine (NDMA) in a single tablet of 150 mg of Zantac, when analyzed using FDA's nitrosamine test methods. The same private laboratory also found that Zantac forms high quantity of NDMA in simulated human body gastric conditions. The preliminary reports seem to indicate that in certain conditions (e.g., high temperatures and presence of nitrites) ranitidine hydrochloride (API) and ranitidine tablets degrade to form high quantities of NDMA.
>
> …
> 1. Are you aware of the above information?
> 2. Is there any potential for NDMA to be present in the Zantac tablets or ranitidine hydrochloride API? Provide a detailed explanation for your response. Include in your explanation quality information for API, excipients, manufacturing process, etc.
> 3. Have you tested Zantac tablets or ranitidine hydrochloride for the presence of NDMA? If you have, what were the levels of NDMA found?
> 4. Have you tested Zantac tablets in simulated human body conditions (including gastric conditions)? If you have, have you detected NDMA? If you did, what were the levels observed?

227.    The Tanner Study itself was not publicly available until December 30, 2022, when it was unsealed in the MDL, buried among more than 50,000 pages of *Daubert* and summary judgment exhibits that were unsealed that day. There was no reason for a reasonably diligent plaintiff to begin sifting through those voluminous exhibits until, at the earliest, the Bloomberg Article, which discussed the Tanner Study. Indeed, numerous redacted references to the Tanner Study appear in filings in the MDL litigation prior to December 2022, such that any reasonable

investor who attempted to research that docket would know that the Tanner Study had been designated "Confidential" and all references to its contents redacted. Prior to that time, there was insufficient reason to infer that the Individual Defendants (who joined the company in 2010 (Walmsley), and 2018 (Mackay)) were aware of the Tanner Study when they made the misstatements discussed herein. The facts necessary to infer that the Individual Defendants acted with fraudulent intent were first made available by the Bloomberg Article and then the Valisure amended *qui tam* complaint.

## XI.    CLASS ACTION ALLEGATIONS

228.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired GSK ADRs during the Class Period, i.e., from February 5, 2020, to August 12, 2022 inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants; members of the immediate families of Individual Defendants, GSK's subsidiaries and affiliates; any person who is or was an officer or director of GSK or its subsidiaries and affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

229.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The Company's ADRs are actively traded on the NYSE and there were more than 425 million GSK ADRs outstanding during the Class Period. While the exact number of Class members is unknown at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained

by GSK, its transfer agent, or its depository bank and may be notified to the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

230.     Common questions of law and fact predominate and include:

(a)     whether Defendants violated the Exchange Act and SEC Rule 10b-5;

(b)     whether Defendants misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or recklessly disregarded that their statements were false;

(e)     whether Defendants' statements and/or omissions artificially inflated the price of GSK ADRs;

(f)     whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     the extent and appropriate measure of damages.

231.     Lead Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

232.     Lead Plaintiffs will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in class and securities litigation.

233.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Nor do any individualized issues pertaining to either Lead Plaintiffs' or other Class members' claims predominate over issues common to the Class. The elements of the securities law claims here are common to the class and will be subject to common proof at trial. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.    THE STATUTORY SAFE HARBOR DOES NOT APPLY

234.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made and/or were misleading because they omitted current or historical facts. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

235.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of GSK who knew that the statement was materially false or misleading when made.

## XIII.    A PRESUMPTION OF RELIANCE APPLIES

236.    At all relevant times, the market for GSK ADRs was an efficient market for the following reasons, among others:

    (a)    GSK ADRs met the requirement for listing and its ADRs were listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

    (b)    GSK filed periodic public reports with the SEC and the New York Stock Exchange;

(c)     GSK regularly publicly communicated with investors via established market-communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     GSK was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

237.    As a result of the foregoing, the market for GSK ADRs promptly digested current information regarding GSK from all publicly available sources and reflected that information in the price of GSK ADRs. Under these circumstances, all purchasers of GSK ADRs during the Class Period suffered similar injury through their purchase of GSK ADRs at artificially inflated prices, and the presumption of reliance applies.

