IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROOFERS LOCAL NO. 149 PENSION : 
FUND, on behalf of itself and all others : 
similarly situated,                                    :                   CIVIL ACTION
                              *Plaintiff*,              : 
                                                              : 
              v.                                           :                   NO. 25-00618
                                                              : 
GSK PLC, et al.,                                  : 
                              *Defendants*.          : 

**MEMORANDUM**

KENNEY, J.                                                                        MARCH 4, 2026

Plaintiffs filed this securities fraud class action on February 4, 2025, alleging violations of

Section 10(b) of the Exchange Act, Rule 10b-5, and Section 20(a) in connection with Defendants'

purported decades-long concealment of Zantac's potential to form a carcinogenic substance.  *See*

ECF No. 1; *see also* ECF No. 25 (operative complaint).  On September 5, 2025, Defendants moved

to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rules of Civil Procedure 9(b) and

12(b)(6), and pursuant to the Private Securities Litigation Reform Act ("PSLRA") (the

"Defendants' Motion").  *See* ECF No. 34.  Plaintiffs oppose dismissal.  *See* ECF No. 37.  For the

reasons set forth below, the Court will **GRANT** Defendants' Motion (ECF No. 34) and **DISMISS**

Plaintiffs' Amended Complaint (ECF No. 25) **WITH PREJUDICE**.

I.    **BACKGROUND**

      A.  **Factual Background**

      The Court draws the following allegations from Plaintiffs' Amended Complaint and

assumes them to be true at the motion-to-dismiss stage.  *See City of Cambridge Ret. Sys. v.*

*Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018).  Defendant GlaxoSmithKline plc

("GSK") is a global "pharmaceutical and biotechnology company" that has "business[] units

spanning pharmaceuticals (including respiratory and HIV drugs), vaccines, and consumer healthcare." ECF No. 25 ¶¶ 27, 40. One of GSK's consumer products is Zantac, which used to be a widely used medication for the treatment of heartburn, acid reflux, and ulcers. *Id.* ¶¶ 3, 35. The active ingredient in Zantac is ranitidine. *Id.* ¶ 3. GSK and its predecessors developed Zantac in 1976 and began selling it in the United States in 1983 after gaining approval of the drug from the U.S. Food and Drug Administration ("FDA"). *Id.* ¶¶ 4, 28, 34–35. From 1983 until 2019, GSK made billions of dollars from its sales of Zantac. *Id.* ¶¶ 34, 37.

In 2019, Valisure, an independent research laboratory, conducted tests on Zantac, which revealed that Zantac and generic ranitidine contained N-Nitrosodimethylamine ("NDMA")—a carcinogenic substance—at levels "that were up to 26,000 times the FDA's daily limit." *Id.* ¶¶ 3, 6, 71–72 (emphasis omitted). Notably, studies have found that exposure to and consumption of NDMA can be associated with the development of various cancers. *Id.* ¶ 68. Valisure confidentially reported the results of its tests to the FDA, which also submitted them to the European Medicines Agency ("EMA"). *Id.* ¶¶ 6, 73. Thereafter, EMA sent an inquiry to GSK requesting additional information about the presence of NDMA in Zantac. *Id.* ¶ 74. The FDA separately reached out to GSK in August 2019 to inform GSK about the results of Valisure's tests and to question the company about the connection between Zantac and NDMA. *Id.* ¶ 75. In September 2019, the FDA warned the public that there was a risk of developing cancer from Zantac and generic ranitidine due to the presence of NDMA. *Id.* ¶¶ 82–83. By October 2019, GSK began recalling Zantac from all markets and stopped further distributions of it. *Id.* ¶¶ 73, 85. In April 2020, the FDA, in addition to other global regulators, ordered a withdrawal of Zantac and all similar drugs that contained ranitidine from the market. *Id.* ¶¶ 6, 87. Zantac has not returned to the market since. *Id.* ¶ 88.

While the presence of NDMA in Zantac publicly came to light in 2019, Plaintiffs allege that "GSK concealed its knowledge of Zantac's formation of [NDMA] for decades." *Id.* ¶ 6. In 1982, Dr. Richard Tanner, a former GSK scientist, had performed an internal study (the "Tanner Study") and found that ranitidine can "form[] NDMA in the human stomach" under certain conditions. *Id.* ¶¶ 5, 34, 46. In the years that followed the Tanner Study, GSK conducted additional tests and found that ranitidine can degrade and form NDMA in normal storage and transportation conditions. *Id.* ¶¶ 5, 34. GSK also found that warmer temperatures and moisture can cause discoloration and darkening of Zantac's otherwise white pills. *Id.* ¶¶ 49–50. When Valisure's independent testing revealed the presence of NDMA in Zantac, GSK "confidentially disclosed" certain information to the FDA and EMA in late 2019, including copies of the Tanner Study. *Id.* ¶¶ 6–7, 81. However, Defendants allegedly continued to mislead investors as to their knowledge of the connection between Zantac and NDMA. *Id.* ¶ 7.