238.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding GSK's business— information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of GSK's withholding of information concerning Zantac, as alleged above, that requirement is satisfied here.

## XIV.  CLAIMS FOR RELIEF

### COUNT I

**Section 10(b) of the Exchange Act and Rule 10b-5(b) Against All Defendants**

239.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

240.    This Count is asserted on behalf of all members of the Class against GSK and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5(b).

241.    During the Class Period, GSK and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) by making, disseminating, and approving untrue statements of material fact and omitting to state material facts necessary to make their statements not misleading. Defendants' actions (1) deceived the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (2) caused Lead Plaintiffs and other members of the Class to purchase GSK ADRs at artificially inflated prices. Defendant GSK and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, instrumentalities of interstate commerce and/or of the mails: made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and made the above statements intentionally or with a severely reckless disregard for the truth, which did: (1) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, the source of NDMA in Zantac, exposure to the risks of patient safety and product quality, the scientific data provided to the FDA in connection with Zantac's approval, and the amount of GSK's probable Zantac litigation exposure; (2) artificially inflate and maintain the market price of GSK ADRs at artificially inflated prices; and (3) cause Lead Plaintiffs

and other members of the Class to purchase GSK ADRs at artificially inflated prices and suffer losses when the true facts became known.

242. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that, in light of the circumstances under which they were made, the statements contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements not misleading.

243. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. The Individual Defendants engaged in this misconduct to conceal GSK's true condition from the investing public and to support the artificially inflated prices of GSK's ADRs. The Individual Defendants' state of mind is imputed to GSK.

244. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GSK's ADRs. Lead Plaintiffs and the Class would not have purchased GSK ADRs at the prices they paid, or at all, had they been aware that the market prices for GSK ADRs had been artificially inflated by Defendants' fraudulent course of conduct.

245. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's ADRs during the Class Period.

246. By virtue of the foregoing, GSK and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

## COUNT II

**Section 10(b) of the Exchange Act and Rule 10b-5(a), (c) Against All Defendants**

247.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

248.    This Count is asserted on behalf of all members of the Class against GSK and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5(a), (c).

249.    During the Class Period, Defendants "devised a plan and induced [Lead Plaintiffs and Class members] to [purchase] their shares without disclosing to them material facts that reasonably could have been expected to influence their decisions to [purchase]." *Affiliated Ute Citizens of Utah v. United* States, 406 U.S. 128, 153 (1972). As alleged herein, Defendant GSK and the Individual Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) in that they (1) employed devices, schemes, and artifices to defraud; and (2) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of GSK ADRs during the Class Period in an effort to maintain artificially high market prices for GSK ADRs.

250.    GSK and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, employed devices, schemes, and artifices to defraud and engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with the purchase and sale of GSK ADRs, which did: (1) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, the source of NDMA in Zantac, exposure to the risks of patient safety and product quality, the scientific data provided to the FDA in connection with Zantac's approval, and the amount of GSK's probable Zantac

litigation exposure; (2) artificially inflate and maintain the market price of GSK ADRs; and (3) cause Lead Plaintiffs and other members of the Class to purchase GSK ADRs at artificially inflated prices and suffer losses when the true facts became known.

251.    As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c):

(a)    GSK knowingly failed to disclose the results of the Tanner Study, which found that Zantac formed NDMA, a genotoxic carcinogen, to the FDA, regulators worldwide, doctors, patients, and investors for nearly four decades (*see, e.g.,* ¶¶3, 5, 7, 9, 15, 34, 38, 48-49, 59, 77-81, 91);

(b)    GSK changed the color of prescription Zantac to peach and OTC Zantac to yellow to further conceal the formation of NDMA from the FDA, regulators worldwide, doctors, patients, and investors (*see, e.g.,* ¶¶49-53);

(c)    GSK insisted that the Tanner Study and similar documents be marked and maintained as "Confidential" in litigation and further insisted that references to them be redacted, even though they did not warrant such treatment because the facts should have been made public decades earlier and relate to a product that GSK was not selling, had not sold for years, and had no intention of selling again (*see, e.g.,* ¶¶11, 90, 97, 102, 127, 135-136, 203, 227); and

(d)    Defendants made false and misleading statements concerning the source of NDMA in Zantac, exposure to the risks of patient safety and product quality, the scientific data provided to the FDA in connection with Zantac's approval, and the amount of GSK's probable Zantac litigation exposure (*see, e.g.,* ¶¶10, 12-14, 100-101, 106-135, 164-173, 185-190, 204-217).