### 1. *The Products Liability and Personal Injury Litigation*

Beginning in September 2019, GSK and other manufacturers of ranitidine faced "tens of thousands of lawsuits by patients who had taken Zantac" and were later diagnosed with cancer. *Id.* ¶¶ 73, 92. Personal injury plaintiffs filed cases in both state and federal courts across the country. *Id.* ¶ 93. The cases that proceeded in federal court were ultimately consolidated in a multi-district litigation ("MDL") proceeding in the Southern District of Florida, *In re: Zantac (Ranitidine) Products Liability Litigation*, No. 20-MD-02924 (S.D. Fla.). *Id.* ¶ 94. GSK entered into settlement agreements that resolved certain cases, including a $2.2 billion settlement in October 2024. *Id.* ¶¶ 154, 157. However, GSK continues to face liability with respect to the suits that are still pending. *Id.* ¶ 158.

2. *The Securities Fraud Class Action*

On February 4, 2025, Plaintiffs initiated this securities fraud action. *See* ECF No. 1. Lead Plaintiffs brought suit on behalf of a class, which consists of those who purchased or acquired American Depositary Receipts ("ADRs") of GSK from February 5, 2020 to August 12, 2022 inclusive (the "Class Period"), and suffered damages as a result of Defendants' alleged violations of the federal securities laws. ECF No. 25 ¶¶ 25–26, 228. In addition to bringing suit against GSK, Plaintiffs sued two individual Defendants: Emma Walmsley, who has been GSK's CEO since 2017, and Iain Mackay, GSK's former CFO from February 2019 through April 2023. *Id.* ¶¶ 29, 31.[1] Plaintiffs asserted three causes of action against Defendants: (1) violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Count I), which Plaintiffs assert against all Defendants; (2) violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (c) (Count II), which Plaintiffs assert against all Defendants; and (3) violations of Section 20(a) of the Exchange Act (Count III), which Plaintiffs assert only against the individual Defendants. *Id.* ¶¶ 239–260.

Plaintiffs allege that Defendants' misrepresentations generally fall into four different buckets: (1) Defendants gave investors the "false impression" that GSK had no knowledge of Zantac's connection to NDMA until 2019 when the FDA reached out to the company, despite the existence of the 1982 Tanner Study, *see id.* ¶ 9; (2) Defendants misrepresented the extent of GSK's liability exposure from pending litigation, *see id.* ¶ 10; (3) in personal injury litigation, GSK stated that the FDA had previously reviewed the safety of Zantac when approving the medication, yet GSK withheld critical information from the FDA by not disclosing the Tanner Study prior to 2019, *see id.* ¶ 11; and (4) GSK misrepresented "the need to quantify the range of its liability related to

---

[1] Plaintiffs also initially brought suit against Victoria Whyte, *see* ECF No. 1, but did not include her as a Defendant in their Amended Complaint, *see* ECF No. 25.

Zantac in its financial statements," *see id.* ¶ 12; *see also id.* ¶¶ 180–217.  Defendants' misrepresentations allegedly caused GSK ADRs to trade at artificially inflated prices.  *Id.* ¶¶ 14, 218.  When the facts and risks that Defendants had concealed were disclosed to the market in August 2022, the price of GSK ADRs substantially declined, which led Plaintiffs to suffer significant economic losses.  *Id.* ¶¶ 218–23.

### B.  Procedural History

On September 5, 2025, Defendants moved to dismiss Plaintiffs' Amended Complaint in its entirety pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and pursuant to the PSLRA.  *See* ECF No. 34.  Defendants asserted a number of arguments in their Motion, including that Plaintiffs' Amended Complaint was time barred, and that Plaintiffs failed to allege (1) a violation of Section 10(b); (2) scheme liability; and (3) a violation of Section 20(a).  ECF No. 34-1 at 17–44.

On November 4, 2025, Plaintiffs filed an Opposition to Defendants' Motion.  *See* ECF No. 37.  In their Opposition, Plaintiffs generally argued that their claims were not barred by the relevant statute of limitations, and that they plausibly pleaded falsity, scienter, loss causation, scheme liability, and control person liability.  *Id.* at 19–47.  In addition, Plaintiffs filed a Response in Opposition to Defendants' Requests for Judicial Notice and Consideration of Documents Purportedly Incorporated by Reference in Support of their Motion to Dismiss ("Opposition to Defendants' Requests for Judicial Notice").  *See* ECF No. 38.  Plaintiffs contest whether and the extent to which the Court may take judicial notice of certain exhibits that Defendants attached to their Motion.  *Id.* at 6–7.

Thereafter, Defendants filed a Reply in Further Support of Motion to Dismiss (ECF No. 39), Plaintiffs filed a Sur-Reply in Further Opposition to Defendants' Motion to Dismiss (ECF No.

40), and Defendants filed a Response to Plaintiffs' Sur-Reply in Further Support of Defendants' Motion to Dismiss (ECF No. 43).  Defendants' Motion is fully briefed and before this Court.

## II.   __LEGAL STANDARD__

When deciding a Rule 12(b)(6) motion, district courts evaluate whether a plaintiff's complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court must "accept all factual allegations as true, [and] construe the complaint in the light most favorable to the plaintiff."  *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (internal quotations and citation omitted).  A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  In addition, the Court "disregard[s] rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements."  *Rabin v. NASDAQ OMX PHLX LLC*, 712 F. App'x 188, 192 (3d Cir. 2017) (internal quotations and citation omitted).