252.    These deceptive acts were part of a course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of GSK ADRs during the Class Period in an effort to maintain artificially high market prices for GSK ADRs.

253.    As described above, GSK, Walmsley, and Mackay acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. GSK,

Walmsley, and Mackay engaged in this misconduct to conceal GSK's true condition from the investing public and to support the artificially inflated prices of the Company's ADRs.

254.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for GSK ADRs, which artificial inflation was removed when the relevant truth became known. Lead Plaintiffs and the Class would not have purchased GSK ADRs at the prices they paid, or at all, had they been aware that the market prices for GSK ADRs had been artificially inflated by the Individual Defendants' fraudulent course of conduct. It was also foreseeable to these Defendants that engaging in this fraudulent course of conduct, including misrepresenting and concealing these material facts from the public would artificially inflate the price of GSK's ADRs and that the revelation of the truth would correct the artificial inflation and cause the price of GSK ADRs to decline.

255.    As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their respective purchases of the Company's ADRs.

256.    Each and every defendant is sued as a primary participant in the wrongful and illegal conduct charged herein.

257.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c), promulgated thereunder.

## COUNT III

### Section 20(a) of the Exchange Act Against the Individual Defendants

258.    Lead Plaintiffs repeat and reallege every allegation above as if fully stated in this Count.

259.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

260.    During the Class Period, the Individual Defendants acted as controlling persons of GSK within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about GSK, the Individual Defendants had the power and ability to control the day-to-day actions of GSK and its employees. GSK violated Section 10(b) of the Exchange Act and Rule 10b-5, as set forth above. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XV.    **PRAYER FOR RELIEF**

261.    WHEREFORE, Lead Plaintiffs pray for judgment against Defendants as follows:

(a)    Determining that this action is a proper class action, certifying Lead Plaintiffs as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class counsel;

(b)    Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

(c)    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XVI.    **JURY TRIAL DEMAND**

262.    Lead Plaintiffs hereby demand a trial by jury.


Dated: July 7, 2025                    **BERNSTEIN LITOWITZ BERGER**
                                       **& GROSSMANN LLP**

                                       _/s/ James A. Harrod_____
                                       Salvatore J. Graziano (*pro hac vice forthcoming*)
                                       Hannah Ross (*pro hac vice forthcoming*)
                                       Avi Josefson (*pro hac vice forthcoming*)
                                       James A. Harrod (*pro hac vice*)
                                       Shane D. Avidan (*pro hac vice forthcoming*)
                                       Abby Kritta (*pro hac vice forthcoming*)
                                       1251 Avenue of the Americas

New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
hannah@blbglaw.com
avi@blbglaw.com
jim.harrod@blbglaw.com
shane.avidan@blbglaw.com
abygail.kritta@blbglaw.com

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Johnston de F. Whitman, Jr. (PA #207914)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jwhitman@ktmc.com

-and-

Stacey M. Kaplan (*pro hac vice*)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Lead Plaintiffs Ohio
Public Employees Retirement System and
Indiana Public Retirement System and
Lead Counsel for the Class*

**PEREZ MORRIS, LLC**
Juan Jose Perez (PA #321641)
445 Hutchinson Ave.
Suite 600
Columbus, Ohio 43235
Telephone: (614) 431-1500
jperez@perez-morris.com

*Additional Counsel for Lead Plaintiff Ohio
Public Employees Retirement System*

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2025, I caused a true and correct copy of the foregoing document to be filed electronically with the Clerk of the Court through the Court's CM/ECF system, which was served on all counsel of record via email and is available for viewing and downloading through the Court's CM/ECF system.

*/s/ James A. Harrod*