Since "a claim for manipulation sounds in fraud, a plaintiff must plead it with particularity under Federal Rule of Civil Procedure 9(b)," and this "particularity requirement is rigorously applied in securities fraud cases."  *Id.* (internal citations and quotation omitted); *see also City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 166 (3d Cir. 2014) (explaining that the PSLRA imposes "heightened pleading standards" in securities fraud actions); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997) ("Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them . . . and reduces the number of frivolous suits brought solely to extract settlements.").  The Court evaluates "'the complaint in its entirety,'" in addition to "'other sources courts ordinarily examine'" when deciding a Rule 12(b)(6) motion to dismiss, including "documents incorporated into the complaint by reference and matters of which

[the Court] may take judicial notice." *City of Edinburgh Council*, 754 F.3d at 166 (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).

## III.    DISCUSSION

In their Motion, Defendants argue that Plaintiffs' securities fraud claims are barred by the two-year statute of limitations because the factual basis for Plaintiffs' claims, including Defendants' alleged concealment of the Tanner Study and the connection between Zantac and NDMA, was "the subject of public allegations, expert reports, a court opinion, and public articles" well before February 4, 2023—two years before Plaintiffs initiated this action.  ECF No. 34-1 at 18.  In their Opposition to Defendants' Motion, Plaintiffs contend that their claims are timely because they could not have discovered the relevant facts in support of their claims, particularly with respect to scienter, prior to the publication of a Bloomberg article on February 15, 2023.[2]  *See* ECF No. 37 at 41–47.  For the reasons discussed below, the Court holds that reasonably diligent plaintiffs would have discovered the facts giving rise to Plaintiffs' securities fraud claims prior to February 4, 2023, and thus Plaintiffs' claims are time barred.  The Court will grant Defendants' Motion (ECF No. 34) and dismiss Plaintiffs' Amended Complaint in its entirety with prejudice.[3]

---

[2] *See* Anna Edney, et al., *Zantac's Maker Kept Quiet About Cancer Risks for 40 Years*, BLOOMBERG (Feb. 15, 2023), https://www.bloomberg.com/news/features/2023-02-15/zantac-cancer-risk-data-was-kept-quiet-by-manufacturer-glaxo-for-40-years, (hereinafter, the "Bloomberg Article").

While Plaintiffs did not attach a copy of the Bloomberg Article to the Amended Complaint—even though the article purportedly contains "the critical context necessary to allege Defendants' scienter," *see* ECF No. 37 at 45—Defendants attached a copy to their Motion, *see* ECF No. 39-5.  The Court finds that the Bloomberg Article was incorporated by reference in the Amended Complaint and takes judicial notice of it.  *See, e.g.*, ECF No. 25 ¶¶ 15, 80, 97, 102, 151–52 (discussing the Bloomberg Article); *see also City of Edinburgh Council*, 754 F.3d at 166.  Plaintiffs also do not contest in their Sur-reply in Further Opposition to Defendants' Motion to Dismiss that the Court can take judicial notice of Defendants' Exhibit FF (ECF No. 39-5).  *See* ECF No. 40.

[3] Because the Court finds that Plaintiffs' claims are time barred, the Court does not address the other arguments raised by Defendants in support of dismissal.

**A.  Plaintiffs' Claims Are Barred by the Two-Year Statute of Limitations**

Section 10(b) of the Exchange Act of 1934 provides a "private right of action" for claims involving "fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws."  28 U.S.C. § 1658(b).  The applicable statute of limitations states that such an action may be initiated no later than "2 years after the discovery of the facts constituting the violation."  *Id.*  The United States Supreme Court has construed Section 1658(b)'s statute of limitations as follows: "a cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first."  *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010) (quoting 28 U.S.C. § 1658(b)).  A fact is considered "discovered" when a "reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss."  *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 275 (3d Cir. 2013) (internal quotations and citation omitted).  When courts determine the time at which the discovery of facts happened, "terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating."  *Merck & Co., Inc.*, 559 U.S. at 653.  "[M]atters of public record and items appearing in the record of the case [can] reveal that the claims in the Original Complaint were untimely."  *Pension Tr. Fund for Operating Eng'rs*, 730 F.3d at 271.  It is Defendants' burden to demonstrate that the statute of limitations has expired because it is an affirmative defense.  *Id.*

Here, Plaintiffs filed the original class action complaint on February 4, 2025, *see* ECF No. 1, and therefore the "critical date for timeliness purposes" is February 4, 2023, the date "two years before th[e] complaint was filed."  *Merck*, 559 U.S. at 638.

In their Motion, Defendants argue that Plaintiffs' claims are barred by the two-year statute of limitations because—based on Plaintiffs' own allegations in their Amended Complaint—reasonably diligent plaintiffs would have discovered the factual basis for Plaintiffs' claims by at least August 2022. *See* ECF No. 34-1 at 18 (citing ECF No. 25 ¶¶ 14, 139–45). Furthermore, Defendants note that multiple publicly available records demonstrate that reasonably diligent plaintiffs would have discovered the relevant facts even earlier—at least as early as 2021. *Id.* at 18–20.[4]

The Court begins with Plaintiffs' Amended Complaint. First, Plaintiffs' own allegations demonstrate that, at a minimum, there were "storm warnings" that "would have prompted a reasonably diligent plaintiff to begin investigating" the basis for the instant securities fraud claims in August 2022. *Merck & Co., Inc.*, 559 U.S. at 653. For instance, Plaintiffs alleged that

---

[4] Defendants attached to their Motion publicly filed court documents from the products liability and personal injury litigation involving GSK and Zantac, in addition to news articles. *See* ECF No. 34-1 at 19–20; *see also* ECF Nos. 34-17, 34-18, 34-19, 34-20, 34-21, 34-22, 34-23.

Courts can take judicial notice of "facts [that] are not subject to reasonable dispute [and are] capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned." *McCullough v. Advest, Inc.*, 754 F. App'x 109, 110–11 (3d Cir. 2018) (per curiam) (internal quotations and citation omitted) (second alteration in original). Courts can also consider, for example, "the *fact* that . . . regulatory filings contained certain information, without regard to the truth of their contents." *Id.* (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).

It is permissible for courts to take judicial notice of publicly filed litigation documents on another court's docket. *See Moore v. Pennsylvania*, No. 22-1945, 2022 WL 7375509, at *2 (3d Cir. 2022); *see also Orabi v. Att'y Gen. of the United States*, 738 F.3d 535, 537 n.1 (3d Cir. 2014); *Talbert v. Dep't of Corr.*, No. 22-cv-4189, 2022 WL 17177479, at *1 n.1 (E.D. Pa. Nov. 23, 2022).

Furthermore, a court may take judicial notice of news articles. *See, e.g.*, *Acuna-Atalaya v. Newmont Mining Corp.*, 765 F. App'x 811, 813 n.2 (3d Cir. 2019) (taking judicial notice of a Washington Post article); *Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (explaining that news articles "indicate what was in the public realm at the time").

"[i]nvestors began to learn the relevant truth when (1) damning evidence, which was confidentially filed under seal in the MDL litigation, began to leak out in August 2022."  ECF No. 25 ¶ 135. "[C]orrective information reach[ed] the market in August 2022" regarding GSK's litigation exposure in the MDL products liability action, and "[i]nvestors were shocked to learn the extensive liability GSK would face."  *Id.* ¶ 14; *see also id.* ¶ 138 (discussing Deutsche Bank analyst report that contained an "analysis of the Zantac litigation"); *id.* ¶ 139 (discussing price drop of GSK ADRs on August 10, 2022).  In addition, Plaintiffs alleged that Credit Suisse published an analyst report on August 11, 2022 addressing GSK and the status of the Zantac litigation.  *Id.* ¶ 140.  That report stated that "[i]nvestor interest has increased sharply in the ongoing Zantac product liability litigation."  *Id.*; *see also id.* ¶ 141 (discussing price drop of GSK ADRs on August 11, 2022).  On August 15, 2022, Credit Suisse held a call with a litigation expert who stated that GSK's liability from the Zantac litigation could figure in the $10 billion range.  *See id.* ¶ 142; *see also id.* ¶ 143 (discussing price drop of GSK ADRs on August 15, 2022); *id.* ¶ 144 (alleging Defendant Mackay responded on August 16, 2022 by estimating GSK's exposure in the Zantac litigation in the "mid $ billions").  Given the strong investor interest in GSK's potential litigation exposure, at a minimum, this information and the analyst reports would have prompted a reasonably diligent plaintiff to investigate the MDL action and potential securities fraud claims prior to February 4, 2023.  *See Pension Tr. Fund for Operating Eng'rs*, 730 F.3d at 275.

Next, the Court turns to publicly available records.  Take, for example, a February 8, 2021 amended master personal injury complaint that was filed in the MDL proceeding, *In re: Zantac (Ranitidine) Products Liability Litigation*, which this Court takes judicial notice of.  *See* ECF No.

34-17.[5]  The MDL plaintiffs in that action specifically alleged that GSK performed "internal studies" in 1980, finding that ranitidine led to "elevated levels of nitrite in the stomach environment," which "could increase the risk of forming nitrosamines and, in turn, cancer."  *Id.* ¶¶ 354–55.  And the MDL plaintiffs further alleged that GSK "knew but did not disclose that it had new evidence showing that NDMA was generated by ranitidine under certain conditions."  *Id.* ¶ 356; *see also id.* ¶ 358 ("GSK conducted an internal study to assess the formation of NDMA and found that ranitidine, when exposed to sodium nitrite, formed hundreds of thousands of nanograms of NDMA.  The GSK study was never published or disclosed to the public."); *id.* ¶ 351 (discussing GSK's alleged "failure to disclose to the federal government information about the potential presence of NDMA in Zantac").  Moreover, the MDL plaintiffs expressly mentioned research that "Dr. R.J.N. Tanner performed in the 1980s, which would have alerted the reasonable manufacturer of ranitidine to beware of the potential for NDMA to form in the drug and/or in the human body."  *Id.* ¶ 1958.  Therefore, as early as February 2021, plaintiffs in another sprawling action had alleged that GSK concealed an internal study regarding the connection between NDMA and Zantac, and identified the author of the study by name.

Complaints that were filed in state courts in August 2021 and August 2022 similarly revealed the factual underpinnings of Plaintiffs' claims in this securities fraud action well before February 4, 2023.  *See* ECF Nos. 34-18, 34-19.[6]  In *Bayer v. Boehringer Ingelheim*

---

[5] Plaintiffs do not contest in their Opposition to Defendants' Requests for Judicial Notice that the Court can take judicial notice of this exhibit.  *See* ECF No. 38 at 7.  While the Court makes no determination as to whether the factual allegations in the MDL complaint are true, the Court can take judicial notice of the fact that the MDL complaint contained certain information. *McCullough*, 754 F. App'x at 110–11.

[6] The Court takes judicial notice of these state court complaints as well.  *See* ECF Nos. 34-18, 34-19; *see also Smith v. Lynn*, 809 F. App'x 115, 117 (3d Cir. 2020) ("[A] district court is permitted to review matters of public record"); *Orabi*, 738 F.3d at 537 n.1.  Plaintiffs do not contest in their

*Pharmaceuticals, Inc., et al.*, No. 2021L000915 (Ill. Cir. Ct. filed Aug. 2, 2021), plaintiffs alleged in their complaint that Zantac contains ranitidine, which "transforms over time and under particular conditions into high levels of [NDMA], a carcinogen that is as potent as it is dangerous," *see* ECF No. 34-18 ¶ 1, and that in the 1980s, GSK "knew but did not disclose that it had new evidence showing that NDMA was generated by ranitidine under certain conditions," *id.* ¶ 189; *see also id.* ¶ 184 (discussing GSK's "failure to disclose to the federal government information about the potential presence of NDMA in Zantac"); *id.* ¶ 185 (alleging that a GSK representative testified before "an FDA Advisory Committee in May 1982," but "failed to disclose its new evidence relating to ranitidine and the formation of a nitrosamine, specifically the formation of NDMA"); *id.* ¶ 186 ("GSK failed to submit or otherwise disclose its new evidence relating to ranitidine and the formation of NDMA."). In *Tormey v. Boehringer Ingelheim Pharmaceuticals, Inc., et al.*, No. N22C-08-207 VLM (Del Super. Ct. filed Aug. 20, 2022), plaintiffs asserted similar allegations in their complaint related to GSK's "fail[ure] to disclose its new evidence relating to ranitidine and the formation of . . . NDMA" in 1982. ECF No. 34-19 ¶ 252; *see also id.* ¶ 258 ("GSK conducted an internal study to assess the formation of NDMA and found that ranitidine, when exposed to sodium nitride, formed hundreds of thousands of nanograms of NDMA. The GSK study was never published or disclosed to the public."); *id.* ¶¶ 251, 253, 255–56. In essence, the products liability and personal injury plaintiffs thus asserted the same theory that Plaintiffs raise here: GSK conducted studies in the 1980s demonstrating that NDMA may form in Zantac under certain conditions, yet GSK concealed this information from the public for decades.

---

Opposition to Defendants' Requests for Judicial Notice that the Court can take judicial notice of these exhibits. *See* ECF No. 38 at 7.

In addition to publicly available complaints, expert reports that were filed in the MDL products liability action in August 2022 specifically discussed the Tanner Report. *See* ECF Nos. 34-20, 34-21.[7]  For example, Dr. Ronald Melnick indicated in a rebuttal expert report that "GSK (Tanner) . . . studies confirmed NDMA formation which should have alerted GSK to test for NDMA in ranitidine API and tablets."  ECF No. 34-21 at 7; *see also id.* at 11 (discussing "[t]he GSK study authored by Tanner (1982) [that] detected a signal for NDMA"); *id.* at 25, 27; ECF No. 34-20 at 5 ("The early Tanner study . . . [was] certainly an indication of concern that was not fully evaluated."); *id.* ("[T]o state GSK had no evidence for the potential of NDMA to form from ranitidine is simply false."); *id.* at 11 ("It did just that for ranitidine in the Tanner study, however, GSK ignored these NDMA results and did not test for NDMA in ranitidine until regulators forced GSK to do so in 2019.").

On December 6, 2022, the Southern District of Florida published a publicly available opinion that dealt with *Daubert* motions from the MDL proceeding and contained a detailed summary of the Tanner Study.  *See In re: Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1174 (S.D. Fla. 2022); *see also* ECF No. 25 ¶ 150 (discussing the *Daubert* opinion in the MDL proceeding); *cf. S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) ("[W]e may take judicial notice of another court's opinion").  The court explained that "[t]he Tanner study is an unpublished and non-peer reviewed study conducted internally by GSK to determine whether ranitidine hydrochloride and nitrite reacted in SGF to form NDMA." *In re: Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d at 1174 (citing R.J.N.

---

[7] The Court also takes judicial notice of expert reports filed on the public docket in the MDL action. *See* ECF Nos. 34-20, 34-21; *see also Smith*, 809 F. App'x at 117; *Orabi*, 738 F.3d at 537 n.1. Plaintiffs do not contest in their Opposition to Defendants' Requests for Judicial Notice that the Court can take judicial notice of these exhibits.  *See* ECF No. 38 at 7.

Tanner et al., Glaxo Grp. Rsch. Ltd. Div. of Biochem. Pharmacology, *The Determination of N-nitrosodimethylamine Formed by the Reaction of Ranitidine Hydrochloride with Sodium Nitrite* (Apr. 6, 1982) (unpublished manuscript)).  And the court went on to describe the study: "[r]esearchers ran two sets of incubation experiments" and "utilized gas chromatography-mass spectrometry to measure the amount of NDMA that formed in the mixtures." *Id.*  One of the sets of experiments was designed to "simulate[] the drug and nitrite concentrations anticipated in the human stomach after ingestion of a nitrite rich meal and 150 mg ranitidine." *Id.* (quoting the Tanner Study) (alteration in the original).  "[T]he researchers did not report the specific amount of NDMA found" because the "concentration was so small that it could not be quantified." *Id.* Therefore, the key findings of the Tanner Study were publicly available by early December 2022.

Furthermore, the Tanner Study itself was unsealed on the public docket in the MDL proceeding on December 30, 2022.  *See In re: Zantac (Ranitidine) Prods. Liab. Litig.*, No. 20-MD-02924, ECF No. 6164-7 at 374–84 (S.D. Fla. filed Dec. 30, 2022) (unsealed copy of the Tanner Study); *see also* ECF No. 25 ¶¶ 59 n.2, 97, 227.[8]  Given the "[i]nvestor interest" in the MDL products liability action, *id.* ¶ 140, reasonably diligent plaintiffs would have begun investigating the case and discovered the Tanner Study prior to February 4, 2023 and the February 15, 2023 Bloomberg Article.

In addition to court records, relevant facts were also revealed in news articles that were published before February 4, 2023.  *See, e.g.*, ECF Nos. 34-22, 34-23.[9]  For example, on October

---

[8] The Court takes judicial notice of the Tanner Study, which was incorporated by reference in the Amended Complaint.  *See, e.g.*, ECF No. 25 ¶¶ 59 n.2, 97, 227 (discussing Tanner Study); *see also City of Edinburgh Council*, 754 F.3d at 166.

[9] The Court also takes judicial notice of the news articles attached to Defendants' Motion (ECF Nos. 34-22, 34-23).  *See, e.g.*, *Acuna-Atalaya*, 765 F. App'x at 813 n.2.  Plaintiffs do not contest in their Opposition to Defendants' Requests for Judicial Notice that the Court can take judicial notice of these exhibits.  *See* ECF No. 38 at 7.

7, 2021, Reuters reported that the products liability plaintiffs "accused the drugmakers[, including GSK,] of engaging in a decades-long scheme to conceal the dangers and risks associated with Zantac use, despite research that linked ranitidine, the generic name of the drug, to a probable carcinogen, N-nitrosodimethylamine (NDMA)." ECF No. 34-22 at 3. On January 31, 2022, in connection with the products liability action, another legal news article reported that "GlaxoSmithKline LLC knew that its blockbuster heartburn drug Zantac (rantidine) could significantly increase users' risk of cancer but failed to inform consumers about the risk." ECF No. 34-23 at 3. "The Zantac class action lawsuits allege that GSK knew of the risks posed by ranitidine but engaged in a decades-long campaign to hide that risk from consumers, misleading them into believing that Zantac was safe to consume." *Id.* at 6.

In sum, multiple public records confirm that factual information about the Tanner Study and Defendants' alleged attempts to conceal their knowledge of the presence of NDMA in Zantac was discoverable months before February 4, 2023. While the "limitations period does not automatically begin to run when a plaintiff is merely put on 'inquiry notice' or when there are 'storm warnings,'" those terms are still "useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating." *McCullough*, 754 F. App'x at 112 (citation omitted); *see also Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 252 (3d Cir. 2001) (explaining that "storm warnings" may include "any financial, legal or other data that would alert a reasonable person to the probability that misleading statements . . . had been made" (citation omitted)). Here, "a reasonably diligent plaintiff would [have] undertake[n] an investigation based on '[t]he filing of related lawsuits,' [and] 'news articles and analyst's reports.'" *Pension Tr. Fund for Operating Eng'rs*, 730 F.3d at 277 (quoting *Benak ex rel. All. Premier Growth Fund*, 435 F.3d at 400, 403 n.20) (third alteration in original); *see also*

15

*DeBenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209, 218–19 (3d Cir. 2007) (finding that "news articles referred specifically to" the problematic practice at issue and "were sufficient storm warnings"); *McCullough*, 754 F. App'x at 112 (affirming dismissal of a time barred complaint where plaintiffs "did not dispute that the significant drop in stock value and the SEC filings put them on inquiry notice" and where "a reasonably diligent plaintiff conducting a timely investigation would have uncovered a strong inference of [the defendant's] intent to deceive"). Indeed, "investors are presumed to have read prospectuses, quarterly reports, and other information relating to their investments." *Mathews*, 260 F.3d at 252. In this case, there were ample "storm warnings" prior to February 4, 2023 that would have led reasonably diligent plaintiffs to discover the facts and elements giving rise to potential violations of the federal securities laws, such that those claims could be "adequately pled" with "sufficient information." *Pension Tr. Fund for Operating Engineers*, 730 F.3d at 275 (internal quotations and citation omitted); *see also McCullough*, 754 F. App'x at 111. Accordingly, Plaintiffs' action is barred by the two-year statute of limitations.

       1.   *Plaintiffs' Arguments that Their Exchange Act Claims Are Timely Are Unavailing*

In an attempt to fend off the statute of limitations, Plaintiffs raise a number of arguments in their Opposition to Defendants' Motion, none of which carry the day.

First, Plaintiffs contend that they "did not and could not have discovered the facts constituting Defendants' Section 10(b) violations, particularly the scienter element, until the Bloomberg Article was published on February 15, 2023." ECF No. 37 at 42 (citing ECF No. 25 ¶¶ 224–27). According to Plaintiffs, this article first revealed that "GSK's current management-level executives had been aware, since at least November 2019, of the Tanner Study and the fact

16

that GSK had for decades withheld it from the FDA." *Id.* at 42–43; *see also id.* at 45 ("The Bloomberg Article thus provided the critical context necessary to allege Defendants' scienter.").

But Plaintiffs make a glaring omission: the Bloomberg Article does not even mention the individual Defendants by name or title. *See* ECF 39-5. The "critical context" that Plaintiffs appear to be referencing is one sentence in the Bloomberg Article, which states that an unidentified "senior GSK executive wrote [to] colleagues" in November 2019 that there was an "urgent need" to figure out if the Tanner Study had been submitted to the FDA and EMA. *Id.* at 21. There is no indication in the Bloomberg Article as to whether that "executive" had any communications with the individual Defendants in this action or as to what that executive's title was at GSK. *Id.* Nor does the article indicate that the executive was "management-level." ECF No. 37 at 43. The Bloomberg Article is a red herring and does not support Plaintiffs' argument that the facts necessary to plead Defendants' scienter were not available prior to its publication.

To the contrary, as explained above, multiple court documents from the MDL proceeding and from other state court proceedings demonstrate that the products liability and personal injury plaintiffs previously alleged almost the exact same theory years before the filing of Plaintiffs' Amended Complaint—that is, that GSK allegedly engaged in a scheme to conceal its knowledge of internal studies and of Zantac's connection to NDMA from the public and the FDA for decades. *See, e.g.*, ECF No. 34-17 ¶ 351 (alleging that GSK "was involved in covering up scientific data"); *id.* ¶¶ 356, 505; ECF No. 34-18 ¶¶ 184–86, 189; ECF No. 34-19 ¶¶ 252–53, 258. In short, the facts underlying the element of scienter were discoverable by a reasonably diligent plaintiff prior to the publication of the Bloomberg Article on February 15, 2023.

In addition, as to the individual Defendants, Plaintiffs' argument that the Bloomberg Article "provided the critical context necessary to allege Defendants' scienter," *see* ECF No. 37 at 45,

simply does not square with the allegations in the Amended Complaint as to those Defendants or Plaintiffs' purported theory of scienter. *See id.* at 30–32. Plaintiffs alleged that Defendant Mackay was "the GSK executive responsible for overseeing the Zantac personal injury litigation and related regulatory investigations," and that he "regularly reported . . . the status of the Zantac litigation" to Defendant Walmsley. ECF No. 25 ¶ 31; *see also id.* ¶ 163 ("Defendants Walmsley and Mackay oversaw GSK's defense of the Zantac litigation and GSK's disclosures regarding it"); *id.* ¶ 164 (alleging that Walmsley and Mackay had "close involvement" in the Zantac litigation). In their Opposition brief, Plaintiffs rely on these types of allegations to claim that Defendants Mackay and Walmsley were aware of the Tanner Study and its "full import" for years, given "[t]heir roles overseeing GSK's regulatory response." ECF No. 37 at 31. As Defendants correctly point out, this theory has nothing to do with the Bloomberg Article. *See* ECF No. 39 at 16.

Second, Plaintiffs argue that because Defendants denied any knowledge of the Tanner Study and the "link between Zantac and NDMA," those denials "dissipated any supposed 'storm warnings' of their wrongdoing" and "prevent[ed] Plaintiffs from discovering the facts." ECF No. 37 at 44 (citation omitted). Plaintiffs' argument is untenable. Plaintiffs' own allegations indicate that investors and the market were allegedly aware of—and had a strong interest in—GSK's exposure from the personal injury and products liability action at least as early as August 2022. *See* ECF No. 25 ¶¶ 14, 138–45. And plenty of other public court documents specifically included allegations that Defendants had purportedly engaged in a scheme to conceal their knowledge of the formation of NDMA in Zantac. *See, e.g.*, ECF No. 34-17 ¶¶ 351, 356, 505; ECF No. 34-18 ¶¶ 184–86, 189; ECF No. 34-19 ¶¶ 252–53, 258. As the Third Circuit has explained, when allegations in an earlier-filed complaint indicate that a defendant cannot "be trusted," that "undermine[s] [the defendant's] prior reassurances." *Pension Tr. Fund for Operating Eng'rs*, 730 F.3d at 278. For

18

example, in *Pension Trust Fund for Operating Engineers*, a complaint that was filed in California state court specifically alleged that "UBS Securities drafted and disseminated the offering documents for the Certificates, and issued false and misleading Prospectuses in connection therewith." *Id.* (internal quotations and citations omitted). A reasonably diligent plaintiff "would have noticed that complaint," and the allegations within it had plainly "undermined UBS's prior assurances about the Certificates." *Id.* Accordingly, the Third Circuit found that a reasonably diligent plaintiff would have begun to investigate by the date that state court complaint was filed. *Id.*

The same is true here: multiple earlier-filed personal injury and products liability complaints, which covered claims for "tens of thousands" of patients, *see* ECF No. 25 ¶¶ 73, 92, alleged that GSK concealed its knowledge of the presence of NDMA in Zantac. *See, e.g.*, ECF No. 34-17 ¶¶ 351, 356, 505; ECF No. 34-18 ¶¶ 184–86, 189; ECF No. 34-19 ¶¶ 252–53, 258. Therefore, Plaintiffs cannot "simply rely on reassurances by management particularly when there are direct contradictions between the [D]efendants' representations and the other materials available to [P]laintiffs regarding the possibility of fraud." *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 418 (D.N.J. 2005), *aff'd*, 500 F.3d 189 (3d Cir. 2007). In other words, Plaintiffs could no longer depend on GSK's denials or reassurances to delay the running of the limitations clock, given the existence of other public records pointing to alleged deception. *McCullough v. Advest, Inc.*, No. 17-cv-407, 2017 WL 3675787, at *4 (W.D. Pa. Aug. 25, 2017) (finding that "Plaintiffs were on 'inquiry notice' of numerous 'storm warnings'" and "Plaintiffs could have (and should have) investigated the veracity of Defendant['s] . . . assurances that TKOI had entered into various contracts with the United States government and GE"); *Barbee v. Amira Nature Foods, Ltd.*, No. 21-cv-12894, 2023 WL 4627744, at *7 n.7 (D.N.J. July 19, 2023)

("Regardless of [plaintiff's] assertion that he was later put 'at ease,' once triggered, the bell of inquiry notice cannot be unrung." (citation omitted)).  At bottom, "a reasonably diligent plaintiff conducting a timely investigation would have uncovered a strong inference of [Defendants'] intent to deceive well" in advance of February 4, 2023.  *McCullough*, 754 F. App'x at 112.

Third, Plaintiffs contend that the August 2022 corrective disclosures did not contain "facts bearing upon any Defendant's scienter," so those disclosures did not "trigger the statute of limitations."  ECF No. 37 at 44.  Even if the August 2022 corrective disclosures did not specifically discuss facts demonstrating Defendants' scienter, at the very least, the disclosures constituted "storm warnings" that would have prompted reasonably diligent plaintiffs to investigate the MDL products liability and personal injury litigation and, in turn, to discover potential claims for securities fraud.  *Merck & Co., Inc.*, 559 U.S. at 653.  The August 2022 disclosures, in combination with other public records, revealed the factual basis for Plaintiffs' claims months before February 4, 2023.

Fourth, Plaintiffs concede that the "Tanner Study first became public, at the earliest, on December 30, 2022," ECF No. 25 ¶ 59 n.2, but argue that because the Tanner Study was unsealed on the same day as "more than 50,000 other pages of previously confidential MDL documents," Plaintiffs could not have realistically located and reviewed it "within 24 hours."  ECF No. 37 at 45; *see also* ECF No. 25 ¶ 227.  But it is no excuse to argue that uncovering fraud is challenging. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1327 (3d Cir. 2002) ("Appellants cannot bolster their cause by arguing the difficulty of discovering the alleged fraud."); *Mathews*, 260 F.3d at 252 n.16 (expressing "reluctan[ce] to excuse . . . lack of inquiry" and investigation into potential claims).  As explained above, numerous public records had previously identified and/or described the Tanner Study, and had discussed GSK's purported scheme to conceal the connection between

Zantac and NDMA.  Moreover, given the specific facts that were already publicly available by December 30, 2022, there is "a smaller temporal disparity between the start of the investigation and the discovery of the facts constituting the violation." *Pension Tr. Fund for Operating Eng'rs*, 730 F.3d at 276.  The Court finds it difficult to believe that it would have taken a reasonably diligent plaintiff over one month to locate the Tanner Study, especially when there was strong "[i]nvestor interest" in the Zantac litigation, *see* ECF No. 25 ¶ 140, and that such a plaintiff would have had no awareness of the Tanner Study until the Bloomberg Article.  *See* ECF No. 39-5 at 7; *see also Pension Tr. Fund for Operating Eng'rs*, 730 F.3d at 278 (finding that a reasonably diligent plaintiff would have begun to investigate the same day that an amended class action complaint was filed).

Fifth, Plaintiffs contend that news articles and court records from the MDL proceeding did not adequately describe the Tanner Study in detail or provide "facts sufficient to plead GSK management's knowledge . . . of the Tanner Study and its liability implications."  ECF No. 37 at 46–47.  The Court disagrees.  As explained above, the products liability complaints were replete with factual allegations that GSK purportedly concealed the results of internal studies that it conducted on the formation of NDMA in Zantac, and the Southern District of Florida summarized the key findings of the Tanner Study in a thorough *Daubert* opinion.  Indeed, the Southern District of Florida's December 6, 2022 opinion contains more detail on the Tanner Study than the Bloomberg Article.  *Compare In re: Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d at 1174, *with* ECF No. 39-5 at 7.  In any event, "Plaintiffs cannot avoid the time bar simply by claiming they lacked knowledge 'of the details or "narrow aspects" of the alleged fraud.'" *Benak ex rel. All. Premier Growth Fund*, 435 F.3d at 400 (quoting *In re NAHC, Inc. Sec. Litig.*, 306 F.3d at 1326).  The facts giving rise to the elements of the claims that Plaintiffs attempt to pursue here

were publicly available for months in advance of when they sued, and a reasonably diligent plaintiff would have discovered them before the limitations period ran.

Accordingly, the Court holds that Plaintiffs' action is time barred because reasonably diligent plaintiffs would have discovered the facts constituting Plaintiffs' securities fraud claims prior to February 4, 2023, and would have had sufficient information to adequately plead their claims in a complaint. The Court will dismiss Plaintiffs' Amended Complaint with prejudice because any attempt to cure the pleading deficiency would be futile. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d at 1332 (finding that amendment is futile where a claim is "time-barred under the statute of limitations").

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion (ECF No. 34) is granted, and Plaintiffs' Amended Complaint (ECF No. 25) is dismissed with prejudice. An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney

**CHAD F. KENNEY, JUDGE**